UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X

DEMOS PARNEROS,                                    No. 18-Civ.-

            Plaintiff,                              <u>COMPLAINT</u>

- against -

BARNES & NOBLE, INC.,

            Defendant.
----------------------------------------X

Plaintiff Demos Parneros ("Parneros" or "plaintiff"), by his attorneys, Vladeck, Raskin & Clark, P.C., complains of defendant Barnes & Noble, Inc. ("B&N," "defendant" or the "Company"), as follows:

<u>NATURE OF CLAIMS</u>

1. Demos Parneros, is a well-respected retail executive recognized as a high integrity leader. He agreed to join B&N as Chief Operating Officer ("COO") and then Chief Executive Officer ("CEO") to try to turn around the fortunes of the retail book store chain. B&N is a financially troubled business led by Leonard Riggio ("Riggio"), a volatile founder who refuses to relinquish control and thus impedes B&N management's ability to effect meaningful change. During Parneros's short tenure, he laid the groundwork for better performance, including an expense reduction plan, a new store prototype, and a pipeline of new sales categories. Parneros was consistently praised by Riggio, the Board, investors, and publishers. Nevertheless, in Riggio's effort to maintain control of B&N, he engineered Parneros's firing without cause and issued an announcement that falsely and irrevocably damaged the reputation Parneros had worked for thirty-five years to build.

2. In early June, a deal to sell B&N fell through for reasons having nothing to do with Parneros. Riggio turned against Parneros and fabricated reasons to fire plaintiff. On July 2, 2018, B&N dismissed Parneros without warning or justification, and refused to pay the severance due under his contract, in contrast to previous CEOs, who were paid millions of dollars in severance. B&N then issued a press release that falsely stated that Parneros had violated company policy and did so in language and in a manner that defendant knew full well was false but would be read as reporting that Parneros had engaged in serious sexual misconduct.

3. Parneros had not violated company policies, and always conducted himself in a professional manner; given Riggio's erratic and unprofessional behavior, the false allegations of cause to fire Parneros rang especially hollow. B&N also announced that Riggio would continue to play a leadership role with the company and that until the next CEO was hired, the CEO role would be filled by a team of three leaders, including one executive that Riggio and several Board members had advocated firing for incompetence.

4. This is an action for breach of contract and defamation.

## JURISDICTION AND VENUE

5. Jurisdiction of this Court is proper under 28 U.S.C. §1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the unlawful practices complained of herein occurred within the Southern District of New York.

## PARTIES

7. Parneros is a citizen of Massachusetts. He worked for B&N from November 2016 until July 2, 2018.

8. B&N is incorporated in Delaware and its principal place of business is New York, New York.

FACTUAL ALLEGATIONS

Background

9. Parneros has had over 35 years of experience in all aspects of retail management, including operations, human resources, merchandising, e-commerce, marketing, and real estate.

10. Parneros earned a B.S. in management from New York University in 1983. In 2010 he graduated from the Advanced Management Program at Harvard Business School.

11. Prior to joining B&N, Parneros worked for Staples for 28 years. He worked his way up from Store Manager to President of North American Stores and Online, managing a business valued at over $11 billion with over 50,000 employees and 1,900 stores. Before his career with Staples, Parneros had worked for Macy's for four years.

12. B&N is the largest retail bookseller in the U.S. with approximately 635 stores and approximately 20,000 employees.

13. In 1971, Riggio purchased a single bookstore called Barnes & Noble. Riggio acquired other bookstore chains in the 1970 and 1980s. In 1993, Riggio took B&N public and became the CEO. Riggio is considered the founder of the current-day B&N.

14. In 2002, Riggio stepped down as CEO, and became Executive Chair.

15. Riggio has remained the largest shareholder of B&N, currently owning approximately 20% of the Company.

16. The first CEO after Riggio stepped down was his brother Steven, who remained CEO until 2010.

3

### B&N in Disarray

17. B&N has been in turmoil for several years, with falling revenue, declining profits, store closings, significant turnover of staff and management, lay-offs, and the failure of its Nook e-book reader. All of these factors resulted in a much lower stock price and valuation.

18. In the last five years, B&N has had four CEOs. William Lynch departed in mid-2013. Then-Chief Financial Officer ("CFO") Michael Huseby ("Huseby") was promoted to CEO in early 2014. In early 2015, B&N spun off its college textbook division, and Huseby was moved from CEO of B&N to Chair of the spin-off. In July 2015, Ronald Boire ("Boire") was hired as CEO. B&N fired Boire in July 2016.

19. Although he announced in April 2016 that he was stepping down as Executive Chair in September 2016, Riggio has remained as Executive Chair. After B&N fired Boire, Riggio acted as CEO until Parneros assumed the position in May 2017.

### B&N Hires Parneros

20. In August 2016, Riggio approached Parneros about becoming B&N's CEO. Riggio suggested that Parneros join defendant to occupy the COO position for six months, "flying under the radar," before assuming the CEO role. During that time, Riggio said he wanted to supervise directly several members of the executive team (Chief Merchant, Chief Digital Officer, and President of Sterling, a B&N subsidiary) in order to "fix them" before Parneros became CEO. In addition, Riggio worked closely with the CFO, General Counsel, and Senior Vice President ("VP") of Corporate Communications.

21. Riggio and Parneros agreed that B&N was in a turnaround situation due to its weak management team, lack of strategic direction, and poor financial performance over the prior five years.

4

22. Parneros accepted the position and joined B&N on November 21, 2016 as COO, reporting to Riggio.

23. As of May 1, 2017, Parneros was promoted to CEO of B&N, reporting to the Board. With the promotion Parneros became a member of the Board.

24. Parneros had an employment agreement for his COO position with B&N dated November 17, 2016. The parties entered into an amendment to the agreement on April 27, 2017 that reflected his promotion to CEO.

25. The employment agreement, as amended, provided for salary, bonus targeted at 150% of salary, equity, and various benefits.

26. In August 2017, Riggio told Parneros that he and the Board had decided to give Parneros additional compensation of $1.4 million as recognition for his strong performance. The increase was to be paid in stock whose value would be based on the performance of the Company. Despite initiating this proposal, B&N failed to follow through on its promise.

27. Parneros's employment agreement, as amended, states that if B&N terminates his employment without cause as defined in the agreement, B&N will pay him two times the sum of his base salary, the bonus based on prior average bonuses, and the cash value of a year of benefits. In addition, Parneros's equity would continue to vest.

Parneros Succeeds Despite Obstacles

28. When Parneros joined B&N, he heard from many employees that the firing of the prior CEO, Boire, had been done without valid reasons and that Riggio had manufactured a basis to fire him.

29. When Parneros became CEO, Riggio remained reluctant to transition the CEO responsibilities to him.

30. When Parneros started at B&N, there were a significant number of management jobs open, many due to resignations that followed the firing of Boire and other executives and to B&N's inability to attract outside talent.

31. Parneros hired 15 new executives. Riggio and the Board were very pleased with the hires. Some of the pivotal positions that Parneros filled were Chief Merchant, Head of Stores, Head of Real Estate, Interim Chief Marketing Officer, and Vice President Creative Director.

32. Parneros made an effort to repair and build B&N's relationships with publishers, who were unhappy with past treatment by the Company. Parneros was successful in those efforts.

33. Parneros pushed to modernize B&N in a variety of areas, including customer service, pricing, and online experience. Riggio was resistant and frequently cited to how poorly his brother and other CEOs had handled things when they were CEO. Riggio frequently referenced how the prior CEOs did not listen to him and did not execute his plan and vision.

34. Parneros was concerned about the lack of succession planning and diversity efforts at B&N. When Parneros raised those issues, Riggio was dismissive, saying B&N did not need to waste time on them. Parneros nonetheless initiated a succession plan process and met with the Vice President of Human Resources ("HR"), Michelle Smith ("Smith"), about establishing diversity as a priority in B&N recruiting.

35. Parneros also undertook cost-cutting initiatives and drafted a five-year plan. When Parneros shared the five-year plan with the Board in early 2018, the Board was very pleased as the plan showed a clear and realistic path to improving B&N's profitability by over $100 million.

36. Parneros also met with several of B&N's top investors to discuss the five-year plan. One prospective investor was particularly enthusiastic about the plan and acquired a significant amount of B&N stock after the meeting.

37. Despite Riggio's resistance to Parneros's initiatives, Riggio praised Parneros's performance and several times said that he wished Parneros had been hired years earlier.

38. In November 2017, activist investor Sandell Management Corporation publicly announced an offer to purchase B&N. B&N refused the offer.

39. In spring 2018, a book retailer made an offer to purchase B&N. B&N decided to accept this offer.

40. In or about early June 2018, after it conducted its due diligence, the book retailer withdrew its offer. There was no suggestion that the failure of the deal was in any respect Parneros's fault.

41. Riggio was extremely upset about the withdrawal of the book retailer's offer. He said that he felt that he no longer had a graceful exit from the company. Riggio made many statements about how B&N could not survive without his being more involved. He said that he had to run the company and could not be a spectator. Riggio routinely repeated that he had to be "all in" or "all out" and that B&N could not survive without him as the founder making the decisions.

42. After the deal with the book retailer fell through, Riggio became hostile to Parneros. He stopped returning Parneros's telephone calls or texts. Riggio continued to meet with many members of management and regularly gave the other executives direction without discussing it with Parneros.

955588 v2

43. In late June 2018, Parneros led the fourth quarter earnings call, in which he outlined his plans for improving B&N's performance. His discussion on that call was favorably received by investors and analysts.

## B&N Suddenly Fires Parneros and Destroys His Reputation

44. On July 2, 2018, Parneros had a lunch meeting scheduled with Riggio. Riggio arrived with Scott Barshay ("Barshay"), an attorney from Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss"), who handled corporate deals for B&N. Riggio read from a document that Parneros was being fired for cause for violating the sexual harassment policy and cited his interactions with an Executive Assistant and purported mistreatment of Allen Lindstrom ("Lindstrom"), the CFO. Riggio said there would be no severance. Riggio added, "You better not speak to the press about this," said that Barshay would answer any questions, and walked out.

45. Parneros told Barshay that he had done nothing wrong and that the interaction with the Executive Assistant was simply an innocuous, less than five-minute conversation about vacationing in Quebec. Parneros advised Barshay that Riggio had confirmed weeks earlier that any issue with that Executive Assistant had been positively resolved. Parneros also said that he had treated Lindstrom appropriately given that Lindstrom was performing poorly, as Riggio and the Board had previously agreed.

46. Barshay told Parneros that B&N would announce his firing after the market closed and would state the discharge was for a violation of company policy. Parneros objected that such a statement would be false, as he had violated no policies. Parneros told Barshay that the HR Department had not been involved and had been purposely kept out of any investigation of purported wrongdoing. Parneros also told Barshay that no one had spoken with him, given him the details of the purported violations, or asked for his statements about any alleged wrongdoing.

47. After the firing meeting, Parneros reached out to the Lead Director, Patricia Higgins, and left her a voice mail message that was not returned; he also called Paul Guenther ("Guenther"), another Board member. Parneros told Guenther that the allegations against him were not properly investigated. Guenther said that he knew it was a terrible thing but that he could not say anything else.

48. On July 3, 2018, B&N issued a press release stating that it had fired Parneros for "violations of the Company's policies." It stated that action was taken by the Board, as advised by Paul Weiss. The statement specified that the firing was "not due to any disagreement with the Company regarding its financial reporting, polices or practices or any potential fraud relating thereto," and that Parneros would not be paid any severance. The press release also announced his removal from the Board. The announcement stated that while a search had begun for a new CEO, the CEO duties would be shared by a leadership group of Lindstrom, the Chief Merchandising Officer, and the VP of Stores, and that Riggio would remain Executive Chairman and would be involved in management.

49. B&N has refused to pay Parneros the severance that is due him, which is over $4 million in cash, plus equity.

50. The B&N press release is false. The press release and the way in which Parneros was fired have caused serious damage to his reputation.

51. Press reports and comments on the internet stated that Parneros's departure was sudden, that he was accused of violating company policies that B&N went to pains to state were not financial, and that B&N publicly announced he would get no severance when it was publicly known that Huseby and Boire had been paid millions in severance. Multiple articles connected Parneros's firing to allegations of sexual harassment highlighted by the Me-Too

9

movement or to executives at other companies who were fired for serious sexual misconduct. Numerous writers on the internet expressed the conclusion that Parneros must have engaged in serious sexual harassment. For example:

  a. An article on *Bloomberg*, after describing Parneros's firing, listed a number of senior executives fired recently for either sexual harassment or an affair with a subordinate.

  b. A story in the *Washington Post* on how much information must be disclosed by a company when a CEO is asked to leave, compared Parneros's situation to one CEO fired for having an affair with a subordinate and another accused of sexual harassment.

  c. A website for book-lovers wrote, "But seriously, if advice from lawyers was involved, and it wasn't something involving finance or fraud, it could had have been some impending scandal with the potential to give B&N a huge black eye if it came out while Parneros was still in the driver's seat. And if this is the sort of thing that could take Parneros from zero to fired in *less than a week*, it must be pretty darned serious. Sexual harassment, perhaps?"

  d. After another website posted a story from CNBC about B&N firing Parneros, comments from readers included: "Reading between the lines, my money's on it being for sexual harassment," "Yeah, my money's on sexual harassment or even assault," "With [the lack of severance], plus the involvement of lawyers, and the close-mouthed 'company policy' bit . . . this has to be seriously reputation-besmirching," "It's obviously an attempt at damage control in the face of pending lawsuit or lawsuits plural," and "Harassment or insider trading, them's my guesses."

e.  An article in Forbes states that while the circumstances of Parneros's firing were "clouded in HR-speak," "clearly somebody did something wrong."

52.  A headhunter with whom Parneros spoke after his dismissal told him that he was "unhirable." Another search firm executive told him that his career was "essentially over" given the announcement, and that even if Parneros were to get some kind of employment at some point, the work would not be anywhere near his prior level or compensation. In contrast, when Parneros left Staples, over 20 headhunters and companies reached out to him to try to recruit him.

53.  Parneros had been a board member of Key Bank since January 2014. Pursuant to Key Bank's policy, he was forced to resign from the Board due to his dismissal from B&N. Losing the board seat caused Parneros humiliation, a significant income loss, and a severe limitation of his ability to serve on a public board in the future.

54.  On May 19, 2018, Parneros gave the commencement speech at Endicott College, which awarded him an honorary degree. Upon information and belief, after the press reports of B&N firing Parneros, Endicott College removed references to Parneros as having been a speaker and honoree from its website.

55.  B&N knows that its public statements that Parneros violated company policies are false. The specific accusations made when he was fired are also false. These defamatory statements have caused Parneros significant injury.

Parneros Engaged In No Improper Conduct.

56.  In late May or early June 2018, Riggio called Parneros into a meeting. Riggio said that an Executive Assistant had complained about comments Parneros had made. Riggio said that the Executive Assistant had spoken to Parneros in his office about her recent vacation in Canada. Parneros allegedly described a hotel in Quebec where he had stayed with his

11

wife, supposedly told the Executive Assistance that the hotel was the kind of place where "you would put out," and showed the Executive Assistant pictures of the hotel on his computer. Riggio said the Executive Assistant had also complained about another occasion when she and Parneros were talking about which of them was taller, and Parneros allegedly stood back to back with her.

57. Parneros told Riggio that these allegations were wrong and not what had happened on either occasion.

58. Parneros told Riggio that one morning, on or about May 22, 2018, the Executive Assistant asked Parneros if he wanted a cup of coffee; he said yes. When she brought him his coffee, she described her recent vacation in Canada. Parneros mentioned that he had been to Quebec. The Executive Assistant asked where he had stayed and Parneros responded that he and his wife had stayed at a hotel that is known as a charming and romantic hotel in Quebec. Parneros briefly showed her the hotel's website.

59. Parneros told Riggio that he had not said anything about that hotel being the "kind of place" where "you put out," and that such a phrase was not an expression he ever used. Riggio said that perhaps those were not the words the Executive Assistant had purportedly repeated. As for the other alleged incident, Parneros explained to Riggio that one day the Executive Assistant said she thought she was as tall as Parneros and he stood next to her, side by side, for them to compare heights but that there was no improper touching or any other inappropriate conduct.

60. Riggio also told Parneros that the Executive Assistant had complained about the alleged incidents to Lindstrom, and insisted that he not bring that information to Smith, the head of HR. Lindstrom and the Executive Assistant told B&N General Counsel Brad Feuer ("Feuer"), who is a friend of Lindstrom. Lindstrom and Feuer then advised Mary Ellen Keating (Keating"), Senior VP of Communications, who told Riggio about the Executive Assistant's contentions

12

61. In his meeting with Riggio, Parneros said that his conversation with the Executive Assistant had been a causal discussion about vacations; he had not made any advances and had not used any inappropriate language. He explained that the only possible touching was standing next to her, shoulder to shoulder, to compare heights. Riggio told Parneros that based on what the Executive Assistant had reported, Riggio did not see the incidents as "too serious." Riggio said the Executive Assistant was not "looking for anything" and just felt uncomfortable. Parneros asked what he should do and said he would like to apologize. Riggio said that Parneros should meet with her and apologize. Riggio told him to bring Keating with him.

62. The following Tuesday, Parneros met with the Executive Assistant in Keating's office. He apologized if anything he said had made her uncomfortable. The Executive Assistant accepted his apology and said she felt very good about the conversation. She said she did not want to make a big deal about the situation. Parneros asked the Executive Assistant if she needed anything else. She said no. Keating asked her if she wanted to transfer to a different office or different job. The Executive Assistant said no.

63. Later in the same day, Keating told Parneros that the meeting had gone very well and that Parneros had handled it perfectly. Keating said Parneros had been clear and sincere and that the Executive Assistant had felt good about the meeting. Keating said the Executive Assistant just wanted to get back to work and did not want to create problems for anyone.

64. That same day, Riggio told Parneros that he had done a "great job" in the meeting with Keating and the Executive Assistant. Riggio said that he considered this to be a closed matter and that because it had been reviewed at a high level by him, there was no need to bring the Executive Assistant issue to the attention of the Board.

13

65. According to what Parneros was told, at no time did anyone inform Smith or anyone else in HR about the complaint by the Executive Assistant or its resolution.

### B&N Falsely Accused Plaintiff of Mistreating the CFO

66. The allegation that Parneros mistreated Lindstrom is also false.

67. Lindstrom was a poor performer. Parneros had counseled him numerous times about his inability to meet deadlines, his lack of communication with Parneros, his disrespect toward Parneros, and his poor execution on the budget and expense savings.

68. Parneros was not alone in being dissatisfied with Lindstrom's performance as Riggio and board members repeatedly expressed their concerns.

69. Consistent with Riggio's direction, Parneros repeatedly urged Lindstrom to improve his performance. Parneros documented several conversations with Lindstrom about his poor performance and unprofessional attitude in the workplace. Parneros gave Lindstrom a mid-year performance review to discuss his concerns. Lindstrom said, "You know I have to respond to this in writing." Several days later Lindstrom presented a memo in which he took little responsibility for his actions. At a later date, still seeing very little progress, Parneros documented and shared with HR a recap of Lindstrom's further performance problems. Lindstrom wrote a self-appraisal in late June 2018 that he used to make baseless claims against Parneros. Parneros informed Riggio who responded that he was not surprised, that Lindstrom was trying "to cover his ass," and that Lindstrom had attacked Parneros because Lindstrom knew he was "in the hot seat."

70. At least ten times over the last year, Riggio disparaged Lindstrom, saying that he was not a "real" CFO and Riggio never should have placed Lindstrom in that role. Riggio described Lindstrom as an accountant, a "bean counter" who was barely good at that. Riggio complained that Lindstrom was not strategic and was lazy. Riggio also said repeatedly that

14

Lindstrom was "weak," that he had "no balls," and that "his wife wears the pants." Riggio frequently complained to Parneros about Lindstrom's poor work ethic and lack of urgency.

71. Riggio often berated Lindstrom in meetings, telling him that he was ineffective and did not know the business. Riggio told Lindstrom he had no sense of urgency.

72. Parneros had told Riggio that he did not think Lindstrom was the right person for the CFO job because he did not have the proper qualifications, did not have a sense of urgency, was not respected by his peers, and frequently sought to undermine Parneros. Riggio told Parneros to "get rid of him," but said they could not do so until the deal with the book retailer was completed.

73. During the last two meetings, the Board was also involved in discussions about firing Lindstrom. Three Board members advocated for dismissing Lindstrom once the deal with the book retailer was completed. Scott Cowen, a member of the Board, suggested to Parneros that Board member Al Ferrara step into the CFO role on an interim basis. Board members George Campbell, Head of Compensation Committee, and Guenther, Head of Audit Committee, made clear that Lindstrom was ineffective, a poor performer, undermined the CEO's direction, and should be replaced as soon as a decision on the deal with the book retailer was reached.

### Riggio Set an Unprofessional Tone at B&N

74. The false accusations of improper conduct by Parneros were made against a backdrop of a company where Riggio frequently engaged in inappropriate and unprofessional conduct. Given the abusive corporate culture that Riggio created and promoted, the bogus nature of the allegations of cause for firing Parneros is even more obvious.

75. For the first six months of Parneros's employment, Riggio repeatedly disparaged Boire, the former CEO. In meetings, Riggio referred to the CEO who preceded

Parneros with terms such as "SOB," "creep," "motherfucker," "slime bag," and "bad guy." At a store manager conference, in front of over a thousand people, Riggio not only blamed that CEO for declining sales, but called him a "bad person."

76. Riggio often criticized a former Chief Merchant. Riggio described her as "flawed" and potentially "schizophrenic." Riggio credited her hard work, but commented in front of the other employees that she was "unstable" and had "serious personality problems." In executive meetings, he routinely referred in to her as a "sick puppy."

77. Riggio routinely described the President of a B&N division as a "head case" who was very "selfish." Riggio described her as "dead wood," and said that "dead wood doesn't make a good fire."

78. In numerous meetings, Riggio attacked a VP of Merchandising who had been given additional responsibility. Riggio described her as unqualified, having no taste, being lazy, and having a big ego. In one meeting with Parneros and Lindstrom, Riggio described that VP as a "fat pig" and asked, "How can someone who looks like that have any taste? Just look at her." Parneros tried to redirect the conversation toward business needs and away from personal attacks and said that if Riggio did not think she was the right person for the position, they should talk about a change. Riggio responded, "Yeah, get her out of here. I don't want to ever talk to her again or see her face around here." Parneros reminded Riggio that there were a large number of open positions and that defendant needed to hire a lot of new talent. Riggio said he knew that, but she should not stay. Referring to such personal attacks, Lindstrom told Parneros to "get used to that; that's Len [Riggio]."

955588 v2

79. Riggio repeatedly asked Parneros why a male senior executive spoke so often about his male spouse. On one occasion, Riggio asked the executive if he called his spouse his wife. The executive responded, "No, he is my husband."

80. Riggio frequently berated and mocked a B&N e-commerce executive. Riggio described him as a "total fraud" and often referred to him as "three-dollar bill." Riggio claimed the executive was never around and had no real responsibility. Riggio also described the executive as clinically ill and incapable of telling the truth. Riggio recommended replacing the executive with a VP who had no knowledge of the field.

81. Parneros objected to moving the VP because of the VP's unprofessional conduct. The VP was a long-term employee who ran a poorly performing business. He had a reputation for a hot temper, bad behavior, and flouting company rules. The VP often told people to "go fuck" themselves. He often hung up the telephone on business callers. Parneros did not witness such conduct first-hand, but when he heard about the VP's reputation, he asked Smith if HR had disciplined or coached him. Smith responded that Riggio liked the VP. When Parneros discussed the VP's issues with Riggio, Riggio defended the VP, and said, "Maybe those people deserved to be treated like that."

82. Riggio frequently said that he had no use for Smith and that she was there simply to serve a clerical function.

## FIRST CAUSE OF ACTION

### Breach of Contract

83. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 82 of the Complaint.

84. The employment contract between defendant and plaintiff obligates B&N to pay him specified severance if B&N terminates his employment without cause.

85. Defendant did not have cause to terminate plaintiff's employment.

86. Defendant has not paid plaintiff the severance that it owed to him under the employment contract.

## SECOND CAUSE OF ACTION

### Defamation

87. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 86 of the Complaint.

88. Defendant defamed plaintiff by libel per se by intentionally making false statements about plaintiff and making statements suggesting that plaintiff had engaged in serious misconduct.

89. Defendant also defamed plaintiff by libel, causing damage to plaintiff's reputation and costing plaintiff employment opportunities.

90. Plaintiff has suffered and will continue to suffer compensable damage, including but not limited to the loss of income and benefits, as well as damage to his reputation and emotional distress, unless and until this Court grants relief.

91. Defendant engaged in this conduct with malice or reckless disregard for the truth of its statements.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that the Court:

a. declare the acts and practices complained of herein to be violations of New York common law.

18

955588 v2

b. enjoin and permanently restrain these violations of New York common law;

c. direct defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful actions are eliminated and do not continue to affect plaintiff's employment opportunities;

d. award plaintiff all amounts owed as severance under the employment agreement;

e. award plaintiff damages to make him whole for all earnings he would have received but for defendant's conduct, including, but not limited to, wages, bonuses, equity, pension and retirement, health care coverage and other lost benefits;

f. award plaintiff compensatory damages for mental anguish, emotional distress, humiliation, and damage to reputation;

g. award plaintiff an additional amount as punitive damages;

j. award pre-judgment interest;

k. award plaintiff such additional relief as the Court may deem just and proper.

Dated: New York, New York
August 28 , 2018

VLADECK, RASKIN & CLARK, P.C.

By: _____

Debra L. Raskin
Anne L. Clark
Attorneys for Plaintiff
565 Fifth Avenue, 9th Floor
New York, New York 10017
(212) 403-7300

955588 v2