UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DEMOS PARNEROS,

        Plaintiff and
        Counterclaim Defendant,

        v.

BARNES & NOBLE, INC.,

        Defendant and
        Counterclaim Plaintiff.

No. 1:18-cv-07834 (JGK)

**DEFENDANT'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS**

---

        Barnes & Noble, Inc. ("Barnes & Noble" or the "Company"), by its attorneys Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss"), hereby submits its Answer and Affirmative Defenses to the Amended Complaint filed by Demos Parneros ("Parneros" or "Plaintiff"), dated October 5, 2018, along with its Counterclaims as follows.

## INTRODUCTION

        In the first paragraph of the Amended Complaint, Parneros, the former Chief Executive Officer ("CEO") of Barnes & Noble, describes himself as a "high integrity leader" who was fired by Defendant without cause.  In truth, as detailed in paragraphs 102-107 and 116-144 of the Counterclaims below, during his tenure as CEO, Parneros sexually harassed a female employee, bullied and belittled subordinates, and undermined a potential change in control transaction in a disloyal attempt to put his own self-interest in front of that of Barnes & Noble and its shareholders.

        First,  the sexual harassment:  As set forth in paragraphs 103 and 121-122 below, on two separate occasions, Parneros inappropriately touched a female subordinate and, during

the second incident, he made an advance and used sexual language, making her feel uncomfortable and uneasy in his presence.

Second, he mistreated and bullied members of the executive team, including one of his direct reports, an officer of the Company.  As described in paragraphs 104 and 119-120 of the Counterclaims below, Parneros frequently berated and humiliated this officer in front of other colleagues and senior executives and, on a particularly egregious occasion, Parneros took a document prepared by the officer and threw it on the floor, to the astonishment of the assembled executive team.

Third, as laid out in paragraphs 105 and 124-144 below, Parneros attempted to sabotage a transaction with a potential acquiror (the "Potential Acquiror"), apparently in an effort to preserve his position as CEO and contrary to the Board's clear directive, an inexcusable breach of the fiduciary duties that any CEO owes the company that employs him.  Indeed, the Potential Acquiror withdrew from its months' long discussions with the Company the very day after Parneros made shocking and derogatory comments about the Company that were designed to and had the effect of blowing up the potential transaction.

Those are the reasons that led to Parneros's dismissal.  Any one of them would have justified the employment action taken by Barnes & Noble; in the aggregate, Parneros's misconduct provided compelling grounds for the Company's Board of Directors to terminate Parneros for "Cause" under his employment agreement and doom any claim by Parneros that he is entitled to severance.

Plaintiff's allegations concerning damage to reputation are similarly wholly unfounded.  The Board's July 3, 2018 announcement that Plaintiff had been terminated "for violations of the Company's policies" and would not receive severance was clearly accurate and

clearly made in good faith.  As a result, the Company is not responsible for any loss of reputation that Plaintiff may have suffered as a result of his termination which, as discussed, was due solely to Plaintiff's misconduct and violation of his fiduciary duties to Barnes & Noble.

Although the Company is not liable to Parneros for any purported damage flowing from his termination, as set forth in the Counterclaims below, Parneros does in fact owe damages to the Company as a result of his breaches of his fiduciary duties of loyalty and good faith in his dealings with the Potential Acquiror.  And, because Parneros's conduct was in conflict with and adverse to the interests of the Company, the cancellation of all of his outstanding equity awards was clearly justified.

## BARNES & NOBLE'S ANSWERS TO SPECIFIC ALLEGATIONS

Barnes & Noble denies all allegations in the Amended Complaint, including those in any headings, except as expressly admitted herein.

1.      Denies each and every allegation in paragraph 1 of the Amended Complaint, except admits that Plaintiff was hired as the Company's Chief Operating Officer ("COO") in November 2016 and became CEO in April 2017, and that Leonard Riggio is the Company's founder and Executive Chairman.

2.      Denies each and every allegation in paragraph 2 of the Amended Complaint, except admits:  that the Potential Acquiror informed the Company in mid-June that it no longer wished to proceed with a potential transaction, following a meeting in which Parneros breached his fiduciary duties by attempting to sabotage the potential transaction, apparently in an effort to maintain his position as CEO; that, following the Company's investigation into complaints of sexual harassment, complaints of bullying behavior, and Parneros's attempt to sabotage the potential transaction, the Board of Directors unanimously voted to terminate

Parneros's employment for "Cause" under his employment agreement; that Parneros's

employment was terminated on July 2, 2018; that Parneros did not receive severance because he

was terminated for "Cause;" that previous Barnes & Noble CEOs who were not terminated for

"Cause" were paid severance; and that the Company issued an accurate press release on July 3,

2018 stating that Parneros was terminated for "violations of the Company's policies," and

respectfully refers the Court to the Company's July 3, 2018 press release, and further avers that

the allegations in paragraph 2 constitute a breach of Plaintiff's confidentiality obligations under

Section 4.3 of his employment agreement dated November 17, 2016, as amended on April 27,

2017.

       3.     Denies each and every allegation in paragraph 3 of the Amended

Complaint, except admits that, in order to ensure continuity going forward, the Company

appointed a leadership group to share the duties of the office of the CEO until a new leader is

named, which includes Allen Lindstrom (the Chief Financial Officer ("CFO")), Tim Mantel

(Chief Merchandising Officer), and Carl Hauch (Vice President of Stores); and that Leonard

Riggio remains Executive Chairman of the Company, and is involved in its management.

       4.     Admits that Plaintiff purports to describe this action in paragraph 4 of the

Amended Complaint, and otherwise denies that Barnes & Noble engaged in any act or omission

giving rise to the claims alleged in the Amended Complaint.

       5.     Neither admits nor denies each and every allegation in paragraph 5 of the

Amended Complaint insofar as they state a legal conclusion.  To the extent any response is

required, denies that Barnes & Noble engaged in any act or omission giving rise to the claims

alleged in the Amended Complaint, and admits that Plaintiff purports to invoke the Court's

jurisdiction under 28 U.S.C. § 1332.

6.      Neither admits nor denies each and every allegation in paragraph 6 of the Amended Complaint insofar as they state a legal conclusion.  To the extent any response is required, denies that Barnes & Noble engaged in any act or omission giving rise to the claims alleged in the Amended Complaint, denies Parneros's characterization of any "unlawful practices," and admits that Plaintiff purports to invoke venue in this district.

7.       Admits the allegations in paragraph 7 of the Amended Complaint.

8.      Admits the allegations in paragraph 8 of the Amended Complaint.

9.       Denies knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 9 of the Amended Complaint, except admits that Barnes & Noble believed that Parneros had relevant retail experience prior to hiring him.

10.      Denies knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 10 of the Amended Complaint.

11.      Denies knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 11 of the Amended Complaint, except admits that Parneros purported to have held various positions at Macy's and Staples, Inc.

12.      Admits the allegations in paragraph 12 of the Amended Complaint, and further avers that, as of July 28, 2018, the Company had 629 stores and, as of April 28, 2018, approximately 23,000 employees.

13.      Admits the allegations in paragraph 13 of the Amended Complaint.

14.      Admits the allegations in paragraph 14 of the Amended Complaint.

15.      Admits the allegations in paragraph 15 of the Amended Complaint, and further avers that, as of August 6, 2018, Leonard Riggio owned 19.2% of the Company's stock.

16.      Admits the allegations in paragraph 16 of the Amended Complaint.

17.     Denies each and every allegation in paragraph 17 of the Amended Complaint, except admits that the Company's revenue and profits have declined and the Company has had a lower stock price and valuation in recent years.

18.     Admits the allegations in paragraph 18 of the Amended Complaint, except denies that the Company fired Ronald Boire, and respectfully refers the Court to the Company's public statements for specifics regarding the tenures of the Company's prior CEOs.

19.     Denies each and every allegation in paragraph 19 of the Amended Complaint, except admits that, in April 2016, Leonard Riggio announced that he would step down as Executive Chair in September 2016; that, following the departure of Boire as CEO in August 2016, Riggio postponed his retirement until a later date; and that, following Boire's departure, Riggio served as interim CEO until Parneros was hired for the CEO position.

20.     Denies each and every allegation in paragraph 20 of the Amended Complaint, except admits that Riggio approached Parneros about the COO position in August 2016 with the understanding that Parneros would, in the future, be considered for the CEO position, and that, as interim CEO, Riggio worked closely with the Company's executive team.

21.     Denies each and every allegation in paragraph 21 of the Amended Complaint, except admits that Riggio discussed with Parneros improving the Company's sales and financial performance.

22.     Admits the allegations in paragraph 22 of the Amended Complaint.

23.     Denies each and every allegation in paragraph 23 of the Amended Complaint, except admits that, on April 27, 2017, Barnes & Noble and Parneros entered into an amended employment agreement in which Parneros assumed the position of CEO, reporting to the Board of Directors, and became a member of the Board, and respectfully refers the Court to

Parneros's employment agreement dated November 17, 2016 and the amendment to the agreement dated April 27, 2017.

24.     Admits the allegations in paragraph 24 of the Amended Complaint, and respectfully refers the Court to Parneros's employment agreement dated November 17, 2016 and the amendment to the agreement dated April 27, 2017.

25.     Admits the allegations in paragraph 25 of the Amended Complaint except insofar as they do not provide the full context and terms of Parneros's employment agreement dated November 17, 2016 and the amendment to the agreement dated April 27, 2017, and respectfully refers the Court to those agreements.

26.     Denies each and every allegation in paragraph 26 of the Amended Complaint, except admits that Riggio and Parneros had discussions about the possibility of awarding him additional equity.

27.     Admits the allegations in paragraph 27 of the Amended Complaint, except denies the allegations concerning the vesting of Parneros's equity and insofar as they do not provide the full context and terms of Parneros's employment agreement dated November 17, 2016 and the amendment to the agreement dated April 27, 2017, and respectfully refers the Court to those agreements.

28.     Denies each and every allegation in paragraph 28 of the Amended Complaint, except denies knowledge or information sufficient to form a belief about what Parneros may have heard from certain unnamed employees.

29.     Denies each and every allegation in paragraph 29 of the Amended Complaint.

30.     Denies each and every allegation in paragraph 30 of the Amended Complaint.

31.     Denies each and every allegation in paragraph 31 of the Amended Complaint, except admits that, during Plaintiff's tenure, the Company hired certain executives who remain with the Company.

32.     Denies each and every allegation in paragraph 32 of the Amended Complaint, except admits that Barnes & Noble has always maintained successful relationships with publishers and suppliers.

33.     Denies each and every allegation in paragraph 33 of the Amended Complaint, except admits that, at times, Riggio and Parneros discussed how other CEOs had handled things.

34.     Denies each and every allegation in paragraph 34 of the Amended Complaint, and avers that Michelle Smith (VP of Human Resources) approached Parneros about prioritizing diversity in recruiting and hiring.

35.     Denies each and every allegation in paragraph 35 of the Amended Complaint, except admits that the Company drafted a five-year plan showing a path to improve profitability, which was shared with the Board in early 2018.

36.     Denies each and every allegation in paragraph 36 of the Amended Complaint, except admits that, from time to time, investors have had meetings with Company executives and taken positions in the Company.

37.     Denies each and every allegation in paragraph 37 of the Amended Complaint, except admits that, prior to receiving complaints of sexual harassment and bullying

and learning about Parneros's breaches of fiduciary duty with respect to a potential acquisition, at times, Riggio had complimented Parneros's performance.

38.     Denies each and every allegation in paragraph 38 of the Amended Complaint, except admits that, in November 2017, the *Wall Street Journal* published a proposal by Sandell Asset Management Corporation, in response to which Barnes & Noble issued a press release which stated that "[t]he Company does not take Sandell's proposal as *bona fide*," and respectfully refers the Court to the November 16, 2017 *Wall Street Journal* article entitled "Barnes & Noble Investor Proposes Deal to take Bookseller Private," by David Benoit and Jeffrey A. Trachtenberg, and the Company's November 17, 2017 press release.

39.     Denies each and every allegation in paragraph 39 of the Amended Complaint, except admits that, in spring 2018, the Potential Acquiror made an indicative proposal, in response to which the Board affirmatively agreed to pursue discussions with the Potential Acquiror at its proposal price as a minimum, and further avers that the allegations in paragraph 39 constitute a breach of Plaintiff's confidentiality obligations under Section 4.3 of his employment agreement dated November 17, 2016, as amended on April 27, 2017.

40.     Denies each and every allegation in paragraph 40 of the Amended Complaint, and avers that, in spring 2018, the Potential Acquiror sent the Company an indicative proposal and then an increased revised indicative proposal and that, in mid-to-late June 2018, while due diligence was ongoing, and immediately following a meeting with the Potential Acquiror at which Parneros disparaged the Company and its financial prospects, the Potential Acquiror withdrew its revised indicative proposal, and further avers that the allegations in paragraph 40 constitute a breach of Plaintiff's confidentiality obligations under Section 4.3 of his employment agreement dated November 17, 2016, as amended on April 27, 2017.

41.     Denies each and every allegation in paragraph 41 of the Amended Complaint, except admits that Riggio and the Board were extremely dismayed upon learning that Parneros had disparaged the Company to senior representatives of the Potential Acquiror at a June 2018 meeting, immediately following which the Potential Acquiror withdrew its revised indicative proposal, and that, following the Potential Acquiror's withdrawal, Riggio stated that he would be involved in the management of the Company, and further avers that the allegations in paragraph 41 constitute a breach of Plaintiff's confidentiality obligations under Section 4.3 of his employment agreement dated November 17, 2016, as amended on April 27, 2017.

42.     Denies each and every allegation in paragraph 42 of the Amended Complaint, except admits that Riggio may not have answered each telephone call and text message from Parneros in June and July 2018, and that Riggio may have had meetings or conversations with management and executives about a variety of topics without Parneros present, and further avers that the allegations in paragraph 42 constitute a breach of Plaintiff's confidentiality obligations under Section 4.3 of his employment agreement dated November 17, 2016, as amended on April 27, 2017.

43.     Denies each and every allegation in paragraph 43 of the Amended Complaint, except admits that, as CEO, Parneros made prepared remarks and answered questions on the fourth quarter earnings call on June 21, 2018, in which he discussed the Company's performance and expectations for fiscal year 2019, and respectfully refers the Court to the transcript of that earnings call and any statements released by investors and analysts in response.

44.     Denies each and every allegation in paragraph 44 of the Amended Complaint, except admits that: on July 2, 2018, Parneros met with Riggio and Scott Barshay (a partner at Paul, Weiss); that Riggio informed Parneros that the Board had voted to terminate his

employment for "Cause" under his employment agreement for violating Company policies, following an investigation and based on claims that Parneros had engaged in sexual harassment and bullying behavior; that Riggio informed Parneros that the Company would issue a press release indicating that he had been terminated for violating Company policies; and that Riggio referred Parneros to the Company's outside counsel to answer any questions.

45.    Denies each and every allegation in paragraph 45 of the Amended Complaint, except admits that Parneros conveyed, in substance, the statements he alleges to have said during his conversation with Barshay.

46.    Denies each and every allegation in paragraph 46 of the Amended Complaint, except admits that Barshay informed Parneros that the Company would issue a press release announcing Parneros's termination after the market closed, that Parneros denied that he had engaged in misconduct during his conversation with Barshay, and further avers that Parneros mischaracterized the Company's investigation during this conversation with Barshay.

47.    Denies each and every allegation in paragraph 47 of the Amended Complaint, except admits that, on July 3, 2018, Parneros left a voicemail message for Lead Independent Director Patricia Higgins, which Higgins declined to return, and that, around this same time, Parneros spoke with Director Paul Guenther.

48.    Admits the allegations in paragraph 48 of the Amended Complaint except insofar as they do not provide the full text of the Company's July 3, 2018 press release, and respectfully refers the Court to that press release.

49.    Denies each and every allegation in paragraph 49 of the Amended Complaint, as no severance is due to Parneros.

50.     Denies each and every allegation in paragraph 50 of the Amended Complaint, except admits that Parneros's employment was terminated on July 2, 2018, and that Parneros did not receive and was not entitled to the equity grant on or around July 13, 2018 because he was terminated for "Cause" prior to that date.

51.     Denies each and every allegation in paragraph 51 of the Amended Complaint.

52.     Denies knowledge or information sufficient to form a belief about the truth of each and every allegation in paragraph 52 of the Amended Complaint.

53.     Denies knowledge or information sufficient to form a belief about the truth of each and every allegation in paragraph 53 of the Amended Complaint.

54.     Denies each and every allegation in paragraph 54 of the Amended Complaint as they relate to the Company, and denies knowledge or information sufficient to form a belief about the truth of the allegations concerning Key Bank.

55.     Denies knowledge or information sufficient to form a belief about the truth of each and every allegation in paragraph 55 of the Amended Complaint.

56.     Denies each and every allegation in paragraph 56 of the Amended Complaint.

57.     Denies each and every allegation in paragraph 57 of the Amended Complaint, except admits that Riggio met with Parneros in or about late May 2018 to inform him that a female employee had made a complaint alleging sexual harassment by Parneros on two separate occasions in May 2018, during which he inappropriately touched her and made unwanted comments of a sexual nature.

58.     Denies each and every allegation in paragraph 58 of the Amended Complaint, except admits that Parneros denied that he had engaged in misconduct during his conversation with Riggio.

59.     Denies each and every allegation in paragraph 59 of the Amended Complaint, except admits that the female employee complained that, while she and Parneros were alone in his office on the morning of May 22, 2018, Parneros showed her website pictures of hotels, inappropriately touched her and made unwanted comments of a sexual nature, and that Parneros denied that he had engaged in misconduct during his conversation with Riggio.

60.     Denies each and every allegation in paragraph 60 of the Amended Complaint, except admits that the female employee complained that Parneros had sexually harassed her on two separate occasions in May 2018, and that Parneros denied that he had engaged in misconduct during his conversation with Riggio.

61.     Denies each and every allegation in paragraph 61 of the Amended Complaint, except admits that the female employee was concerned about reporting the incident because it involved the CEO, but did report the incident to Lindstrom, who then reported it to Brad Feuer, the Company's General Counsel, and that the female employee's complaint was also reported by Feuer to Mary Ellen Keating (Senior VP of Communications) and Riggio.

62.     Denies each and every allegation in paragraph 62 of the Amended Complaint, except admits that Parneros denied that he had engaged in misconduct during his conversation with Riggio, that the female employee indicated that she was not seeking any compensation as a result of Parneros's conduct, but that Parneros's behavior made her uncomfortable, and that, upon Riggio's suggestion, Parneros indicated that he would apologize to the female employee in a meeting with Keating.

63.     Denies each and every allegation in paragraph 63 of the Amended Complaint, except admits that Parneros met with the female employee and Keating in Keating's office in early June 2018, that Parneros delivered what appeared to be a prepared statement, and that the female employee indicated that she did not wish to transfer to a different office or job.

64.     Denies each and every allegation in paragraph 64 of the Amended Complaint, except admits that Keating and Parneros discussed the meeting between Parneros and the female employee.

65.     Denies each and every allegation in paragraph 65 of the Amended Complaint.

66.     Denies each and every allegation in paragraph 66 of the Amended Complaint, except denies knowledge or information sufficient to form a belief about what Parneros was told by unidentified individuals.

67.     Denies each and every allegation in paragraph 67 of the Amended Complaint.

68.     Denies each and every allegation in paragraph 68 of the Amended Complaint, except avers that Parneros bullied, criticized, and treated Lindstrom in an unprofessional and disrespectful manner in front of his colleagues and fellow executive team members on numerous occasions, including turning his back on Lindstrom at meetings and throwing Lindstrom's work product on the floor.

69.     Denies each and every allegation in paragraph 69 of the Amended Complaint, except admits that Riggio engaged in discussions about the CFO playing a bigger role in operations and strategy.

70.     Denies each and every allegation in paragraph 70 of the Amended Complaint, except denies knowledge or information sufficient to form a belief about what Parneros documented concerning his conversations with Lindstrom, and admits that Lindstrom received a mid-year 2018 performance review from Parneros to which Lindstrom provided written comments, and that, in late May 2018, Lindstrom reported in his self-review that Parneros frequently berated and bullied him, including in front of others at meetings, and provided that self-review to Parneros and Smith, and respectfully refers the Court to those documents.

71.     Denies each and every allegation in paragraph 71 of the Amended Complaint, except admits that Riggio engaged in discussions about the CFO playing a bigger role in operations and strategy.

72.     Denies each and every allegation in paragraph 72 of the Amended Complaint.

73.     Denies each and every allegation in paragraph 73 of the Amended Complaint, and avers that Parneros disparaged Lindstrom to Riggio, other executives, and co-workers, and further avers that the allegations in paragraph 73 constitute a breach of Plaintiff's confidentiality obligations under Section 4.3 of his employment agreement dated November 17, 2016, as amended on April 27, 2017.

74.     Denies each and every allegation in paragraph 74 of the Amended Complaint, and avers that the allegations in paragraph 74 constitute a breach of Plaintiff's confidentiality obligations under Section 4.3 of his employment agreement dated November 17, 2016, as amended on April 27, 2017.

75.     Denies each and every allegation in paragraph 75 of the Amended Complaint, and avers that Parneros repeatedly disparaged his colleagues to other executives and co-workers.

76.     Denies each and every allegation in paragraph 76 of the Amended Complaint.

77.     Denies each and every allegation in paragraph 77 of the Amended Complaint, except admits that, on occasion, Riggio both credited this former executive's hard work and criticized her performance.

78.     Denies each and every allegation in paragraph 78 of the Amended Complaint.

79.     Denies each and every allegation in paragraph 79 of the Amended Complaint, and avers that Parneros repeatedly disparaged his colleagues to other executives and co-workers.

80.     Denies each and every allegation in paragraph 80 of the Amended Complaint, except admits that Riggio asked a male senior executive for guidance as to how to refer to his spouse.

81.     Denies each and every allegation in paragraph 81 of the Amended Complaint, except admits that, from time to time, Riggio raised concerns about the performance of the e-commerce business.

82.     Denies each and every allegation in paragraph 82 of the Amended Complaint, except denies knowledge or information sufficient to form a belief about the allegations concerning the conduct and reputation of this former executive, and avers that Parneros repeatedly disparaged his colleagues to other executives and co-workers.

83.   Denies each and every allegation in paragraph 83 of the Amended Complaint.

84.   Repeats and realleges its responses to paragraphs 1 through 83 of the Amended Complaint with the same force and effect as if fully set forth herein.

85.   Denies each and every allegation in paragraph 85 of the Amended Complaint insofar that they do not provide the full context and terms of Parneros's employment agreement dated November 17, 2016 and the amendment to the agreement dated April 27, 2017, and respectfully refers the Court to those agreements.

86.   Denies each and every allegation in paragraph of 86 of the Amended Complaint.

87.   Denies each and every allegation in paragraph of 87 of the Amended Complaint.

88.   Repeats and realleges its responses to paragraphs 1 through 87 of the Amended Complaint with the same force and effect as if fully set forth herein.

89.   Denies each and every allegation in paragraph of 89 of the Amended Complaint.

90.   Denies each and every allegation in paragraph of 90 of the Amended Complaint.

91.   Denies each and every allegation in paragraph of 91 of the Amended Complaint.

92.   Denies each and every allegation in paragraph of 92 of the Amended Complaint.

93.     Repeats and realleges its responses to paragraphs 1 through 92 of the Amended Complaint with the same force and effect as if fully set forth herein.

94.     Admits the allegations in paragraph 94 of the Amended Complaint.

95.     Admits the allegations in paragraph 95 of the Amended Complaint.

96.     Denies each and every allegation in paragraph 96 of the Amended Complaint.

97.      Denies each and every allegation in paragraph 97 of the Amended Complaint.

98.     Denies each and every allegation in paragraph 98 of the Amended Complaint.

99.     Denies that Parneros is entitled to any of the relief sought in his prayer for relief.

## AFFIRMATIVE AND OTHER DEFENSES

### First Defense

The Amended Complaint fails to state a claim upon which relief may be granted.

### Second Defense

Plaintiff's breach of contract claim and/or the remedies he seeks thereunder are barred and/or limited by the after acquired evidence doctrine.

### Third Defense

Plaintiff's claims are barred, in whole or in part, based on the doctrine of unclean hands as a result of his misconduct, including violations of Company policies and his breach of fiduciary duties.

## Fourth Defense

All of the statements Barnes & Noble made about Parneros were either true or substantially true.

## Fifth Defense

All of the statements Barnes & Noble made about Parneros were protected by the Company's qualified privilege to make them.

## Sixth Defense

Plaintiff's defamation claim fails because the alleged harm and damages sustained by Plaintiff, if any, are the result of the acts and/or omissions of Plaintiff or other entities, not of Barnes & Noble.

## Seventh Defense

Without conceding that Plaintiff has suffered any damages as a result of any alleged wrongdoing by Barnes & Noble, Plaintiff has failed to mitigate or minimize his alleged damages.

## Eighth Defense

The alleged harm and damages sustained by Plaintiff, if any, are speculative.

## Ninth Defense

Plaintiff fails to state a claim for punitive damages.

## Tenth Defense

Plaintiff's claim for breach of the covenant of good faith and fair dealing is barred for failure to satisfy conditions precedent under Plaintiff's employment agreements and relevant equity plan agreements, including the Barnes & Noble, Inc. Amended and Restated 2009

Incentive Plan, Restricted Stock Award Agreements, and Performance-Based Stock Unit Award Agreements.

Barnes & Noble is not knowingly waiving any affirmative defense and hereby expressly reserves the right to amend its Answer and include all such defenses as may become available or apparent during pretrial proceedings of this action.

**WHEREFORE,** Barnes & Noble respectfully requests that this Court:

(a)     Dismiss the Amended Complaint in its entirety with prejudice;

(b)     Award Barnes & Noble the costs of defending against the suit, including reasonable attorneys' fees and expenses; and

(c)     Grant such other and further relief as the Court deems just and proper.

## COUNTERCLAIMS

Defendant and Counterclaim-Plaintiff Barnes & Noble for its Counterclaims, by its attorneys Paul, Weiss, hereby alleges as follows:

100.     Barnes & Noble repeats and alleges its responses to paragraphs 1 through 99 of the Amended Complaint above as if fully restated herein.

### NATURE OF THE COUNTERCLAIMS

101.     Barnes & Noble brings these Counterclaims to recover from its former CEO Parneros the substantial damages flowing from Parneros's breach of his fiduciary duties to Barnes & Noble as an officer and as an employee and agent of the Company, and to seek a declaratory judgment that Parneros's conduct constituted ample grounds to cancel all of his outstanding equity awards under the Barnes & Noble, Inc. Amended and Restated 2009 Incentive Plan (the "Plan").

102.    During his tenure as CEO, Parneros behaved antithetically to Barnes &
Noble's policies and corporate culture.  He used his authority to belittle and bully subordinates.
He sexually harassed a female employee. And he attempted to sabotage a transaction with the
Potential Acquiror in order to benefit himself, in direct contravention of the Board's express
instructions.  He was justifiably terminated for "Cause," denied severance, and his outstanding
equity awards were cancelled as a result.

103.    While Parneros admits in his Amended Complaint that the Company
received a complaint of sexual harassment against him, he downplays what occurred.  But the
details of what happened, which Parneros carefully avoids in his Amended Complaint,
demonstrate the seriousness of his misconduct.  Parneros fails to mention that, on two separate
occasions, he engaged in inappropriate touching of a female subordinate and made her feel
uncomfortable and uneasy in his presence.  In the first instance, after calling this employee into
his office, Parneros attempted to push his back against hers purportedly to compare their heights
and then, as she pulled away, tweaked or pinched the skin on the back of her neck.  Just a few
days later, Parneros again called this employee into his office, inappropriately showed her
pictures of Quebec City hotels that he considered to be romantic, told her that he "would have
taken" her to those hotels if he were her husband, pulled her close to him so that their faces
touched cheek-to-cheek and, when she pulled away, angrily responded that he thought she
seemed like someone who "would put out" if he "wined and dined" her.  Since his termination,
the Company has received additional complaints about Parneros's inappropriate behavior toward
women at Barnes & Noble.

104.    Parneros also mistreated and bullied members of the executive team.  One
of the most frequent targets of Parneros's bullying and public humiliation was a senior executive,

to whom Parneros often sent critical and unprofessional emails.  Parneros claimed not to have received documents from this senior executive when in fact he had, and berated and humiliated him and other co-workers in front of colleagues in executive meetings.  On multiple occasions, Parneros expressed displeasure with this executive's work and abilities during team meetings, and, in front of other colleagues and senior executives, would turn his back on this executive.  At one particular executive meeting, before a room full of people, Parneros took a document that this senior executive had prepared and threw it to the floor.

105.    In addition, Parneros intentionally sabotaged a potential acquisition of the Company to further his own self-interests, in direct contravention of the Board's clear instruction to proceed with negotiations and facilitate the potential transaction.  Parneros indicated to Company executives and the Company's outside advisors that he did not support the acquisition, telling one Company executive, "I don't think it's my job to sell" the Company.  He actively engaged in behavior that deliberately obstructed the progress of the transaction, consistently pushing back on the Potential Acquiror's requests for information and the amount of time required by the negotiations.  At a key meeting with the Potential Acquiror in June 2018, Parneros did not provide the information the Potential Acquiror requested and instead engaged in a shocking monologue portraying the Company in an extremely and unduly negative light—a monologue that was wholly inconsistent with his prior statements to the Board about the Company.  The very day after Parneros made his stunning and derogatory comments about the Company that were designed to and had the effect of blowing up the potential transaction, the Potential Acquiror withdrew from its months' long discussions with the Company.

106.    Parneros wrongfully and intentionally engaged in these actions in an apparent effort to preserve his position as the CEO of the Company and placed his personal

interests above those of Barnes & Noble.  His misconduct substantially contributed to the Potential Acquiror's withdrawal and has resulted in damages to the Company.

107.    Once the Company was on notice of Parneros's misconduct, Barnes & Noble acted appropriately, dismissed him for "Cause" without severance pursuant to his employment agreement, and his outstanding equity awards were cancelled pursuant to Section 13.4 of the Plan, his award agreements, and his employment agreements.

108.    Thus, the Company seeks a) damages resulting from Parneros's breach of his fiduciary duties, and b) a declaratory judgment that Parneros's misconduct constituted activity "adverse to the interest of the Company" and, thereby, grounds for the Company to cancel his outstanding equity awards under Section 13.4 of the Plan.

**PARTIES**

109.    Barnes & Noble is a Delaware corporation with its principal place of business in New York, New York.

110.    Parneros is a citizen of Massachusetts.

**JURISDICTION AND VENUE**

111.    To the extent the Court has subject matter jurisdiction over the Amended Complaint, it likewise has jurisdiction over the subject matter of these Counterclaims pursuant to 28 U.S.C. §§ 1332, 1367 and 2201.

112.    This Court has personal jurisdiction over Counterclaim-Defendant by virtue of, *inter alia*, the Amended Complaint he filed in this Court.

113.    This venue is proper pursuant to 28 U.S.C. § 1391 because the unlawful practices complained of in these Counterclaims occurred within the Southern District of New York, and because Counterclaim-Defendant filed his Amended Complaint in this Court.

23

## RELEVANT FACTS

**Barnes & Noble Hires Parneros as Chief Operating Officer**

114. Prior to joining Barnes & Noble, Parneros had been employed by Staples, but left there as of March 31, 2016, on information and belief, after having not received a position that he sought there.

115. On November 17, 2016, Barnes & Noble entered into an employment agreement with Parneros, pursuant to which he was hired as COO. As COO, Parneros reported directly to the Company's Executive Chairman, Riggio.

**Parneros Is Promoted to CEO and Begins a Pattern of Bullying, Public Humiliation, And Harassment of Co-Workers**

116. In his first few months as COO, Parneros appeared to be focused on improving the Company's business and financials. Within a few months, he was considered for and offered the open CEO position. Parneros accepted the offer. Barnes & Noble and Parneros entered into an amended employment agreement, and he assumed the position of CEO and became a Director effective April 27, 2017.

117. As CEO, Parneros reported directly to the Company's Board of Directors.

118. By July 2017, however, Parneros's behavior and demeanor appeared to change. Parneros began to rely increasingly on outside consultants and to routinely and openly criticize the Company and his co-workers, expressing his unduly negative views both internally and to outside advisors, a pattern of behavior that continued and escalated until his dismissal in July 2018.

119. One of the most frequent targets of Parneros's bullying and public humiliation was a longstanding senior executive of the Company who was one of his direct reports. Parneros frequently sent this executive critical and unprofessional emails, claimed not to

have received documents when in fact he had, and berated and humiliated the executive and other co-workers in front of colleagues in executive meetings.  For example, on multiple occasions, Parneros expressed displeasure with the senior executive during team meetings in front of other colleagues by turning his back on him.  At one executive meeting, in mid-April 2018, before a room full of people, Parneros took a document that the executive had prepared and threw it to the floor.

120.    Over the course of a year, Parneros's mistreatment of this senior executive was witnessed on many occasions by executives and employees.  In May 2018, the executive raised concerns about his treatment by Parneros with Human Resources.

121.    In late May 2018, a female employee reported two incidents in which she was subjected to unwanted touching and/or unwanted comments of a sexual nature by Parneros, which made her uncomfortable and uneasy in his presence.  She reported that, after calling her into his office, Parneros attempted to push his back against hers purportedly to compare their heights and then tweaked or pinched the skin on the back of her neck as she pulled away.  She also reported that just a few days after this incident, Parneros again called her into his office, inappropriately showed her pictures of what he considered to be romantic Quebec City hotels, told her that he "would have taken" her to those hotels if he were her husband, pulled her towards him so that their faces touched cheek-to-cheek and, as she attempted to pull away, angrily told her that he thought she seemed like someone who "would put out" if he "wined and dined" her.

122.    Barnes & Noble promptly investigated these allegations.

123.    Since his termination, the Company has received additional complaints about Parneros's inappropriate behavior toward women at Barnes & Noble.

25

**Against this Backdrop, Parneros Impedes and Obstructs a Potential Acquisition
Of Barnes & Noble**

124. In late January 2018, the CEO of the Potential Acquiror contacted Riggio to express interest in a potential acquisition of Barnes & Noble. Although the Company was not engaged in an active process to seek a buyer at that time, the Board, consistent with its fiduciary responsibilities, reviewed and considered the Potential Acquiror's interest.

125. Subsequently, Riggio and the Board of Directors instructed Parneros to meet with the Potential Acquiror and to move forward with negotiations.

126. While Parneros at times portrayed himself to Riggio and the Board as willing to participate in the discussions with the Potential Acquiror, Parneros acted instead in furtherance of his own interests and against the interests of the Company and in direct contravention of the clear mandate that Riggio and the Board had given him. Despite the Board's clear instructions to facilitate the transaction to a successful conclusion to the extent possible, Parneros told senior Barnes & Noble executives, other employees and the Company's outside advisors that he did not want to go forward with the transaction which, in all likelihood, would have terminated his tenure as CEO of Barnes & Noble. Parneros told one Company executive, "I don't think it's my job to sell" the Company.

127. A series of meetings were scheduled with representatives of the Potential Acquiror. Parneros reluctantly met with representatives of the Potential Acquiror on at least three occasions.

128. In February 2018, the CEO of the Potential Acquiror requested a meeting with Parneros, which Parneros insisted be kept short, even though the Potential Acquiror had requested a longer meeting

129.    Discussions with the Potential Acquiror continued after the February meeting, and a second meeting was scheduled for the end of March.

130.    Prior to the March meeting, the Potential Acquiror made numerous requests for information to the Company.  Parneros repeatedly interfered with the Company's responses to these requests by demanding that the Barnes & Noble finance team provide less detailed data to the Potential Acquiror.  When one executive disagreed with Parneros and cautioned that providing a detailed response was an important step in securing an indicative proposal from the Potential Acquiror, Parneros continued to press for less detailed disclosure of information to the Potential Acquiror.

131.    At the March meeting, Parneros and another senior executive from Barnes & Noble met with representatives from the Potential Acquiror.  Parneros did not prepare for the meeting, and he did not bring any materials with him.  For most of the meeting, Parneros harshly criticized the Company.  He described the Company as "spiraling" and "ugly," and he even questioned his own decision to join the Company, stating: "Why did I come here?"  Parneros also attempted to paint himself as a hero by claiming that he had brought back opportunities for the Company.

132.    At the close of the meeting, the CEO of the Potential Acquiror asked Parneros if he could briefly meet for a drink.  Parneros declined the invitation, claiming that he already had plans.  The CEO then suggested meeting for breakfast the following morning.  Again, Parneros declined.

133.    Approximately a month later, and notwithstanding Parneros's efforts to undermine the proposed transaction, in April 2018, the Potential Acquiror sent Barnes & Noble an indicative proposal.  After further discussions and due diligence, in late May 2018, the

Potential Acquiror sent the Company a revised indicative proposal with an increased offer price. At that time, the Potential Acquiror informed the Company that it remained committed to entering into a definitive transaction agreement on an expeditious timetable.

134.    Around May 2018, the Company's Board of Directors asked Parneros to provide answers to a list of questions in order to assess whether to go forward with the potential transaction.  At a meeting with directors, Parneros portrayed the Company and its expected future performance in a positive light and advocated that the Company forgo the potential acquisition, and instead have him continue to lead the Company.

135.    After Parneros's presentation, the directors decided to move forward with the potential transaction and expressly directed Parneros on at least two occasions to do so.

136.    Parneros appeared visibly upset with the directors' decision.  If the transaction went through, Parneros would no longer be the CEO of a standalone public company, and instead could be relegated to the position of a divisional head, or lose his job entirely.

137.    A critical third meeting between Parneros and other Barnes & Noble executives and the CEO and other executives of the Potential Acquiror occurred on June 18, 2018.  Before the meeting, the CEO of the Potential Acquiror made clear that he wanted Parneros to explain a recent downward sales trend.  The parties planned that the meeting would last several hours and be followed by a dinner attended by both sides.

138.    The June 18 meeting did not go well, due in large part to Parneros's disloyal conduct.  While the Company's finance team with input from its consultants prepared a detailed presentation for the meeting, Parneros showed little interest in the presentation or, in fact, in the meeting itself, and did not hold any strategy or preparation sessions with the other

Barnes & Noble executives in advance of the meeting, nor did he even discuss the strategy or approach for the meeting with them.

139.     Instead, acting in furtherance of his own self-interests and against the clear mandate he had received from Riggio and the Board, through his conduct at the meeting, Parneros attempted to sabotage the potential deal entirely.

140.     After opening remarks by the Potential Acquiror's CEO, Parneros embarked on a long, rambling monologue, which failed to address the issues and questions posed by the Potential Acquiror and, instead, portrayed the Company in an extremely and unduly negative light, with no realistic prospects for success.  Among the many shocking and disparaging statements Parneros made during the meeting, he described the Company as an "ugly mess" and complained that the Company had "no talent" before he arrived.  Parneros did not provide positive information concerning initiatives that the Company had made in 2018 or about the Company's expectations for growth in 2019.

141.     The Barnes & Noble executives who attended the June 18, 2018 meeting were stunned and horrified by Parneros's behavior.

142.     The Potential Acquiror immediately and negatively reacted to Parneros's damaging characterizations of the Company.  Soon after Parneros finished his speech, the Potential Acquiror abruptly cut the meeting short and cancelled the scheduled dinner.

143.     Parneros did not appear dismayed by the Potential Acquiror's decision to abandon the meeting.  Instead, at the end of the meeting, Parneros declared to his colleagues and the Company's advisors that there would be no need for future meetings about a potential acquisition.

144.    On the day after the meeting, the Potential Acquiror informed Riggio that it was withdrawing its revised indicative proposal, citing the Company's failure to explain its sales decline—information that it had specifically requested at the June 18 meeting and information which the Board had expressly directed Parneros to provide to the Potential Acquiror at the meeting.

**The Barnes & Noble Board Votes to Terminate Parneros's Employment for Cause**

145.    In late June 2018, after the female employee's complaint alleging sexual harassment by Parneros and the Company's subsequent investigation, the complaint by the senior executive regarding his mistreatment by Parneros, and multiple reports concerning Parneros's behavior at the June 18, 2018 meeting with the Potential Acquiror, the Company's Board of Directors voted to terminate Parneros's employment for "Cause" under his employment agreement based on the sexual harassment allegations against him, Parneros's workplace bullying, and Parneros's attempts to sabotage the potential transaction.

146.    On July 3, 2018, the Board announced Parneros's termination "for violations of the Company's policies."  The Board stated that Parneros "will not receive any severance payment and he is no longer a member of the Company's Board of Directors."  The Company's July 3, 2018 press release provided no further details about the reasons for Parneros's termination.   Following the Board's decision, additional allegations of misconduct by Parneros have come to the Company's attention.

**Barnes & Noble Properly Terminated Parneros without Severance and His Outstanding Equity Awards Were Appropriately Cancelled**

147.    Section 3.9 of Parneros's employment agreement dated November 17, 2016 and the amendment to the agreement dated April 27, 2017 provided that if he were terminated for "Cause," he would be entitled only to the payment of any earned salary through

the date of termination and any bonus for any prior fiscal year.[1]  Accordingly, the Board

appropriately decided that Parneros was not entitled to severance.  Under Section 13.4 of the

Plan, Parneros's equity awards were subject to cancellation if he "engages in activity that is in

conflict with or adverse to the interest of the Company or any Affiliate, as determined by the

[Compensation] Committee [of the Board] in its sole discretion."  Accordingly, for reasons

independent of and in addition to his termination for "Cause," Parneros's outstanding equity

awards at the time of his termination, totaling approximately $3.4 million in value, were

appropriately cancelled.

**Barnes & Noble Is Damaged by Parneros's Disloyal Conduct**

148.    Parneros wrongfully and intentionally sabotaged the potential transaction,

in furtherance of his own self-interests and against the interests of the Company.  As a result of

Parneros's breaches of his fiduciary duties, Barnes & Noble is entitled to damages including, but

not limited to, Parneros's forfeiture and repayment of any salary payments, bonus payments, and

any other payments and benefits provided to him by Barnes & Noble during the period of his

disloyalty, spanning at least five months, as well as damages as a result of his breach of his

fiduciary duties, including costs expended in connection with the potential transaction.

## FIRST COUNTERCLAIM

### (Breach of Fiduciary Duties of Loyalty and Good Faith)

149.    Barnes & Noble repeats and realleges each and every allegation contained

in Paragraphs 1 through 148 above as if fully set forth here.

---

[1]    "Cause" is defined under Section 2 (c) of  Parneros's employment agreement to include, among other things, any material breach of the Company's policies; any intentional misconduct in connection with the performance of his employment duties and responsibilities that is injurious to the Company or its business or reputation; and any willful failure or refusal to properly perform the duties, responsibilities or obligations of his employment for reasons other than Disability or authorized leave, or to properly perform or follow any lawful direction by the Company.

150.     As an officer of Barnes & Noble, Parneros owed Barnes & Noble fiduciary duties of loyalty and good faith.  Parneros had an affirmative duty at all times to act in Barnes & Noble's best interests and to place the interests of the Company above his own interests.

151.     Parneros breached his fiduciary duties of loyalty and good faith when he acted against the interests of the Company, in an apparent effort to preserve his position and status as the CEO of Barnes & Noble, by attempting to sabotage the potential transaction.

152.     Barnes & Noble was damaged by Parneros's breach of loyalty and good faith.  The Company is entitled to an award against Parneros for damages as a result of his breach of his fiduciary duties, including costs expended in connection with the potential transaction.

## SECOND COUNTERCLAIM

### (Faithless Servant)

153.     Barnes & Noble repeats and realleges each and every allegation contained in Paragraphs 1 through 152 above as if fully set forth here.

154.     Under the terms of Parneros's employment agreement dated November 17, 2016 and the amendment to the agreement dated April 27, 2017, Parneros was an employee and agent of the Company.  As CEO, Parneros reported directly to the Board of Directors.

155.     As an employee and agent of the Company, Parneros owed fiduciary duties of loyalty and good faith to the Company.  Parneros had an affirmative duty at all times to be loyal to Barnes & Noble and to avoid acting in any manner inconsistent with his agency.  He was at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.

156.     Parneros breached his fiduciary duties of loyalty and good faith when he acted adversely to the Company by attempting to sabotage the potential transaction, in an apparent effort to preserve his position and status as the CEO of Barnes & Noble.

157.     Parneros's disloyal activity was related to the performance of his duties with respect to the potential transaction.

158.     These breaches permeated Parneros's services as an executive employee in the most material and substantial parts of his employment with Barnes & Noble.

159.     Barnes & Noble is entitled to recover all compensation paid to Parneros, including salary, bonus payments, and other payments and benefits during the period in which he acted adversely to Barnes & Noble, lasting at least five months, totaling in excess of one million dollars.

**THIRD COUNTERCLAIM**

**(Declaratory Judgment)**

160.     Barnes & Noble repeats and realleges each and every allegation contained in Paragraphs 1 through 159 above as if fully set forth here.

161.     As of July 2, 2018, the date of his termination, Parneros had accepted awards of Barnes & Noble Performance Stock Units ("PSUs") and Restricted Stock Units ("RSUs") under the Plan and the Company's award agreements.

162.     The equity awards that Parneros received under the Plan were in addition to, and not part of, the salary he received for his work at Barnes & Noble.

163.     Section 3.5 of Parneros's employment agreement dated November 17, 2016 and the amendment to the agreement dated April 27, 2017 provides that his equity awards are subject to the terms and conditions of the Plan and the Company's award agreements.

164.    Under Section 13.4 of the Plan, equity awards are subject to cancellation if the participant "engages in activity that is in conflict with or adverse to the interest of the Company or any Affiliate, as determined by the [Compensation] Committee in its sole discretion."

165.    During his tenure as CEO, Parneros repeatedly sexually harassed a female employee, frequently bullied and mistreated a senior executive and other subordinates, and attempted to sabotage a transaction with the Potential Acquiror in order to benefit himself, in direct contravention of the Board's express instructions.

166.    Each of these three reasons, independently, constitutes "activity that is in conflict with or adverse to the interest of the Company" and, thereby, renders Parneros's outstanding equity awards at the time of his termination subject to cancellation under the Plan.

167.    Accordingly, Barnes & Noble is entitled to a declaratory judgment that Parneros's conduct constituted ample grounds for cancellation of all of his outstanding equity awards, which were approximately $3.4 million in value at the time of his termination.

## Prayer for Relief

WHEREFORE, Defendant and Counterclaim-Plaintiff Barnes & Noble hereby requests judgment against Parneros as follows:

(a)    Enter judgment on its Counterclaims in Barnes & Noble's favor;

(b)    Award Barnes & Noble damages as a result of Parneros's breaches of his fiduciary duties of loyalty and good faith as an officer of the Company, including costs expended in connection with the potential transaction;

(c)    Award Barnes & Noble damages in connection with Parneros's breaches of his fiduciary duties of loyalty and good faith as an employee and

agent of the Company, including, but not limited to, the disgorgement to Barnes & Noble of all compensation, including salary, bonus payments, and other payments and benefits paid to Parneros during the period of his disloyal conduct, which amount exceeds one million dollars;

      (d)     Enter a declaratory judgment that Parneros's conduct constituted grounds for cancellation of all of his outstanding equity awards;

      (e)     Award Barnes & Noble its attorneys' fees, costs, and disbursements incurred in bringing these Counterclaims; and

      (f)     Grant to Barnes & Noble any such further relief as the Court deems just and proper.

Dated: New York, New York
       October 30, 2018

          PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

          By: /s/ Jay Cohen
             Jay Cohen
             Liza M. Velazquez
             Maria H. Keane

             1285 Avenue of the Americas
             New York, New York 10019-6064
             Telephone: (212) 373-3000
             jaycohen@paulweiss.com

             *Attorneys for Defendant and Counterclaim-Plaintiff Barnes & Noble, Inc.*