**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DEMOS PARNEROS,

               Plaintiff and
               Counterclaim Defendant,

         - against -

BARNES & NOBLE, INC.,

               Defendant and
               Counterclaim Plaintiff.

No. 1:18-cv-07834 (JGK)(GWG)

# DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Tel: (212) 373-3000

*Counsel for Defendant and Counterclaim Plaintiff*
*Barnes & Noble, Inc.*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 3

    A.    Barnes & Noble Receives a Complaint of Sexual Harassment Against Plaintiff and Launches an Investigation................................................ 3

    B.    During the Investigation, Plaintiff Attempts to Sabotage the Potential Transaction at the June 18, 2018 Meeting ................................................ 4

    C.    The Board of Directors Votes to Terminate Plaintiff's Employment, and Barnes & Noble Issues a Press Release Announcing His Termination ............... 5

    D.    Procedural Background................................................................... 6

ARGUMENT ................................................................................................. 7

I.    Barnes & Noble's Investigation Notes Are Protected from Disclosure by the Attorney-Client Privilege and the Work Product Doctrine................................ 7

    A.    The Investigative Notes Concerning Allegations of Sexual Harassment Are Protected By the Attorney-Client Privilege ..................................... 7

    B.    The Investigative Notes Concerning Allegations of Sexual Harassment Are Also Work Product ............................................................... 12

II.    The Notes Prepared by Barnes & Noble's General Counsel Concerning Plaintiff's Conduct at the June 18, 2018 Meeting with the Potential Acquiror Are Protected by the Attorney-Client  Privilege and Work Product Doctrine........................... 15

III.    The Draft Press Releases Are Privileged ......................................................... 17

IV.    Barnes & Noble's Communications with Outside Counsel, Including the Memorandum that Outside Counsel Prepared for the Board, Are Privileged ............... 19

V.    Barnes & Noble Has Not Put the Privileged Advice of Its Counsel "At Issue"............... 21

CONCLUSION.............................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.I.A. Holdings* v. *Lehman Bro., Inc.*,
   No. 97 Civ. 4978, 2002 WL 31556382 (S.D.N.Y. Nov. 15, 2002) .........................................12

*Albert* v. *Loksen*,
   239 F.3d 256 (2d Cir. 2001).................................................................................................23

*Alcor Life Extension Found.* v. *Johnson*,
   43 Misc. 3d 1225(A), 2014 WL 2050661 (N.Y. Sup. 2014), *aff'd*, 136 A.D.3d
   464 (N.Y. App. Div. 2016) ............................................................................................21, 23

*Allied Irish Banks* v. *Bank of America*,
   240 F.R.D. 96 (S.D.N.Y. 2007) .......................................................................................14, 20

*Arista Records LLC* v. *Lime Grp. LLC*,
   No. 06 Civ. 5936, 2011 WL 1642434 (S.D.N.Y. Apr. 20, 2011).........................................23

*AU New Haven, LLC* v. *YKK Corp.*,
   No. 15 Civ. 03411 (GHW)(SN), 2017 WL 4838793 (S.D.N.Y. Oct. 24, 2017),
   *order clarified on reconsideration*, No. 15 Civ. 03411 (GHW)(SN), 2018 WL
   333828 (S.D.N.Y. Jan. 5, 2018).....................................................................................14, 16

*Brown* v. *Unified School Dist. No. 501*,
   No. 10–1096–JTM, 2011 WL 111693 (D. Kan. Jan. 13, 2011) ............................................17

*Carter* v. *Cornell Univ.*,
   173 F.R.D. 92 (S.D.N.Y. 1997) .........................................................................................9, 11

*Chapadeau* v. *Utica Observer-Dispatch*,
   38 N.Y.2d 196 (1975) ...........................................................................................................22

*Cruz* v. *Coach Stores, Inc.*,
   196 F.R.D. 228 (S.D.N.Y. 2000) ...........................................................................................10

*In re Cty. of Erie*,
   546 F.3d 222 (2d Cir. 2008)...........................................................................................21, 23

*Dawson* v. *New Yew York Life Ins. Co.*,
   901 F. Supp. 1362 (N.D. Ill. 1995) .......................................................................................23

*Deutsche Bank Tr. Co. of Ams.* v. *Tri-Links Inv. Tr.*,
   43 A.D.3d 56 (1st Dep't 2007) ..............................................................................................21

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*E.I. DuPont de Nemours & Co.* v. *Kolon Indus., Inc.*,
269 F.R.D. 600 (E.D. Va. 2010) ...........................................................................24

*Electro* v. *Sci. Indus., Inc.* v. *Gen. Scanning Inc.*,
175 F.R.D. 539 (N.D. Cal. 1997) ..........................................................................24

*Farzan* v. *Wells Fargo Bank*,
No. 12 Civ. 1217, 2012 WL 6763570 (S.D.N.Y. Dec. 28, 2012)............................9

*Fine* v. *ESPN, Inc.*,
11 F. Supp. 3d 209 (N.D.N.Y. 2014) .....................................................................22

*First Chicago Int'l* v. *United Exchange Co. Ltd.*,
125 F.R.D. 55 (S.D.N.Y. 1989) ...............................................................................9

*Fleming* v. *Hymes-Esposito*,
No. 12 Civ. 1154 (JPO), 2013 WL 1285431 (S.D.N.Y. 2013)...............................23

*In re Gen. Motors LLC Ignition Switch Litig.*,
80 F. Supp. 3d 521 (S.D.N.Y. Jan. 15, 2015) ..................................................13, 15

*Gomez* v. *Metro District*,
No. 3:11 CV 1934 (JBA), 2013 WL 2489138 (D. Conn. June 10, 2013) ..............10

*In re Grand Jury Proceedings*,
No. M-11-189, 2001 WL 1167497 (S.D.N.Y. 2001).............................................19

*Greater New York Taxi Assoc.* v. *City of New York*,
13 Civ. 3089 (VSB) (JCF), 2017 WL 4012051 (S.D.N.Y. Sept. 11, 2017) ...............14, 16, 17

*Gruss* v. *Zwirn*,
276 F.R.D. 115 (S.D.N.Y. 2011), *rev'd in part*, 2013 WL 3481350 (S.D.N.Y.
July 10, 2013).....................................................................................................7, 9, 21

*Gucci Am., Inc.* v. *Guess?, Inc.*,
271 F.R.D. 58 (S.D.N.Y. 2010) ........................................................................9, 14

*Hoesten* v. *Best*,
34 A.D.3d 143 (1st Dep't 2006) ............................................................................23

*Horn & Hardart Co.* v. *Pillsbury Co.*,
888 F.2d 8 (2d Cir. 1989)........................................................................................16

*Jarzyna* v. *Home Properties, L.P.*,
201 F. Supp. 3d 650 (E.D. Pa. 2016) .....................................................................11

**TABLE OF AUTHORITIES**
**(Continued)**

*Johnson* v. *J. Walter Thompson U.S.A., LLC*,
  16 Civ. 1805 (JPO)(JCF), 2017 WL 3432301 (S.D.N.Y. Aug. 7, 2017)...............................13

*Karaduman* v. *Newsday, Inc.*,
  51 N.Y.2d 531 (1980) ........................................................................................................22

*Koumoulis* v. *Independent Financial Marketing Group*,
  295 F.R.D. 28 (E.D.N.Y. 2013), *aff'd*, 29 F. Supp. 3d 142 (E.D.N.Y. 2014) ........................10

*Martinez* v. *Kleinfeld Bridal Corp.*,
  16 Civ. 348 (RA), 2017 WL 2859941 (S.D.N.Y. June 30, 2017) ......................................8, 11

*Mott* v. *Anheuser-Busch, Inc.*,
  910 F. Supp. 868 (N.D.N.Y. 1995), *aff'd*, 112 F.3d 504 (2d Cir. 1996) ..............................22

*OneBeacon Insurance Co.* v. *Forman International, Ltd.*,
  No. 04 Civ. 2271(RWS), 2006 WL 3771010 (S.D.N.Y. Dec. 15, 2006) ...............................20

*Orbit One Comm'ns, Inc.* v. *Numerex Corp.*,
  255 F.R.D. 98 (S.D.N.Y. 2008) .............................................................................................7

*Patel* v. *L-3 Comm'ns Holdings, Inc.*,
  14-CV-6038 (VEC), 14-CV-6182 (VEC), 14-CV-6939 (VEC), 2016 WL
  4030704 (S.D.N.Y. July 25, 2016) .......................................................................................19

*Pearlstein* v. *Blackberry Ltd.*,
  No. 13-CV-07060 (CM)(KHP), 2019 WL 1259382 (S.D.N.Y. Mar. 19, 2019) ..............10, 18

*Redvanly* v. *NYNEX Corp.*,
  152 F.R.D. 460 (S.D.N.Y. 1993) .........................................................................................16

*Rogers* v. *Grimaldi*,
  No. 86 Civ. 1851 (RWS), 1986 WL 13459 (S.D.N.Y. Nov. 17, 1986)..................................16

*Scott* v. *Chipotle Mexican Grill, Inc.*,
  67 F. Supp. 3d 607 (S.D.N.Y. 2014)....................................................................................23

*Strougo* v. *BEA Associates*,
  199 F.R.D. 515 (S.D.N.Y. 2001) ....................................................................................20, 21

*Vidal* v. *Metro-North Commuter Railway*,
  No. 3:02 Civ. 0248 (MPS)(WIG), 2014 WL 413952 (D. Conn. Feb. 4, 2014).....................20

*Welland* v. *Trainer*,
  No. 00 Civ. 0738, 2001 WL 1154666 (S.D.N.Y. Oct. 1, 2001), *aff'd*, 116 F.
  App'x 321 (2d Cir. 2004).....................................................................................................20

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Wilder* v. *World of Boxing LLC*,
    324 F.R.D. 57 (S.D.N.Y. 2018) ................................................................................19

*Windsor Secs., LLC* v. *Arent Fox LLP*,
    273 F. Supp. 3d 512 (S.D.N.Y. 2017).........................................................7, 21, 22

*Women's InterArt Center, Inc.* v. *N.Y.C. Economic Development*,
    223 F.R.D. 156 (S.D.N.Y. 2004) ............................................................................16

Defendant and Counterclaim Plaintiff Barnes & Noble, Inc. ("Barnes & Noble" or "the Company"), respectfully submits this memorandum of law in opposition to Plaintiff Demos Parneros's ("Plaintiff" or "Parneros") Motion to Compel ("Pl.'s Br.").  For the reasons set forth below, Plaintiff's motion seeking to compel the production of certain privileged documents should be denied.[1]

## PRELIMINARY STATEMENT

During his tenure as Chief Executive Officer ("CEO") of Barnes & Noble, Plaintiff engaged in egregious misconduct, including sexual harassment of a female employee, bullying of subordinates, and sabotaging a potential transaction with a company that expressed interest in acquiring Barnes & Noble ("the Potential Acquiror").  When these allegations came to light, the Company's General Counsel and others working under his direction conducted an investigation. The Barnes & Noble Board of Directors ("the Board") then considered the facts uncovered by that internal investigation and voted to terminate Plaintiff for Cause, as that term is defined in Plaintiff's employment contract.

By this motion, Plaintiff seeks to obtain privileged material that is clearly protected from disclosure by either the attorney-client privilege or the work product doctrine, or both.  But, when the circumstances of the documents at issue are considered, there is no doubt that each has been properly withheld.  *First*, the investigative notes concerning the allegations of sexual harassment were prepared during the course of the internal investigation led by, and at the direction of, the Company's General Counsel, for the singular purpose of aiding him in rendering legal advice to the Company about potential claims and potential legal remedies emanating from *a*

---

[1]    At the Court's request, Barnes & Noble is prepared to submit any of the challenged documents for *in camera* review.

*CEO's* alleged misconduct against a female subordinate.  This was not a routine human resources investigation nor was it conducted for a business purpose.  Moreover, these notes were created because of the prospect of litigation, as evidenced in part by the fact that the Company engaged outside litigation counsel as soon as the internal investigation began.  *Second*, the investigative notes of the Company's General Counsel taken during the key June 18, 2018 meeting, immediately after which the Potential Acquiror backed out of the potential transaction, contain the General Counsel's mental impressions of Plaintiff's behavior, again, in anticipation of litigation.  They are not merely a summary of a business meeting.  Nor did they serve any business purpose.  Rather, they contain what the General Counsel thought was significant *about the Company's CEO's appalling behavior* during that meeting for the purpose of rendering legal advice to the Company during an ongoing internal investigation into the CEO's misconduct.  *Third*, the drafts of press releases concerning Plaintiff's departure from the Company were reviewed and commented upon by the Company's counsel right before the event happened in order to provide legal advice about the wording of the document, a document with clear legal risks, as demonstrated by Plaintiff's defamation claim, and in anticipation of the very litigation that Plaintiff brought just weeks later. *Fourth*, the memorandum outside counsel prepared for the Board and the minutes of the June 27, 2018 Board meeting at which the Board voted to terminate Plaintiff's employment reflect outside counsel's legal advice.  *Finally,* neither Barnes & Noble's defenses to Plaintiff's defamation claim nor its mention in its press release that it was advised by outside counsel puts the privileged advice of its counsel "at issue" or waives the attorney-client privilege or work product protection.

Accordingly, Plaintiff's motion to compel should be denied.

2

## STATEMENT OF FACTS

**A.     Barnes & Noble Receives a Complaint of Sexual Harassment Against Plaintiff and Launches an Investigation**

In May 2018, a female employee of Barnes & Noble complained to the Chief Financial Officer ("CFO") that Plaintiff sexually harassed her and made her feel uncomfortable in his presence.  (Declaration of Bradley A. Feuer ("Feuer Decl."), ¶ 2; Answer, Affirmative Defenses & Countercl. ("Countercl.") (Oct. 30, 2018), ¶ 121, ECF No. 23.)  Shortly thereafter, the CFO escalated the complaint to Barnes & Noble's General Counsel, Mr. Bradley Feuer.  (Feuer Decl. ¶¶ 1-2.)  Mr. Feuer initiated an investigation into these serious allegations lodged against the Company's CEO.  (*Id.* ¶¶ 3-10.)  As part of his investigation, Mr. Feuer met with the female employee and prepared notes memorializing his meeting with her.  (*Id.* ¶¶ 3-4.)  The same day that Mr. Feuer met with the female employee, he engaged outside litigation counsel to provide legal advice.  (S*ee* Declaration of Anne Clark ("Clark Decl."), Ex. 4, Priv. Log #94-95; Clark Decl., Ex. 5, Red. Log #223; Feuer Decl. ¶ 6.)

Mr. Feuer spoke with the Senior Vice President of Communications and Public Affairs, Ms. Mary Ellen Keating, and the Chairman and Founder of the Company, Mr. Leonard Riggio, about the sexual harassment allegations.  (Feuer Decl. ¶¶ 9-10.)  In his role as General Counsel, Mr. Feuer directed Ms. Keating to meet with the female employee and Plaintiff, and to provide him with her notes of those meetings, to assist him in providing legal advice to the Company regarding Plaintiff's misconduct, possible legal claims that might be brought against the Company and/or CEO, and the possible defenses.  (*Id.* ¶¶ 9, 11-14.)  Mr. Riggio was present during some of the meetings.  (*Id.* ¶ 11-13.)[2]

---

[2]    The female employee consulted with her own counsel in June 2018.  (*See* Velazquez Decl., Ex. E.)

Barnes & Noble also received a complaint from a senior executive regarding his mistreatment by Plaintiff during this time period, which was also subsequently investigated. (*Id.* ¶ 16.)

**B.    During the Investigation, Plaintiff Attempts to Sabotage the Potential Transaction at the June 18, 2018 Meeting**

Throughout early 2018, Barnes & Noble and a Potential Acquiror engaged in discussions about a potential acquisition of Barnes & Noble, and as of late May 2018, Barnes & Noble had received a revised indicative proposal from the Potential Acquiror. (Countercl. ¶¶ 124-33.) On June 18, 2018, Mr. Feuer attended a critical meeting between Plaintiff, other Barnes & Noble executives, and the CEO and other executives at the Potential Acquiror. (Feuer Decl. ¶ 17; Countercl. ¶ 137.) Before the meeting, the CEO of the Potential Acquiror made clear that Plaintiff needed to explain a recent downward sales trend. (Countercl. ¶ 137.) Separately, the Barnes & Noble Board of Directors made clear to Plaintiff that it wished to pursue the potential transaction. (*Id.* ¶¶ 135, 139.) Nonetheless, during the course of the meeting, Plaintiff failed to address key issues and questions posed by the Potential Acquiror and instead launched into a diatribe in which he made a number of disparaging statements, casting Barnes & Noble in an extremely negative light. (*Id.* ¶ 140; Feuer Decl. ¶¶ 17-18.) Already in the midst of an investigation in which he was obtaining information for the purpose of advising the Company concerning its legal rights and obligations with respect to Plaintiff's alleged sexual harassment and bullying behavior, Mr. Feuer prepared notes about Plaintiff's conduct at the meeting. (Feuer Decl. ¶ 19.) Mr. Feuer also asked two other senior executives who attended the meeting to memorialize their recollections of Plaintiff's conduct at the meeting. (*Id.* ¶ 20.)

### C.   The Board of Directors Votes to Terminate Plaintiff's Employment, and Barnes & Noble Issues a Press Release Announcing His Termination

After May 24, 2018, Mr. Feuer was in frequent communication with outside counsel concerning Plaintiff's employment at Barnes & Noble, his misconduct, and potential grounds for Plaintiff's termination.  (*Id.* ¶¶ 15, 27)   In late June, a number of the exchanges involved drafts, revisions to, and a final version of a memorandum prepared by outside counsel to provide Barnes & Noble and its Board with legal advice.  (*Id.*; *see, e.g.*, Clark Decl., Ex. 4, Priv. Log #158-66.)  The Board received the memorandum on June 27, 2018, before a Board meeting scheduled for the same day.  (Clark Decl., Ex. 4, Priv. Log #167.)  At the meeting, the Company's Board of Directors voted to terminate Plaintiff's employment for "Cause" under his employment agreement based on the allegations of Plaintiff's sexual harassment, bullying of subordinates, and his sabotage of the potential transaction.  (Countercl. ¶ 145.)  Outside counsel was present at the meeting and rendered legal advice.  (Feuer Decl. ¶¶ 28-29.)

In light of the sensitive nature surrounding Plaintiff's departure from Barnes & Noble, the draft press releases prepared to announce that event were reviewed a number of times by both in-house and outside counsel.  (Feuer Decl. ¶¶ 24-25.)  After multiple rounds of review, Barnes & Noble issued a final press release on July 3, 2018, in which the Board announced Plaintiff's termination "for violations of the Company's policies."  (Countercl. ¶ 146; Clark Decl., Ex. 7.)  The Board also stated that "[t]his action was taken by the Company's Board of Directors who were advised by the law firm Paul, Weiss, Rifkind, Wharton & Garrison LLP."  (Clark Decl., Ex. 7.)  The release stated that Plaintiff "will not receive any severance payment and he is no longer a member of the Company's Board of Directors," but it did not provide further details about the reasons for Plaintiff's termination.  (Countercl. ¶ 146; Clark Decl., Ex. 7.)

### D.     Procedural Background

Following his termination for misconduct, Plaintiff sued Barnes & Noble on August 28, 2018, asserting claims for breach of contract and defamation.  (Compl. (Aug. 28, 2018), ECF No. 1.)  Plaintiff amended his complaint in October 2018 to add a third cause of action for the breach of the covenant of good faith and fair dealing.  (Am. Compl. (Oct. 5, 2018), ECF No. 15; Am. Compl. (Oct. 12, 2018), ECF No. 16.)  On October 30, 2018, Barnes & Noble filed its Answer, Affirmative Defenses, and Counterclaims, asserting three causes of action:  breach of the fiduciary duties of loyalty and good faith, faithless servant, and a declaratory judgment that Plaintiff's conduct constituted ample grounds for cancellation of his outstanding equity awards.  (Countercl. at 31-34.)  Since November 29, 2018, the parties have been engaged in, and continue to be in the process of, discovery.  (Declaration of Liza M. Velazquez ("Velazquez Decl."), ¶ 9.)  During discovery, Plaintiff has indicated his intent to depose ten Barnes & Noble witnesses, including two female employees who complained of sexual harassment by Plaintiff, the senior executive he bullied, Mr. Feuer, Ms. Keating, Mr. Riggio, the Vice President of Human Resources, and three members of the Board.  (*Id.* ¶ 10.)  The fact depositions have begun and are scheduled to be conducted over the next few months.  (*Id.*)

On April 24, 2019, Plaintiff filed a pre-motion letter seeking to file a motion to compel the production of certain privileged documents, and Barnes & Noble filed its response on April 29, 2019.  (Pl.'s Pre-Mot. Ltr. (Apr. 24, 2019), ECF No. 62; Def.'s Pre-Mot. Ltr. (Apr. 29, 2019), ECF No. 64.)  The district court held a pre-motion conference on May 6, 2019, and subsequently referred this discovery dispute to this Court.  (Order (Apr. 26, 2019), ECF No. 63; Am. Order (May 7, 2019), ECF No. 66.)  On May 17, 2019, Plaintiff filed the present motion. (Pl.'s Br.)

6

## ARGUMENT

**I.**  **Barnes & Noble's Investigation Notes Are Protected from Disclosure by the Attorney-Client Privilege and the Work Product Doctrine[3]**

**A.**  **The Investigative Notes Concerning Allegations of Sexual Harassment Are Protected By the Attorney-Client Privilege**

The first category of documents at issue here[4]—the investigative notes of the General Counsel and another senior executive concerning the allegations that Plaintiff sexually harassed a female employee—is clearly protected from disclosure by the attorney-client privilege. Plaintiff claims that these investigative notes are not privileged because, according to Plaintiff, they were created for business purposes, were part of a human resources investigation, and Plaintiff and the complainant were allegedly not advised that the purpose of their interviews was to gather information in order to provide legal advice to the Company.  (Pl.'s Br. 6-7.)  Each of these arguments is without merit.

The notes at issue were part of an investigation conducted by Barnes & Noble's General Counsel and those acting at his direction for the purpose of facilitating his provision of legal advice to the Company about the legal consequences of the sexual harassment allegations

---

[3]   New York law governs the attorney-client privilege issue in this diversity action, and federal law governs the work product doctrine issue. *See Windsor Secs., LLC* v. *Arent Fox LLP*, 273 F. Supp. 3d 512, 517 (S.D.N.Y. 2017) ("[I]n civil actions where 'state law supplies the rule of decision' . . . state law also governs matters of privilege. . . . 'While state law governs the question of attorney-client privilege in a diversity action, federal law governs the application of the work product doctrine.'" (citations omitted)).  The standards for attorney-client privilege are similar under New York and federal law. *See Gruss* v. *Zwirn*, 276 F.R.D. 115, 124 n.2 (S.D.N.Y. 2011), *rev'd in part*,  2013 WL 3481350 (S.D.N.Y. July 10, 2013) (providing the New York attorney-client privilege standard and noting that "[e]ssentially the same requirements apply under federal common law" and applying federal precedents to the issues, regardless of "whether they arise out of federal-question cases or diversity cases"); *see also Orbit One Commc'ns, Inc.* v. *Numerex Corp.*, 255 F.R.D. 98, 103 (S.D.N.Y. 2008) ("New York law governing the attorney-client privilege is generally similar to accepted federal doctrine, albeit with certain variants." (internal quotation marks and citations omitted)).

[4]   *See* Pl.'s Br. 4 n.1, Clark Decl., Ex. 4, Priv. Log #94-96, 122.  Although not noted by Plaintiff, this category also includes Clark Decl., Ex. 5, Red. Log #349-50.

against its CEO and as to the Company's rights and obligations concerning the alleged conduct. (Feuer Decl. ¶¶ 4-5.)  The notes were intended to be kept, and were kept, confidential.  (*Id.* ¶ 23.) As even Plaintiff acknowledges, the Company's investigation into Plaintiff's misconduct was *not* conducted by Human Resources.  (Am. Compl. ¶ 46.)  This was for two reasons: the complainant specifically asked that Human Resources not be involved and the allegations involved misconduct by the CEO, entailing a high degree of legal risk and requiring the General Counsel to advise the Company concerning its rights and obligations.  (Feuer Decl. ¶ 7.)[5]  The fact that Barnes & Noble's employee handbook provides that all complaints of alleged sexual harassment will be investigated does not alter the facts and circumstances concerning *this* particular investigation.   These allegations, involving the actions of the Company's most senior executive, were investigated by the General Counsel so that he could advise the Company's rights and obligations, potential litigation by or against the CEO, and assess the Company's litigation exposure.  (*Id.* ¶¶ 4-5, 7-9.) There was no business or routine human resources purpose.  (*Id.* ¶ 8.)

Immediately upon receiving a report from the CFO that a female employee had complained to him of Plaintiff's sexual harassment of her, Mr. Feuer met with the female employee to understand what had happened and prepared notes in order to render legal advice to the Company.  (*Id.* ¶¶ 2-4.)  His notes of that interview are clearly privileged.  *See, e.g.*, *Martinez* v. *Kleinfeld Bridal Corp.*, 16 Civ. 348 (RA) (JLC), 2017 WL 2859941, at *2 (S.D.N.Y. June 30, 2017) (where management relayed details of a workplace fight to counsel prior to initiating the employee's termination, counsel's notes were "protected from disclosure by attorney-client

---

[5]   In implying that Barnes & Noble failed to identify Mr. Feuer's role in the investigation of Plaintiff's misconduct in its Responses to Interrogatories (Pl.'s Br. 4 n.1), Plaintiff overlooks the full text of Barnes & Noble's response, which made clear that counsel was involved.  *See* Clark Decl., Ex. 3, at 10 ("Subject to and without waiver of the foregoing general objections, *and excluding counsel*, Barnes & Noble responds that the following Barnes & Noble employees participated in an investigation or inquiry into Plaintiff's conduct" (emphasis added)).

privilege" because "the notes memorialize the giving of information to the lawyer to enable him to give sound and informed advice" (internal quotation marks and citations omitted)). "Interviews of a corporation's employees by its attorneys as part of an internal investigation into wrongdoing and potentially illegal conduct have been repeatedly found to be protected by the attorney-client privilege." *Gruss*, 276 F.R.D. at 124-25 (citing cases and denying motion to compel production of counsel's notes and summaries of employee interviews).

In addition, as part of this investigation and to aid him in rendering legal advice concerning the Company's litigation exposure, possible legal claims being brought against the Company and/or CEO, and possible defenses, Mr. Feuer asked a senior female executive, Ms. Keating (the Senior Vice President of Corporate Communications and Public Affairs), to meet with the complainant and Plaintiff to understand what had happened. (Feuer Decl. ¶ 9.) Mr. Riggio was sometimes present.  (*Id.* ¶¶ 11-14.) Ms. Keating's notes of those meetings are likewise protected by the attorney-client privilege.  It is well-settled that "[f]actual investigations conducted by an agent of the attorney, such as 'gathering statements from employees, clearly fall within the attorney-client rubric.'"  *Gucci Am., Inc.* v. *Guess?, Inc.*, 271 F.R.D. 58, 71 (S.D.N.Y. 2010) (citations omitted).  *See also Farzan* v. *Wells Fargo Bank*, No. 12 Civ. 1217, 2012 WL 6763570, at *1 (S.D.N.Y. Dec. 28, 2012) (same).  "[C]ourts have frequently extended the attorney-client privilege to communications made to [non-lawyer employees] who have provided necessary assistance to attorneys."  *Gucci*, 271 F.R.D. at 71.  *See also Carter* v. *Cornell Univ.*, 173 F.R.D. 92, 93-95, n.3 (S.D.N.Y. 1997) (interview notes of non-lawyer whose duties did not normally include assisting counsel were covered by the attorney-client privilege where she had been asked specifically by counsel to conduct investigation to assist counsel in rendering legal advice); *First Chicago Int'l* v. *United Exchange Co. Ltd.*, 125 F.R.D. 55, 57-58 (S.D.N.Y. 1989) (investigation

records and interview notes created by non-lawyer employees at counsel's request to provide facts so that counsel could render a legal opinion were covered by the attorney-client privilege).

The cases Plaintiff cites do not support his position.  In *Koumoulis* v. *Independent Financial Marketing Group*, outside counsel acknowledged that "her advice would advance *business goals*."  295 F.R.D. 28, 45 (E.D.N.Y. 2013), *aff'd*, 29 F. Supp. 3d 142 (E.D.N.Y. 2014) (emphasis added).  *Pearlstein* v. *Blackberry Ltd.*, No. 13-CV-07060 (CM)(KHP), 2019 WL 1259382 (S.D.N.Y. Mar. 19, 2019), and *Gomez* v. *Metro District*, No. 3:11 CV 1934 (JBA), 2013 WL 2489138 (D. Conn. June 10, 2013) are likewise distinguishable:  both involved documents created predominantly for business purposes (concerning a market research report and a reduction-in-force, respectively).  *See* 2019 WL 1259382, at *1, *15; 2013 WL 2489138, at *6-*7.

Similarly, Plaintiff's assertion, citing to *Cruz* v. *Coach Stores, Inc.,* 196 F.R.D. 228, 230-31 (S.D.N.Y. 2000), that investigative notes are not privileged unless the interviewees were given an *Upjohn* warning is incorrect.  (Pl.'s Br. 6-7.)  Neither *Cruz* nor *Upjohn* stands for any such bright line rule.  Moreover, *Cruz* involved very different facts than those presented here.  The *Cruz* court's decision turned first and foremost on the fact that Coach had waived any privilege claim over an "Executive Summary" of a series of interviews conducted *by an outside audit firm* looking into alleged financial improprieties on Coach's behalf.  *Id.* at 229-31.  The summary had been publicly filed years before without objection by Coach.  *Id.* at 230.  The audit firm apparently interviewed both outside parties and employees, but made no attempt to make the employees "sufficiently aware that they were being questioned in order that the corporation could obtain legal advice."  *Id.* at 231 (citations omitted).  Based on the audit firm's findings, the Chief Administrative Officer promptly fired employees implicated in the wrongdoing.  *Id.*  As a result

of all of these factors, the *Cruz* court found that the "investigative audit" was "not solely, or even primarily" made "to enable its counsel to render legal advice to Coach." *Id.*

Here, the investigation was not done by an outside audit firm; it was conducted by the General Counsel and other senior executives under his direction, in order to provide legal advice to the Company regarding the acts of its CEO. (Feuer Decl. ¶¶ 7-14.)  The two employees interviewed, Plaintiff and the female complainant, were aware of Mr. Feuer's involvement. Plaintiff's own notes from this period make this clear and undermine his assertion that he was not aware that Company's counsel was involved in the investigation: *Plaintiff noted Mr. Riggio told him that the female employee asked for the General Counsel not to speak with the head of Human Resources.* (Velazquez Decl., Ex. F.)  The primary purpose of these meetings was to gather information so that the Company could obtain legal advice. (Feuer Decl. ¶¶ 3-9.)  Further, Plaintiff's own notes reference "counsel" under his "Q" heading. (Velazquez Decl., Ex. F.) [6]

Courts have found investigation notes to be privileged in similar circumstances, without discussing whether an *Upjohn* warning had been given. *See, e.g.*, *Martinez*, 2017 WL 2859941, at *2 (upholding counsel's notes as attorney-client privileged where senior management communicated facts about a workplace incident, without discussion of an *Upjohn* warning); *Carter*, 173 F.R.D. at 94-95 (finding investigation notes by non-lawyer acting at the direction of counsel to be attorney-client privileged, without discussion of an *Upjohn* warning).

---

[6]  Plaintiff's argument as to what is "typical" for an employee to be told during an investigative interview should be stricken, as it is based on an improper attempt by Plaintiff's counsel to provide expert testimony. (*See* Pl.'s Br. 7 n.6; Clark Decl. ¶ 10.)  *See, e.g.*, *Jarzyna* v. *Home Props., L.P.*, 201 F. Supp. 3d 650, 659-62 (E.D. Pa. 2016) (striking an attorney's declaration where the attorney was "attempting to take on the dual roles of expert witness and advocate" and where the attorney's "sworn statement was proffered to show facts needed to support class certification," such that the attorney had "injected himself as a fact witness").

11

**B.      The Investigative Notes Concerning Allegations of Sexual Harassment Are Also Work Product**

The investigative notes of the General Counsel and Ms. Keating concerning the allegations of sexual harassment are also work product because they were prepared in anticipation of litigation.[7]   Plaintiff's arguments to the contrary are unavailing.

Plaintiff points to three irrelevant facts in support of his assertion that there was no possible or threatened litigation when the investigation was conducted—that the complainant said she was not seeking compensation, that no one who spoke with Plaintiff mentioned possible or threatened litigation, and that Barnes & Noble's policy required an investigation of the allegations regardless of whether litigation was a possibility.  (Pl.'s Br. 7-8.)  However, the relevant facts, ignored by Plaintiff, demonstrate that these notes were created because of the prospect of litigation. Barnes & Noble was confronted with a complaint lodged *against its CEO for sexual harassment in the wake of the #MeToo movement*, circumstances under which the prospect of litigation was not just a remote possibility.  "A lawsuit need not be filed for the 'anticipation of litigation' requirement to be triggered."  *A.I.A. Holdings* v. *Lehman Bro., Inc.*, No. 97 Civ. 4978, 2002 WL 31556382, at *5-*6 (S.D.N.Y. Nov. 15, 2002) (internal quotation marks and citations omitted) (work product protection attached once the General Counsel and in-house litigation counsel became involved and began directing the gathering of information, even though litigation had not yet commenced).

The investigation was elevated to the General Counsel and the highest levels of senior executives, and the General Counsel, not Human Resources personnel, led and conducted the investigation.  (Feuer Decl. ¶¶ 7-8).  The Company also engaged outside litigation counsel on

---

[7]   *See* Pl.'s Br. 4 n.1, Clark Decl., Ex. 4, Priv. Log #94-96, 122.  Although not noted by Plaintiff, this category also includes Clark Decl., Ex. 5, Red. Log #349-50.

May 24, 2018, the same day that the complainant was interviewed by the General Counsel.  (Feuer Decl. ¶ 6; *see* Clark Decl., Ex. 4, Priv. Log #94-95; Clark Decl., Ex. 5, Red. Log #223).  Moreover, the female employee consulted an outside attorney shortly after the sexual harassment incidents, further demonstrating that the prospect of litigation was not a remote possibility.  (*See* Velazquez Decl., Ex. E.)  The fact that Barnes & Noble's policy provides that all complaints of alleged sexual harassment will be investigated is not dispositive.  It is the circumstances of the particular investigation and its purpose as related to the prospect of litigation that matters, not the existence of such a policy.  *See*, *e.g.*, *Johnson* v. *J. Walter Thompson U.S.A., LLC*, 16 Civ. 1805 (JPO)(JCF), 2017 WL 3432301, at *6 (S.D.N.Y. Aug. 7, 2017) (holding that the investigation documents were work product, reasoning that even though the defendant "ha[d] a written policy for investigating discrimination complaints," the investigation at issue was "unique in several ways," including that human resources personnel did not lead the investigation, the defendant engaged outside counsel, and the end product of the investigation, a report, "d[id] not appear to be in a form consistent" with the company's other investigations into discrimination).

Furthermore, the work product doctrine does not require that documents have been prepared "primarily or exclusively" to assist in litigation; rather, it simply requires that the documents would not have been created "in essentially similar form" irrespective of the anticipated litigation.  *In re Gen. Motors LLC Ignition Switch Litig.*, 80 F. Supp. 3d 521, 532 (S.D.N.Y. 2015).  Here, it is beyond dispute that these investigation notes would not have been created in "essentially the similar form" had Barnes & Noble not anticipated litigation.  (Feuer Decl. ¶ 22.)  Had litigation not been anticipated, Mr. Feuer would have, either orally or by a cursory note, asked Human Resources to handle the complaint and do the investigation, consulting with the Legal Department only if they thought it was necessary.  (*Id.*)  If that had been the case, Mr. Feuer would either not

have had any investigative notes of his own or they would have contained much less detail than those that he took during the course of this investigation.  (*Id.*)  He also would have given any notes he took to Human Resources to keep in their complaint files.  (*Id.*)

The cases Plaintiff cites are distinguishable.  In *Allied Irish Banks* v. *Bank of America*, the investigation into rogue trading at the company was conducted for a business purpose (to provide a public response to the fraud and mismanagement that had been committed), was publicly announced, and the documents at issue were created or reviewed in the course of preparing a report that the company publicly released.  240 F.R.D. 96, 99-102 (S.D.N.Y. 2007).  Likewise, the documents at issue in *AU New Haven, LLC* v. *YKK Corp.* were prepared in connection with various attempts to renegotiate a licensing agreement, not because of the prospect of litigation. No. 15 Civ. 03411 (GHW)(SN), 2017 WL 4838793, at *1, *3 (S.D.N.Y. Oct. 24, 2017), *order clarified on reconsideration*, No. 15 Civ. 03411 (GHW)(SN), 2018 WL 333828 (S.D.N.Y. Jan. 5, 2018).

In any event, Plaintiff cannot demonstrate a "substantial need" to justify overriding work product protection for the investigation notes.  As a matter of well-settled law, there is no substantial need where a party can obtain the information it seeks through deposition testimony. *See, e.g.*, *Greater New York Taxi Assoc.* v. *City of New York*, 13 Civ. 3089 (VSB) (JCF), 2017 WL 4012051, at *15 (S.D.N.Y. Sept. 11, 2017); *Gucci*, 271 F.R.D. at 80-81.  Here, Plaintiff has already indicated his intent to depose all of the Barnes & Noble employees involved in the investigation— the female employee, Ms. Keating, Mr. Feuer, and Mr. Riggio—at which depositions Plaintiff can ask the witnesses questions about the underlying facts and events, which, for many, Plaintiff himself has firsthand knowledge.  (Velazquez Decl., ¶ 10.)

14

## II.  The Notes Prepared by Barnes & Noble's General Counsel Concerning Plaintiff's Conduct at the June 18, 2018 Meeting with the Potential Acquiror Are Protected by the Attorney-Client  Privilege and Work Product Doctrine

Barnes & Noble's General Counsel's notes concerning Plaintiff's conduct at the June 18, 2018 meeting with the Potential Acquiror[8] were created to aid in his provision of legal advice, at a time when potential litigation was contemplated and outside litigation counsel had been engaged.  (Feuer Decl. ¶¶ 19-20.)  They also contain his mental impressions, and thus, are protected against disclosure by both the attorney-client privilege and the work product doctrine.  *See, e.g.*, *In re Gen. Motors*, 80 F. Supp. 3d at 530 (attorney-client privilege applies to investigation documents as long as one significant purpose was obtaining or providing legal advice and work product doctrine does not require documents to be prepared "primarily or exclusively" to assist in litigation").  Mr. Feuer also directed two senior executives who had attended the meeting to prepare notes of their recollections of Plaintiff's behavior at the meeting, which are also protected.  (Feuer Decl. ¶ 20.)

Plaintiff seems to suggest that Mr. Feuer's notes to himself about a meeting with Plaintiff and others cannot reflect an attorney-client communication.  (Pl.'s Br. 8.)  But, as Plaintiff himself claimed on his own privilege log with respect to notes he wrote to himself (Velazquez Decl., Ex. D), these notes reflect Mr. Feuer's thoughts and mental impressions, taken down for the purpose of rendering legal advice to his client, the Company, in the face of multiple and serious acts of misconduct on the part of the Company's CEO.  (Feuer Decl. ¶ 19.)  By June 18, 2018, Mr. Feuer was already investigating the sexual harassment and bullying complaints against Plaintiff,

---

[8]  *See* Pl.'s Br. 4 n.2, Clark Decl., Ex. 4, Priv. Log #142-43.  Although not noted by Plaintiff, Clark Decl., Ex. 4, Priv. Log #199 and Clark Decl., Ex. 5, Red. Log #353-55 also fall within this category, as they pertain to two other senior executives' recollections of the June 18 meeting, prepared at Mr. Feuer's request.  Clark Decl., Ex. 5, Red. Log #353-55 also fall within the category discussed in Section IV.

and outside litigation counsel had been engaged.  (*Id.* ¶¶ 6-8, 16, 19.)  Moreover, there was no

business need for Mr. Feuer to prepare notes about Plaintiff's conduct at the June 18 meeting with

the Potential Acquiror.  (*Id.* ¶ 19)  His notes were part of the Company's ongoing investigation

and reflect what Mr. Feuer thought was significant about Plaintiff's conduct.  (*Id.*)  Mr. Feuer's

notes are not a factual recitation of the June 18 meeting, nor are they a "transcript" of what was

said by the attendees; rather, his notes focus *solely* on Plaintiff's behavior during that meeting.  (*Id.*

¶¶ 19, 21.)  Likewise, the two senior executives' notes, prepared at Mr. Feuer's direction, focus on

their recollections of Plaintiff's conduct at the meeting.  (*Id.* ¶ 20.)  These notes were intended to

be, and were kept, confidential.  (*Id.* ¶ 23.)

        Courts in this circuit have found such notes to be work product.  *See, e.g., Greater*

*New York Taxi Assoc.*, 2017 WL 4012051, at *15 (finding that attorney's meeting notes were

opinion work product because "an attorney's mental processes are implicated when he or she

exercises selective judgment in determining what is worthy of being written down" (internal

quotation marks and citations omitted)); *Horn & Hardart Co.* v. *Pillsbury Co.*, 888 F.2d 8, 12 (2d

Cir. 1989) (affirming "district court's denial of discovery, based on a finding that [the general

counsel's] notes [about a meeting] contained mental impressions and were made with an eye

toward litigation" (internal quotation marks and citations omitted)).

        The cases on which Plaintiff relies are inapposite.  *See AU New Haven*, 2017 WL

48389793, at *3 (run-of-the mill contract negotiations between two companies where litigation

had not ensued after any of the previous failed negotiation attempts);  *Rogers* v. *Grimaldi*, No. 86

Civ. 1851 (RWS), 1986 WL 13459, at *1 (S.D.N.Y. Nov. 17, 1986) (litigation not anticipated

regarding draft agreements); *Women's InterArt Ctr., Inc.* v. *N.Y.C. Econ. Dev.*, 223 F.R.D. 156,

161 (S.D.N.Y. 2004) (attorney notes related to "business information"); *Redvanly* v. *NYNEX*

*Corp.*, 152 F.R.D. 460, 466 (S.D.N.Y. 1993) (attorney notes were "a running transcript of the meeting," "consist[ing] *entirely* of the initials of the persons at the meeting followed by what that person said.") (emphasis in original)).

As with the investigation notes concerning the allegations of sexual harassment, Plaintiff cannot meet his burden of showing a "substantial need" to justify overriding work product protection with respect to the notes about the June 18 meeting. *See, e.g.*, *Greater New York Taxi Assoc.*, 2017 WL 4012051, at *15. There were numerous individuals present, including Plaintiff himself, at the June 18 meeting. Plaintiff can depose the meeting participants, and has firsthand knowledge, about what occurred. *See Brown* v. *Unified Sch. Dist. No. 501*, No. 10–1096–JTM, 2011 WL 111693, at *3 (D. Kan. Jan. 13, 2011) (denying motion to compel attorney notes of a meeting where "plaintiff and his attorney were present during this meeting and have firsthand knowledge of what transpired during the meeting" concluding that the request to compel the notes was "merely an attempt to secure opposing counsel's mental impressions," and further noting that plaintiff failed to show he was unable to gather non-privileged information about the meetings through "alternative discovery tools").

## III.   The Draft Press Releases Are Privileged

The third category of documents at issue consists of draft press releases reviewed and revised by in-house and outside counsel during the period leading up to Plaintiff's dismissal.[9]

---

[9]   *See* Pl.'s Br. 4 n.3, Clark Decl., Ex. 4, Priv. Log #142-45, 147-49, 153-57, 169, 174-76, 178-80, 183-97, 194-98, 200-01, 205-09, 216-28, 230-32, 234, 250-51; Clark Decl., Ex. 5, Red. Log #362-63. While Plaintiff contends all these documents are at issue, by letter dated May 3, 2019, Barnes & Noble withdrew its claim of privilege for Priv. Log #217, 218, 219, 223, and 225 and produced those documents the same day. (Velazquez Decl., Ex. B.) In addition, Plaintiff appears to have inadvertently included Clark. Decl. Ex. 4, Priv. Log #142-43 and 188-93, and Clark Decl., Ex. 5, Red. Log #362-63 in this category; none of the descriptions for those documents mentions draft press releases. Most of these documents instead fall under other categories. *See* Section II (Clark Decl., Ex. 4, Priv. Log #142-43 (counsel's June 18 meeting notes)); Section IV (Clark Decl., Red. Log #362-63 (Board memo and Board minutes) and Clark Decl., Priv. Log #188, 192-93 (communications

(Feuer Decl. ¶¶ 24-25.)   The withheld documents reflect iterative rounds of consultation with counsel for the purpose of giving and/or receiving legal advice with respect to Plaintiff's departure from the Company and the wording of the announcement.  (*Id.* ¶ 24.)  These communications were intended to be and were maintained as confidential.  (*Id.* ¶ 26.)  The legal risks posed by the July 3, 2018 press release are demonstrated by Plaintiff's defamation claim based on the final version of that document.

The context in which these documents were exchanged clearly demonstrates that they are privileged.  At the time, the Company was in the process of dismissing Plaintiff for his misconduct.  (Feuer Decl. ¶ 24)  A press release was being issued by the Company to inform the public about Plaintiff's departure from the Company.  (*Id.*)  The Company sought the legal advice of counsel concerning Plaintiff's departure and how to word the press release, given the legal risks posed by this particular statement and to satisfy legal requirements.  (*Id.*)  *Pearlstein* v. *Blackberry Ltd.*, the case Plaintiff relies upon, only confirms that these documents are privileged.  2019 WL 1259382.  *Pearlstein* held that draft press releases sent to the company's in-house counsel for legal review, prior to filing them with the Securities Exchange Commission, *were covered by the attorney-client privilege*.  *Id.* at *19.[10]  The *Pearlstein* court made clear that "[d]raft documents sent to counsel for legal review are often found to constitute an attorney-client communication so long as the draft and communications concerning it were intended to be and maintained as

---

with outside counsel)).  Clark Decl., Ex. 4, Priv. Log #189-91 do not fall within any of the categories expressly challenged in this motion.

[10]  Plaintiff ignores this holding and instead cites to the court's holding at *13 about other draft press releases and related communications that are factually very different than the one at issue in this case. The press releases at issue on page 13 of the decision, unlike here and the press releases at issue on page 19 of the decision, were issued in rebuttal to a negative market research report and were held to be  "predominantly for business purposes," and therefore not privileged.

confidential.  This is true even where the document in its final form is intended to be disseminated publicly."  *Id.*

Further, many of these draft press releases and related communications are also protected work product because they were prepared due to the prospect of litigation.  (Feuer Decl. ¶ 25.)  *See Wilder* v. *World of Boxing LLC*, 324 F.R.D. 57, 63-64 (S.D.N.Y. 2018) (email between plaintiffs and attorney and later discussions in which attorney provided recommendations protected by work product doctrine, finding they "were not something that would have occurred absent the potential for litigation").  While Plaintiff argues that Barnes & Noble had only a "generalized desire to avoid litigation" (Pl.'s Br. 9), the fact is that the Company was confronted with allegations of misconduct involving its CEO and Plaintiff was about to be discharged for gross misconduct, was not to be paid any severance, and after his firing, bitterly disputed the grounds for termination.  (Feuer Decl. ¶ 25.)  Plaintiff's reliance on *In re Grand Jury Proceedings* is unavailing.  No. M-11-189, 2001 WL 1167497 (S.D.N.Y. Oct. 3, 2001).  The court there acknowledges that "no lawsuit need already been filed for the 'in anticipation of litigation' requirement to be met" and that a document "may be protected even if it was 'created prior to the event giving rise to litigation.'"  *Id.* at *14 (citations omitted).  *See also Patel* v. *L-3 Commc'ns Holdings, Inc.*, 14-CV-6038 (VEC), 14-CV-6182 (VEC), 14-CV-6939 (VEC), 2016 WL 4030704, at *3 (S.D.N.Y. July 25, 2016) ("work product protection applies even when documents are created for multiple purposes").

## IV.    Barnes & Noble's Communications with Outside Counsel, Including the Memorandum that Outside Counsel Prepared for the Board, Are Privileged

The last category of documents at issue consists of a memorandum from outside counsel providing legal advice to the Board, portions of the June 27, 2018 Board minutes reflecting that advice, and communications with counsel, all of which reflect the request or provision of legal

advice in connection with Plaintiff's termination.[11]   (Feuer Decl. ¶¶ 15, 27-29.)   The memorandum

from outside counsel and communications relating thereto are clearly privileged.   *See Welland* v.

*Trainer*, No. 00 Civ. 0738, 2001 WL 1154666, at *2 (S.D.N.Y. Oct. 1, 2001), *aff'd*, 116 F. App'x

321 (2d Cir. 2004) (documents providing legal advice regarding internal investigation protected

by attorney-client privilege).   The cases Plaintiff relies upon are inapposite.   *See OneBeacon Ins.*

*Co.* v. *Forman Int'l, Ltd.,* No. 04 Civ. 2271(RWS), 2006 WL 3771010, at *5-*6 (S.D.N.Y. Dec.

15, 2006) (involving an insurance coverage dispute in which the court held that documents at issue

were prepared in the ordinary course of the *insurer's* business); *Allied Irish Banks,* 240 F.R.D. at

101, 104 (involving drafts and memoranda prepared for the purpose of generating a *public* report

by an independent expert and his consulting firm—a report "which indisputably did not provide

legal advice").

        Likewise, the redacted portions of the meeting minutes of the June 27, 2018 Board

meeting at issue contain counsel's legal advice and are also privileged.   One of the cases Plaintiff

---

[11]   *See* Pl.'s Br. 4 n.4, Clark Decl., Ex. 5, Red. Log #349-70, 372-78; *see* Pl.'s Br. 4 n.5, Clark Decl., Ex. 4, Priv. Log #150-51, 158-68, 170, 173, 177, 179, 189-91, 199, 229.   Plaintiff disputes two redaction log entries (Clark Decl., Ex. 5, #354 and 355) which Barnes & Noble has previously advised Plaintiff have been revised.   (*See* Velazquez Decl., Ex. C at 5 (Ex. B of letter).)

Further, Plaintiff cites to various log entries that are neither drafts, revisions to, or the final version of the memorandum the Board received nor the minutes of the June 27, 2018 Board meeting.   They are communications with outside counsel concerning the request or provision of legal advice and therefore should be included within this section: Clark Decl., Ex. 5, Red. Log #351-54, 360-61; Clark. Decl., Ex. 4, Priv. Log #170, 173, 177.   Similarly, the following are communications with outside counsel inadvertently cited in another footnote by Plaintiff which should be instead included within this section:  Clark Decl., Ex. 4, Priv. Log #188, 192-93.

Clark Decl., Ex. 5, Red. Log #353-55 falls both within this category and Section II (senior executives' June 18 meeting notes, prepared at the request of counsel).

Finally, the following fall within other categories.  *See* Section I (Clark Decl., Ex. 5, Red. Log #349-50 (sexual harassment investigation notes)); Section II (Clark Decl., Ex. 4, Priv. Log #199 (senior executives' June 18 meeting notes, prepared at the request of counsel)); Section III (Clark Decl., Ex. 4, Priv. Log #179 (draft press releases)).   Others do not fall within any category of documents Plaintiff expressly challenges in this motion.  *See* Clark Decl., Ex. 4, Priv. Log# 150-51, 189-91, 229; *see* Velazquez Decl., Ex. A (letter providing Red. Log #378 entry).

cites supports Barnes & Noble's position.  *See Vidal* v. *Metro-N. Commuter Ry.*, No. 3:02 Civ. 0248 (MPS)(WIG), 2014 WL 413952, at *9 (D. Conn. Feb. 4, 2014) (ordering that certain meeting minutes which contained legal advice and analysis be redacted).  Plaintiff's other case, *Strougo* v. *BEA Associates*, is factually distinguishable in that the meeting minutes at issue there either did not reflect counsel's "litigation-related thought processes" or were not privileged because the presence of third parties had waived the privilege.  199 F.R.D. 515, 524-26 (S.D.N.Y. 2001).

## V. Barnes & Noble Has Not Put the Privileged Advice of Its Counsel "At Issue"

Plaintiff argues that Barnes & Noble has put the privileged advice of its counsel "at issue" through its defense to Plaintiff's defamation claim.  (Pl.'s Br. 10-12.)  Specifically, Plaintiff claims that Barnes & Noble has waived privilege over the documents at issue because in its answer it stated that its public statements about Plaintiff's termination were made in good faith and it asserted the affirmative defense of qualified privilege.  (Pl.'s Br. 10-11.)  Plaintiff also asserts that Barnes & Noble has waived privilege through the statement in the July 3, 2018 press release that his termination was taken by the Board, who were advised by Paul, Weiss. (Pl.'s Br. 12.)  These arguments are without merit.

To find "at-issue" waiver, the party arguing for a waiver must show that "the opposing party relies on the privileged advice" to prove a claim or defense.  *In re Cty. of Erie*, 546 F.3d 222, 228-29 (2d Cir. 2008); *see also Deutsche Bank Tr. Co. of Ams.* v. *Tri-Links Inv. Tr.*, 43 A.D.3d 56, 64 (1st Dep't 2007) (applying New York law, noting that "at-issue waiver occurs when the party has asserted a claim or defense that he intends to prove by use of the privileged materials" (internal quotation marks and citations omitted)).  A party does not put privileged information at issue merely by stating the fact of consultation with counsel.  *See Alcor Life Extension Found.* v. *Johnson*, 43 Misc. 3d 1225(A), 2014 WL 2050661, at *8 n.4 (N.Y. Sup. 2014), *aff'd*, 136 A.D.3d 464 (N.Y. App. Div. 2016) (no waiver in defamation case where defendant had merely stated the

fact of consultation with counsel).  Where a party is not asserting a claim or defense that it intends to prove by use of the privileged materials, courts do not find "at issue" waiver.  *See, e.g.*, *Windsor*, 273 F. Supp. 3d at 519 (finding no "at issue" waiver where the plaintiff "made clear" that it did not intend to rely on any of its privileged communications to prove its claims); *Gruss*, 276 F.R.D. at 134-39 (denying plaintiff's motion to compel production of counsel's notes and summaries of employees' interviews and finding no waiver as to those documents).

Here, Barnes & Noble is not relying on the privileged advice of its lawyers to defend against Plaintiff's defamation claim.  It intends to demonstrate the truth of the statement in its July 3 press release that Plaintiff was terminated for violations of Company policies through the testimony of witnesses and non-privileged documents, all of which are available to Plaintiff in discovery.  *See Windsor*, 273 F. Supp. 3d at 519 ("Indeed, case law frequently ends the inquiry into 'at issue' waiver once it is established that the party does not intend to use [privileged] materials as proof.").

Under New York law, a qualified privilege attaches to statements that involve a matter of public concern (such as the termination of a Company's CEO).  *See Chapadeau* v. *Utica Observer-Dispatch*, 38 N.Y.2d 196, 198-99 (1975).  When the allegedly defamatory statement is within the sphere of public concern, the burden falls on the plaintiff to show, by a preponderance of the evidence, that the defendant acted in a "grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties" when it made the statement.  *Id.* at 199.  The law is clear that this is *Plaintiff's* burden.  *See, e.g.*, *Mott* v. *Anheuser-Busch, Inc.*, 910 F. Supp. 868, 875, 88 (N.D.N.Y. 1995), *aff'd*, 112 F.3d 504 (2d Cir. 1996).  Moreover, the *Chapadeau* standard focuses on the defendant's process and can be shown by "objective proof, without the

need to resort to an exploration of the defendant's subjective mental state." *Karaduman* v.

*Newsday, Inc.*, 51 N.Y.2d 531, 545 (1980).[12]

Further, if Plaintiff were correct that the application of the *Chapadeau* standard

entailed waiver of contemporaneous legal advice, then every defamation claim involving

statements within the sphere of public concern would involve a waiver of privilege.  That is not

the law.  *See Alcor*, 2014 WL 2050661, at *8 n.4 (no waiver in defamation case involving

*Chapadeau* "gross irresponsibility" standard where defendant merely stated the fact of

consultation with counsel).  In *none* of Plaintiff's cases did a court find a waiver of attorney-client

privilege through the defense of a defamation claim involving the *Chapadeau* standard.  The cases

he cites are wholly inapposite.[13]

In any event, to find waiver, as one of Plaintiff's own cases indicates, Plaintiff must

show that access to the privileged advice provided by the Company's lawyers is the "only" means

by which he can challenge Barnes & Noble's claims or defenses.  *See, e.g.*, *Scott*, 67 F. Supp. 3d

at 611.  Plaintiff cannot possibly satisfy that high standard here, where he can depose Barnes &

Noble's witnesses about relevant facts and events.

---

[12]   Plaintiff's reliance on *Fine* v. *ESPN, Inc.* to suggest otherwise is unavailing, as *Fine* is non-binding,
and did not involve waiver of attorney-client privilege or work product.  11 F. Supp. 3d 209, 225
(N.D.N.Y. 2014).

[13]   *See In re Cty. of Erie*, 546 F.3d at 228-230 (not involving defamation or *Chapadeau*); *Albert* v.
*Loksen*, 239 F.3d 256, 271-72 (2d Cir. 2001) (discussing "actual malice" in relation to a different type
of qualifiedly privileged communication, not deciding whether the *Chapadeau* standard applied, with
no discussion of waiver of attorney-client privilege); *Scott* v. *Chipotle Mexican Grill, Inc.*, 67 F.
Supp. 3d 607, 614 (S.D.N.Y. 2014) (discussing FLSA statutory defenses based on advice of counsel);
*Fleming* v. *Hymes-Esposito*, No. 12 Civ. 1154 (JPO), 2013 WL 1285431, at *9 (S.D.N.Y. Mar. 29,
2013) (no discussion of waiver of attorney-client privilege or the *Chapadeau* standard); *Hoesten* v.
*Best*, 34 A.D.3d 143 (1st Dep't 2006) (no discussion of waiver of attorney-client privilege or the
*Chapadeau* standard); *Dawson* v. *New York Life Ins. Co.*, 901 F. Supp. 1362, 1369-70 (N.D. Ill.
1995) (discussing waiver under Illinois law); *Arista Records LLC* v. *Lime Grp. LLC*, No. 06 Civ.
5936, 2011 WL 1642434, at *1 (S.D.N.Y. Apr. 20, 2011) (copyright infringement case).

Lastly, Plaintiff's contention that Barnes & Noble waived its attorney client privilege by simply referring to the fact that it consulted with outside counsel in its July 3, 2018 press release is plainly misguided.  *See Alcor*, 2014 WL 2050661, at *8 n.4 (no waiver in defamation case where defendant merely stated the fact of consultation with counsel).  It is Plaintiff, not Barnes & Noble, who has injected the press release into this case.  Moreover, Plaintiff's cases are inapplicable, because in each of them, unlike here, the defendants had disclosed the substance of counsel's advice.  *See Electro* v. *Sci. Indus., Inc. v. Gen. Scanning Inc.*, 175 F.R.D. 539, 543 (N.D. Cal. 1997) (concluding that the "substantive disclosures of counsel's advice," *i.e.*, revealing "the bottom line of the lawyer's opinion," was "critical" to the finding of waiver); *E.I. DuPont de Nemours & Co.* v. *Kolon Indus., Inc.*, 269 F.R.D. 600, 607 (E.D. Va. 2010) (finding waiver where plaintiff "chose to broadcast the substance of [its] communications [with the FBI] to the public").  Barnes & Noble's press release only stated the fact of outside counsel's engagement, *not* the substance of outside counsel's advice.  (*See* Clark Decl., Ex. 7.)

## CONCLUSION

For the reasons set forth above, Barnes & Noble respectfully requests that the Court deny Plaintiff's Motion to Compel.

Dated:   New York, New York
         May 31, 2019

PAUL, WEISS, RIFKIND, WHARTON &
  GARRISON LLP

By:   /s/ Jay Cohen
      Jay Cohen
      Liza M. Velazquez
      Maria H. Keane

1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
jaycohen@paulweiss.com
lvelazquez@paulweiss.com
mkeane@paulweiss.com

*Attorneys for Defendant and*
*Counterclaim Plaintiff Barnes & Noble, Inc.*