UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
DEMOS PARNEROS,                                    :

                        Plaintiff,                 :            OPINION & ORDER

        -v.-                                       :            18 Civ. 7834 (JGK) (GWG)

BARNES & NOBLE, INC.,                              :

                        Defendant.                 :
---------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

        This case was brought by Demos Parneros, the former Chief Executive Officer of Barnes

& Noble, Inc. ("Barnes & Noble"), against Barnes & Noble to seek compensation for his firing,

including claims of breach of contract and defamation.  Barnes & Noble has asserted

counterclaims against Parneros as well.  Parneros has now filed a motion seeking to compel

Barnes & Noble to produce certain documents that it has withheld on the basis of the attorney-

client privilege and the work product doctrine.[1]  Barnes & Noble opposes this motion.  For the

_____

[1]  See Notice of Motion to Compel Discovery, filed May 17, 2019 (Docket # 74);
Memorandum of Law in Support of Plaintiff's Motion to Compel, filed May 17, 2019 (Docket
# 75) ("Pl. Mem."); Declaration of Demos Parneros, filed May 17, 2019 (Docket # 76)
("Parneros Decl."); Declaration of Anne L. Clark, filed May 17, 2019 (Docket # 77) ("Clark
Decl."); Defendant's Memorandum of Law in Opposition to Plaintiff's Motion to Compel, filed
May 31, 2019 (Docket # 83) ("Def. Mem."); Declaration of Bradley A. Feuer, filed May 31,
2019 (Docket # 84) ("Feuer Decl."); Declaration of Liza M. Velazquez, filed May 31, 2019
(Docket # 85); Reply Memorandum of Law in Support of Plaintiff's Motion to Compel, filed
June 14, 2019 (Docket # 89) ("Pl. Reply Mem."); Reply Declaration of Demos Parneros, filed
June 14, 2019 (Docket # 90) ("Parneros Reply Decl."); Reply Declaration of Anne L. Clark,
filed June 14, 2019 (Docket # 91) ("Clark Reply Decl."); Letter from Anne L. Clark, filed July 3,
2019 (Docket # 92) (also filed as Docket ## 114, 118) ("Clark July 3, 2019, Letter"); Letter from
Liza M. Velazquez, filed July 8, 2019 (Docket # 93) ("Velazquez July 8, 2019, Letter"); Letter
from Anne L. Clark, dated July 30, 2019 (Docket # 96) ("Clark July 30, 2019, Letter"); Letter
from Liza M. Velazquez, filed July 30, 2019 (Docket # 97) (also filed as Docket # 116)
("Velazquez July 30 Letter"); Letter from Anne L. Clark, filed Aug. 2, 2019 (Docket #
98)("Clark Aug. 2 Letter"); Letter from Liza M. Velazquez, filed Aug. 2, 2019 (Docket # 99)
("Velazquez Aug. 2 Letter"); Letter from Anne L. Clark, filed Aug. 15, 2019 (Docket # 104) (also

following reasons, Parneros's motion to compel is granted in part and denied in part.

I. BACKGROUND

A. Facts

From November 2016 until July 2, 2018, Parneros worked for Barnes & Noble, a retail bookstore chain, first as its Chief Operating Officer ("COO") and then as its Chief Executive Officer ("CEO"). See Amended Complaint, filed Oct. 12, 2018 (Docket # 16) ("Am. Compl."), ¶¶ 1, 7, 12, 22-23. On May 24, 2018, at a time when Parneros was CEO, Barnes & Noble's Chief Financial Officer, Allen Lindstrom, informed the company's General Counsel, Bradley A. Feuer, that a female employee who served as an executive assistant (the "Executive Assistant") had reported to him that Parneros sexually harassed her and made her uncomfortable. See Feuer Decl. ¶ 2. Feuer met with the Executive Assistant, and prepared notes documenting his meeting with her. Id. ¶¶ 3-4.[2] Feuer asserts that he prepared the notes "so that [he] could render legal advice to the Company regarding its rights and obligations with respect to the alleged conduct by the CEO." Id. ¶ 4.

Feuer engaged outside counsel, Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss") on the same day he met with the Executive Assistant. Id. ¶ 6. He also "led" an investigation into the allegations, which Feuer decided he would do himself along with "other senior executives at [his] direction." Id. ¶ 7. The Executive Assistant had specifically stated that she did not want the company's Human Resources department to be involved, id., because she

_____

filed as Docket # 110) ("Clark Aug. 15 Letter"); Letter from Liza M. Velazquez, filed Aug. 16, 2018 (Docket # 105); Letter from Liza M. Velazquez, filed September 20, 2019 (Docket # 128) ("Velazquez Sept. 20 Letter"); Letter from Anne L. Clark, dated September 20, 2019 (Docket # 129) ("Clark Sept. 20 Letter").

   [2] Feuer does not specify if the notes were prepared contemporaneously.

was concerned that the head of Human Resources had a close relationship with Parneros, see Excerpts of the Videotaped Deposition of [the Executive Assistant], dated June 28, 2019 (annexed as Ex. B to Clark July 3, 2019, Letter), at 238-39.

On the same day, May 24, 2018, Feuer directed Mary Ellen Keating, Barnes & Noble's Senior Vice President of Corporate Communications and Public Affairs, to meet with the Executive Assistant and Parneros, and to provide Feuer with any notes of the meeting because he thought the notes "would enable [Feuer] to provide legal advice to the Company" regarding its exposure to legal claims.  Feuer Decl. ¶ 9.

On May 30, 2018, Keating and Leonard Riggio, who was the Founder and Chair of Barnes & Noble, met with the Executive Assistant concerning her allegations.  Id. ¶ 11.  Feuer asserts that this meeting was "part of the investigation I was directing."  Id. ¶ 11.  At his deposition, however, Riggio said that the meeting with the Executive Assistant came about because he had personally "decided that [he] wanted to speak with the Executive Assistant."  Clark Aug. 15 Letter at 2.  He also claimed that it was he who asked Keating to sit in on the meeting with him, which he arranged for the Executive Assistant's "comfort."  Id.  The reason he arranged for the meeting, Riggio said, was because he was the chairman of the company and "the buck stops here."  Id.

On June 4, 2018, Riggio met with Parneros, with Keating present, to discuss the allegations.  Id. ¶ 12.[3]

On June 5, 2018, Keating, Riggio, and the Executive Assistant met twice, and Keating

---

[3]  According to Parneros, during this meeting Parneros denied having said the particular inappropriate words alleged by the Executive Assistant, see Parneros Decl. ¶ 2 (citing Am. Compl. ¶¶ 57-62), and, in a follow-up conversation, Riggio stated that he did not believe the Executive Assistant's allegations to be to "too serious," id.

and the Executive Assistant also met alone.  Feuer Decl. ¶ 13.  That same day, Parneros, Keating, and the Executive Assistant had a meeting, id. ¶ 14 — which we will refer to as the "apology meeting" — at which Parneros apologized for his conduct, see Parneros Reply Decl. ¶ 7.  Keating and Parneros also had a separate conversation that day.  Feuer Decl. ¶ 14.

Meanwhile, on May 28, 2018, Feuer became aware of allegations that Parneros had engaged in workplace bullying of another executive, Alan Lindstrom.  Feuer Decl. ¶ 16; see Excerpts of Videotaped Deposition Testimony of Al Ferrara, dated June 5, 2019 (annexed as Ex. 1 to Clark Reply Decl.) ("Ferrara Dep."), at 282-83.

On June 18, 2018, a meeting was held between Barnes & Noble executives, including Parneros and Feuer, and the executives of a company that was interested in acquiring Barnes & Noble (the "Potential Acquirer").  Feuer Decl. ¶ 17.  According to Barnes & Noble, prior to the meeting, the Potential Acquirer had made clear to Barnes & Noble executives, including Parneros, that it was very important for Parneros to "provide a cogent explanation about a downward trend in the Company's sales at that meeting."  Id.  Instead, according to Barnes & Noble, Parneros "left the Potential Acquir[e]r's questions unanswered and engaged in a long, rambling monologue in which he painted [Barnes & Noble] in an unduly negative and harsh light."  Id.  Feuer prepared notes memorializing Parneros's behavior at the June 18, 2018, meeting, which Feuer asserts were "solely focused on [Parneros's] behavior, not on the business aspects of the meeting," and which he "would not have prepared . . . had [he] not been concerned about the prospect of litigation" by or against Parneros in the near future.  Id. ¶ 19.  At Feuer's direction, two other senior executives who attended the June 18, 2018, meeting also documented their recollections of Parneros's conduct.  Id. ¶ 20.  The day after the meeting, the Potential Acquirer withdrew its offer.  Id. ¶ 17.

In late June 2018, Feuer received and reviewed drafts of a memorandum prepared by Barnes & Noble's outside counsel, which was prepared to provide Barnes & Noble's Board of Directors with legal advice regarding Parneros's possible termination. Id. ¶ 27. The Board met on June 27, 2018, and voted to terminate Parneros's employment. See id. ¶ 29. Scott Barshay of Paul, Weiss attended the Board Meeting and rendered legal advice. Id. ¶ 28. Feuer prepared minutes of that board meeting. Id. ¶ 29.

On July 2, 2018, Barnes & Noble fired Parneros, and refused to pay him severance. See Am. Compl. ¶¶ 2, 49. The following day, July 3, 2018, Barnes & Noble issued a press release stating that it had fired Parneros for "violations of the Company's policies," noting that the "action was taken by the Company's Board of Directors who were advised by the law firm Paul, Weiss, Rifkind, Wharton & Garrison LLP." Id. ¶ 48; see Press Release: Barnes & Noble Announces CEO Termination, dated July 3, 2018 (annexed as Ex. 7 to Clark Decl.) ("Press Release"). The Press Release further noted that Parneros's termination was "not due to any disagreement with the Company regarding its financial reporting, policies or practices or any potential fraud relating thereto," and that Parneros would "not receive any severance payment" and was "no longer a member of the Company's Board of Directors." See Press Release. Feuer and outside counsel for Barnes & Noble had reviewed several drafts of this press release beginning in late June 2018. See Feuer Decl. ¶ 24. As part of his claim for defamation, Parneros asserts that the language of the press release implied that he had engaged in serious sexual misconduct and that Barnes & Noble understood that the press release would be read in such a manner — yet nonetheless published it knowing that this implication was false. See Am. Compl. ¶¶ 2, 52.

Parneros brought the instant action against Barnes & Noble for breach of his employment

contract based on its failure to pay him severance, see id. ¶¶ 84-97; for defamation because Barnes & Noble falsely suggested that Parneros had engaged in serious misconduct, see id. ¶¶ 88-92; and for breach of the covenant of good faith and fair dealing with respect to his employment contract, id. ¶¶ 93-98.  Barnes & Noble has asserted counterclaims against Parneros for breach of the fiduciary duties of loyalty and good faith, see Defendant's Answer, Affirmative Defenses, and Counterclaims, filed Oct. 30, 2018 (Docket # 23) ("Answer"), ¶¶ 149-52; for damages resulting from his acting as a faithless servant to the company, id. ¶¶ 153-59; and for a declaratory judgment that Parneros's conduct constituted grounds for the cancellation of awards that would have otherwise been due to him, id. ¶ 167.

B.  Documents at Issue

Parneros seeks the discovery of the following documents that Barnes & Noble has withheld under the attorney-client privilege and/or work product doctrine: 1) documents prepared during the course of Feuer's investigation into the sexual harassment allegations against Parneros; 2) Feurer's and the other executives' notes from the June 18, 2018, meeting with the Potential Acquirer; 3) drafts of the press release announcing Parneros's termination from Barnes & Noble; 4) a report prepared by Paul, Weiss that was provided to Barnes & Noble's Board of Directors prior to the meeting at which the Board voted to terminate Parneros's employment; and 5) the minutes of the Board meeting at which the Board voted to terminate Parneros's employment.  See Pl. Mem. at 4, nn. 1-5.

On July 11, 2019, this Court directed Barnes & Noble to provide copies to the Court of the disputed documents in the event that the Court felt it necessary to conduct an in camera review of any of the documents.  See Order, filed July 11, 2019 (Docket # 94).  Barnes & Noble did so.  See Letter from Liza M. Velazquez, filed Aug. 8, 2019 (Docket # 100).  The Court

ultimately did not find it necessary to review the documents in camera in order to decide the privilege issues.

II. GOVERNING LAW

    A. Law Governing Attorney-Client Privilege

Because this Court's subject matter jurisdiction is based upon diversity, see Am. Compl. ¶ 5, state law provides the rule of decision concerning the claim of attorney-client privilege, see Fed. R. Evid. 501; Dixon v. 80 Pine St. Corp., 516 F.2d 1278, 1280 (2d Cir. 1975). Both Barnes & Noble and Parneros agree that New York law applies to the issue of attorney-client privilege. See Def. Mem. at 7 n.3; Clark July 30, 2019, Letter, at 1.

In New York, the statutory codification of the privilege is as follows:

> [A]n attorney or his or her employee, or any person who obtains without the knowledge of the client evidence of a confidential communication made between the attorney or his or her employee and the client in the course of professional employment, shall not disclose, or be allowed to disclose such communication, nor shall the client be compelled to disclose such communication . . . .

N.Y. C.P.L.R. § 4503(a)(1). For the privilege to apply, the communication from the attorney to client must be made "for the purpose of facilitating the rendition of legal advice or services, in the course of a professional relationship." Rossi v. Blue Cross & Blue Shield of Greater N.Y., 73 N.Y.2d 588, 593 (1989). The communication itself must be "primarily or predominantly of a legal character." Id. at 594. "The critical inquiry is whether, viewing the lawyer's communication in its full content and context, it was made in order to render legal advice or services to the client." Spectrum Sys. Int'l Corp. v. Chem. Bank, 78 N.Y.2d 371, 379 (1991). "[L]egal advice involves the interpretation and application of legal principles to guide future

conduct or to assess past conduct." In re Cty. of Erie, 473 F.3d 413, 419 (2d Cir. 2007).[4]

"A corporation's communications with counsel, no less than the communications of other clients with counsel, are encompassed within the legislative purposes of CPLR 4503, which include fostering uninhibited dialogue between lawyers and clients in their professional engagements, thereby ultimately promoting the administration of justice." Rossi, 73 N.Y.2d at 592. A communication between an attorney and the agent or employee of a corporation may be privileged where the agent "possessed the information needed by the corporation's attorneys in order to render informed legal advice." In re Copper Mkt. Antitrust Litig., 200 F.R.D. 213, 218-19 (S.D.N.Y. 2001) (citing Upjohn Co. v. United States, 449 U.S. 383, 391 (1981)). "The privilege applies to communications with attorneys, whether corporate staff counsel or outside counsel." Rossi, 73 N.Y.2d at 592; accord Stock v. Schnader Harrison Segal & Lewis LLP, 142 A.D.3d 210, 216 (1st Dep't 2016). Nonetheless, because in-house counsel may have "mixed business-legal responsibility . . . their day-to-day involvements in their employers' affairs may blur the line between legal and nonlegal communications." Rossi, 73 N.Y.2d at 592. Accordingly, given that "privilege obstructs the truth-finding process and its scope is limited to that which is necessary to achieve its purpose . . . the need to apply it cautiously and narrowly is

---

[4] While In re Cty. of Erie was decided under federal privilege law, it has long been recognized that New York law on attorney-client privilege is "generally similar to accepted federal doctrine." Bank of Am., N.A. v. Terra Nova Ins. Co. Ltd., 211 F. Supp. 2d 493, 495 (S.D.N.Y. 2002); accord Argos Holdings Inc. v. Wilmington Tr. Natl. Ass'n., 2019 WL 1397150, at *2 (S.D.N.Y. Mar. 28, 2019) ("New York law of attorney-client privilege is, with certain exceptions, substantially similar to the federal doctrine.") (internal quotation marks and citation omitted); Edebali v. Bankers Stand. Ins. Co., 2017 WL 3037408, at *4 n.2 (E.D.N.Y. July 17, 2017) ("[T]he distinction between New York and federal law on attorney-client privilege is quite indistinguishable, as the law intersects in all of its facets, and are viewed interchangeably.") (internal quotation marks and citation omitted). Because the law of the two jurisdictions is similar in all respects discussed in this opinion, we sometimes cite to cases applying federal law such as In re Cty. of Erie.

heightened in the case of corporate staff counsel, lest the mere participation of an attorney be used to seal off disclosure." Id. at 593.

Under New York law, "the burden of establishing any right to protection is on the party asserting it; the protection claimed must be narrowly construed; and its application must be consistent with the purposes underlying the immunity." Spectrum Sys., 78 N.Y.2d at 377 (citing cases). "The proponent of the privilege has the burden of establishing that the information was a communication between client and counsel, that it was intended to be and was kept confidential, and [that] it was made in order to assist in obtaining or providing legal advice or services to the client." Charter One Bank, F.S.B. v. Midtown Rochester, L.L.C., 191 Misc. 2d 154, 166 (Sup. Ct. 2002); accord People v. Mitchell, 58 N.Y.2d 368, 373 (1983) (citing cases). Such showings must be based on competent evidence, usually through affidavits, deposition testimony or other admissible evidence. See von Bulow by Auersperg v. von Bulow, 811 F.2d 136, 147 (2d Cir. 1987); Bowne of N.Y. City, Inc. v. AmBase Corp., 150 F.R.D. 465, 472 (S.D.N.Y. 1993). The burden cannot be met by "'mere conclusory or ipse dixit assertions'" in unsworn motion papers authored by attorneys. See von Bulow, 811 F.2d at 146 (quoting In re Bonanno, 344 F.2d 830, 833 (2d Cir. 1965)). It is also the burden of the party asserting a privilege to establish that it has not been waived. See John Blair Commc'ns, Inc. v. Reliance Capital Group, 182 A.D.2d 578, 579 (1st Dep't 1992).

B. Law Governing the Work-Product Doctrine

"Federal law governs the applicability of the work product doctrine in all actions in federal court." Wultz v. Bank of China Ltd., 304 F.R.D. 384, 393 (S.D.N.Y. 2015) (citing Allied Irish Banks, P.L.C. v. Bank of Am., N.A., 252 F.R.D. 163, 173 (S.D.N.Y. 2008)). Federal Rule of Civil Procedure 26(b)(3) codifies the doctrine in part, providing that "a party may not

discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)," unless "the party shows that it has substantial need for the materials . . . and cannot, without undue hardship, obtain their substantial equivalent by other means." The work-product rule is designed "to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." United States v. Adlman, 134 F.3d 1194, 1196 (2d Cir. 1998) (quoting Hickman v. Taylor, 329 U.S. 495, 510-11 (1947)); accord United States. v. Nobles, 422 U.S. 225, 238-39 (1975). The party asserting work-product protection must demonstrate that the material at issue "(1) [is] a document or a tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by his representative." Allied Irish Banks, P.L.C., 252 F.R.D. at 173 (internal quotation marks and citation omitted).

"Documents prepared in the ordinary course of business, or that would have been created whether or not litigation was anticipated, are not protected by work-product immunity. . . . It is firmly established, however, that a document that assists in a business decision is protected by work-product immunity if the document was created because of the prospect of litigation." In re Copper Mkt. Antitrust Litig., 200 F.R.D. at 221 (citing Adlman, 134 F.3d at 1202). Ultimately, "in anticipation of litigation" means that "'in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.'" Costabile v. Cty. of Westchester, 254 F.R.D. 160, 164 (S.D.N.Y. 2008) (quoting Adlman, 134 F.3d at 1202).

Notwithstanding the common description of the doctrine as the "attorney" work product

doctrine, it is not in fact necessary that the material be prepared by or at the direction of an attorney.  The text of Fed. R. Civ. P. 26(b)(3)(A) accords the protection to material prepared "by or for [a] party or its representative" — not merely material prepared by or for an attorney.  The Advisory Committee Notes (1970) to Rule 26(b)(3) confirm that the intention of the Rule was to protect material also prepared by non-attorneys.  Fed. R. Civ. P. 26(b)(3) advisory committee's note to 1970 amendment; see Wultz, 304 F.R.D. at 394; accord Goff v. Harrah's Operating Co., 240 F.R.D. 659, 660 (D. Nev. 2007) ("It may be surprising to long-time practitioners that a lawyer need not be involved at all for the work product protection to take effect.") (quotation marks and citation omitted).  Thus, the rule "afford[s] protection to materials gathered by non-attorneys even where there was no involvement by an attorney."  Wultz, 304 F.R.D. at 394 (citing cases).

III.  DISCUSSION

      A.  Documents Prepared During the Course of the Investigation of Sexual
          Harassment Allegations Against Parneros

     Parneros seeks the following categories of documents related to the investigation of the sexual harassment allegations: 1) handwritten notes prepared by Bradley Feuer on May 24, 2018, during his interview with the Executive Assistant; 2) a memorandum drafted by Bradley Feuer on May 24, 2018, regarding his interview with the Executive Assistant; 3) a memorandum prepared by Mary Ellen Keating on May 30, 2018, at the request of Bradley Feuer concerning her interview of the Executive Assistant; 4) a memorandum prepared by Mary Ellen Keating on June 5, 2018, at the request of Bradley Feuer, regarding the apology meeting between the Executive Assistant and Parneros; and 5) two email attachments sent by Bradley Feuer to himself on June 25, 2018, concerning his interview of the Executive Assistant, which have been

redacted.  See Pl. Mem. at 4 n.1; Def Mem. at 7 n.4.

### 1.  Whether the Documents Are Protected by Attorney-Client Privilege

Feuer affirms that the notes that he and others took in the course of the investigation were intended to be, and have been kept, confidential, Feuer Decl. ¶ 23, and Parneros does not contest this.  In his declaration, Feuer states that he "prepared notes documenting [his] meeting with the [Executive Assistant] so that [he] could render legal advice to the Company regarding its rights and obligations with respect to the alleged conduct by the CEO."  Id. ¶ 4.  Feuer credibly states that at the time of his initial meeting with the Executive Assistant, he was concerned about the possibility of the Executive Assistant bringing claims against Barnes & Noble and/or Parneros, id. ¶ 5, which supports his assertion that he needed to investigate the claims in order to render legal advice to the company.  Significantly, he engaged Paul, Weiss, an outside law firm, on the same day he met with the Executive Assistant so that the firm could advise Barnes & Noble "on potential litigation issues."  Id. ¶ 6.  While Paul, Weiss did not conduct the investigation, Feuer states that beginning on May 24, 2018, the date on which he met with the Executive Assistant, through Parneros's termination and beyond, he and Riggio, and sometimes Keating, had ongoing communications with Paul,Weiss about Barnes & Noble's "possible exposure with respect to [Parneros's] termination as well as his behavior vis a vis the complainant," as well as regarding Barnes & Noble's right to terminate Parneros for "cause" under the terms of his employment contract.  Id. ¶ 15.  Because "very serious allegations had been raised against the CEO of the Company," Feuer decided to direct the investigation.  Id. ¶ 7.  The investigation included interviews and note-taking by Keating.  Id. ¶¶ 9, 11-14.

Parneros denies that Barnes & Noble was in the process of gathering information for the purpose of obtaining legal advice at the time of his initial meeting and follow-up discussion with

Riggio concerning the sexual harassment allegations.  During this "follow-up discussion,"
Parneros states that "Riggio described the allegations by the Executive Assistant as not 'too
serious' and said he did not believe that he needed to report the issue to the Board."  Parneros
Decl. ¶ 2.  Parneros further states that "[a]t no point did Riggio tell me that he was speaking to
me to gather information for the purpose of obtaining legal advice for Barnes & Noble," and
Riggio did not tell Parneros "that the conversation between [them] was protected by [Barnes &
Noble's] attorney-client privilege."  Id.  Further, Parneros states that "[n]o one told [him] that
[Barnes & Noble] had any expectation that the Executive Assistant's allegations would lead to
litigation," and that, to the contrary, following his meeting with the Executive Assistant and
Keating, "Riggio and Keating told [Parneros] that the Executive Assistant was satisfied with the
outcome and was not seeking anything and that the matter was considered closed."  Id. ¶ 4.

     "Interviews of a corporation's employees by its attorneys as part of an internal
investigation into wrongdoing and potentially illegal conduct have been repeatedly found to be
protected by the attorney-client privilege."  Gruss v. Zwirn, 276 F.R.D. 115, 124 (S.D.N.Y.
2011) (citing Upjohn, 449 U.S. at 394-95, and In re John Doe Corp., 675 F.2d 482, 488 (2d Cir.
1982)) rev'd in part on other grounds, 2013 WL 3481350 (S.D.N.Y. July 10, 2013).  "This
protection extends to the attorneys' notes of those interviews insofar as those notes reflect
communications between the employee and counsel."  Id. at 125.  This protection was
recognized in Upjohn Co. v. United States, 449 U.S. 383 (1981), which noted that the "first step
in the resolution of any legal problem is ascertaining the factual background and sifting through
the facts with an eye to the legally relevant."  Id. at 390-91.  Upjohn thus found that a corporate
investigation directed by an attorney was protected by attorney-client privilege.  Id. at 394-95
(employees' responses to questionnaires received from counsel in connection with an internal

investigation conducted to provide legal advice protected by attorney-client privilege).

Here, the fact that the company's top executive was being accused of potentially serious misconduct by itself provides some circumstantial evidence to support Feuer's claim that his purpose in conducting the investigation was to provide the company with legal advice. This conclusion is further bolstered by the fact that Feuer retained Paul, Weiss as litigation counsel the same day that he learned of the allegations. Courts have often found the retention of outside litigation counsel to advise an internal investigation to be an important factor in determining whether an internal investigation is being conducted for the purpose of obtaining legal advice for the company. See, e.g., Cicel (Beijing) Sci. & Tech. Co. v. Misonix, Inc., 2019 WL 1574806, at *8 (E.D.N.Y. Apr. 11, 2019); Robinson v. Vineyard Vines, LLC, 2016 WL 845283, at *2-3 (S.D.N.Y. Mar. 4, 2016); Prince v. Madison Square Garden, L.P., 240 F.R.D. 126, 127 (S.D.N.Y. 2007). It is certainly true that in Prince and Robinson counsel was retained to prepare for more imminent litigation at the point at which the courts found the privilege to attach. See Robinson, 2016 WL 845283, at *2; Prince, 240 F.R.D. at 127. Here, however, Barnes & Noble was concerned not only with possible litigation by the Executive Assistant, but also required legal advice as to whether the Executive Assistant's allegations "might lead to the involuntary 'for cause' termination" of Parneros. See Feuer Decl. ¶ 5.

 In his declaration, Feuer states that he asked Keating "to assist [him] in the investigation" into Parneros's alleged sexual harassment of the Executive Assistant, and

> asked Ms. Keating to provide [him] with any notes of those meetings, as [he] believed such notes would enable [him] to provide legal advice to the Company about its potential exposure as a result of the CEO's misconduct, the possible legal claims that might be brought against the Company and/or the CEO, and the possible defenses thereto.

Feuer Decl. ¶ 9. "Factual investigations conducted by an agent of the attorney, such as gathering

statements from employees, clearly fall within the attorney-client rubric." Gucci Am., Inc. v. Guess?, Inc., 271 F.R.D. 58, 71 (S.D.N.Y. 2010) (internal quotation marks and citations omitted). As the Supreme Court in Upjohn recognized, the attorney-client privilege protects "not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." 449 U.S. at 390. Keating's notes, if prepared for Feuer in order to facilitate his provision of ongoing legal advice to the company, fit within the privilege.

Parneros suggests that where a non-lawyer employee assists in an internal investigation, the employee must have some "expertise" in investigations in order for communications made to that employee to be privileged. See Pl. Reply Mem. at 2. While Keating does not appear to have any particular expertise that would enable her to conduct the investigation in a more skilled manner than Feuer himself, we find nothing in case law suggesting that a corporate employee who conducts an investigation for an attorney must have a particular skill to qualify as the attorney's agent.[5] See, e.g., Farzan v. Wells Fargo Bank, 2012 WL 6763570, at *2 (S.D.N.Y.

---

[5] We disagree with Parneros's characterization of the cases cited by Barnes & Noble. See Pl. Reply Mem. at 2 n.1. These cases do not suggest that an agent must offer some particular expertise in order for the attorney-client privilege to apply. Patel v. L-3 Commc'ns Holdings, Inc., 2016 WL 4030704 (S.D.N.Y. July 25, 2016), involved an assertion of work product protection. Id. at *2-3. Thus, the question was whether materials created by a forensic accounting firm were created in anticipation of litigation or in the ordinary course of business. Id. The forensic accountants' status as non-lawyers was irrelevant in making this determination. See id. at *3. In Farzan v. Wells Fargo Bank, 2012 WL 6763570 (S.D.N.Y. Dec. 28, 2012), the court's decision to protect communications by an "EEO" consultant turned on the fact that it was "undisputed that she conducted the internal investigation on behalf of Wells Fargo's in-house counsel for the purpose of representing Wells Fargo in its proceedings before the EEOC," not on her status as a EEO consultant. Id. at *2. The same was true in Carter v. Cornell Univ., 173 F.R.D. 92 (S.D.N.Y. 1997). See id. at 95. While the court in Gucci engaged in an extended discussion of the agent's role and expertise, see 271 F.R.D. at 62-63, and its holding with respect to attorney-client privilege specifically noted the importance of "investigators," see id. at 71, the court recognized that "[f]actual investigations conducted by an agent of the attorney . . . clearly

Dec. 28, 2012) (upholding attorney-client privilege even though individual was not an attorney where it was "undisputed that she conducted the internal investigation on behalf of Wells Fargo's in-house counsel for the purpose of representing Wells Fargo in its proceedings before the EEOC"); Carter v. Cornell Univ., 173 F.R.D. at 94 ("Ms. Flamm [Associate Dean of Human Resources] clearly conducted the interviews in question at the request of counsel and for the exclusive use of counsel in rendering legal representation.  Thus, Ms. Flamm qualifies as a representative of an attorney for attorney-client privilege purposes."); see generally Welland v. Trainer, 2001 WL 1154666, at *2 (S.D.N.Y. Oct. 1, 2001) (communications made to investigator were protected by the attorney-client privilege because the "investigator was obtaining confidential, legal advise [sic] regarding the investigation" at the direction of in-house counsel so that in-house counsel could provide legal advice to defendants).  Accordingly, because Keating was conducting a factual investigation into the Executive Assistant's allegations at Feuer's direction, see Feuer Decl. ¶¶ 9, 11-14, Keating's notes are also protected by the attorney-client privilege.

Parneros argues that the investigation documents are not privileged because they were created for business purposes, rather than for legal purposes.  See Pl. Mem. at 6-7.  As Parneros points out, Barnes & Noble's Employee Handbook's "No Discrimination & Harassment Policy" requires that all complaints of alleged sexual harassment be investigated.  See Employee Relations (annexed as Ex. 8 to Clark Decl.), at B&N 00000465.  Case law has recognized, however, that "the distinction between legal advice and business advice 'is not demarcated by a

---

fall within the attorney-client rubric," id. (internal quotation marks and citation omitted).  Gucci nowhere holds that only corporate employees with specialized knowledge can be an agent of an attorney.

16

bright line.'"  Gruss, 276 F.R.D. at 125 (quoting In re Cty of Erie, 473 F.3d at 420).  The mere

fact that there was a business benefit obtained from conducting the investigation does not detract

from the circumstances here indicating that the predominant purpose of the investigation was to

gather facts for the General Counsel so he could give legal advice to the corporation.  That

Feuer's meeting with the Executive Assistant may have also advanced the business purpose of

appropriately responding to her complaint does not change this fact.  See generally Johnson v. J.

Walter Thompson U.S.A., LLC, 2017 WL 3432301, at *3 (S.D.N.Y. Aug. 9, 2017) ("the purpose

of a communication need not be exclusively legal in order for the privilege to attach").

Parneros argues that when investigatory reports and materials are "created for business

purposes, including personnel decisions, they are not privileged."  Pl. Mem. at 6.   But, as we

have just noted, we reject the implicit premise of this statement which is that the investigation

was created exclusively for business purposes.

Parneros argues that there is significance to the fact that Barnes & Noble did not give

Parneros or the Executive Assistant an "Upjohn warning."  Pl. Mem. at 7, n.6.[6]  The case cited by

Parneros, Cruz v. Coach Stores, Inc., 196 F.R.D. 228 (S.D.N.Y. 2000), however, did not turn on

counsel's failure to give an Upjohn warning to the employees being interviewed.  Rather, Cruz

held that the purpose of the "investigative audit"  at issue "was not solely, or even primarily, to

enable [defendant's] counsel to render legal advice," as evidenced by the fact that "the audit

interviews were conducted indiscriminately with [defendant's] employees and non-employees

---

[6]  "An 'Upjohn warning' is the notice an attorney (in-house or outside counsel) provides
a company employee to inform her that the attorney represents only the company and not the
employee individually.  An attorney cautions a company employee with an Upjohn warning
when the company is involved in litigation or conducting an internal investigation."  United
States v. Connolly, 2019 WL 2120523, at *4 n.1 (S.D.N.Y. May 2, 2019).

alike." Id. at 231.  Certainly, courts have found the attorney-client privilege to shield notes of interviews undertaken as part of an internal investigation without discussing whether an Upjohn warning was first given.  See, e.g., Carter, 173 F.R.D. at 95.  Accordingly, for the reasons stated above, the investigation notes drafted by Feuer and those drafted by Keating at the direction of Feuer are protected by the attorney-client privilege.  In light of this ruling, it is not necessary to address whether the documents are protected by the work product doctrine.

> 2.  Whether the Executive Assistant or Parneros's Deposition Testimony Waived Any Privilege

In a supplemental letter dated July 3, 2019, that followed the parties' briefing, Parneros argues that the deposition testimony of the Executive Assistant and of Parneros himself waived any attorney-client privilege over communications made at the meetings discussed.  See Clark July 3, 2019, Letter at 1.  Parneros states in this letter that "[d]efense counsel not only permitted the Executive Assistant to testify to parts of the meetings . . . but actually elicited extensive testimony from plaintiff."  Id.  The testimony at issue concerns the "apology meeting" with Parneros, as well as the conversation that Parneros had with Riggio.  Parneros says that defendant has argued that the "meetings" that Keating and Riggio had with Parneros and the Executive Assistant "are attorney client privileged," id., and thus that the choice to elicit testimony from the Executive Assistant about the "apology meeting" and from Parneros about his meeting with Riggio constitutes a waiver of some kind.

We reject this argument.  Barnes & Noble has not taken the position that either the "apology meeting" with Parneros or Parneros's meeting with Riggio were subject to attorney-client privilege.  See Velazquez July 8, 2019, Letter, at 1.  With respect to the "apology meeting," this is hardly surprising since the meeting itself did not have an investigative function.  Rather,

Barnes & Noble has taken the position that certain notes taken at the apology meeting as part of the investigation overseen by Feuer are privileged.  Accordingly, any statements by corporate witnesses to the meeting — whether elicited by defendant or any other party — do not waive any privilege over any notes that Parneros seeks.

Notwithstanding Parneros's arguments, we see no inconsistency in Barnes & Noble's assertion that notes taken by an attorney or his designee at a non-privileged meeting may be privileged as long as the notes were taken for the purpose of allowing counsel to give legal advice.  For example, it frequently happens that a client confidentially discusses even an entirely public event with his attorney in order to seek legal advice.  The fact that the event was public does not have any bearing on whether the client's description of the event to the attorney during the course of an attorney-client communication is privileged.

B.  Notes from the Meeting with the Potential Acquirer

Barnes & Noble argues that Feuer's notes concerning Parneros's conduct at the June 18, 2018, meeting with the Potential Acquirer, and the notes of other senior executives that were prepared at Feuer's direction, are protected by both the attorney-client privilege and the work product doctrine.  See Def. Mem. at 15-17.

As for attorney-client privilege, the evidence in the record does not support the notion that the notes were taken for the purpose of rendering legal advice.  Feuer's assertion that there was "no business need" for him or others to prepare notes regarding Parneros's allegedly outrageous conduct at the meeting makes no sense as there are numerous business reasons why a corporation would want to document improper conduct by its CEO, including preparing to potentially terminate the CEO or even just to explain to the Company's management and Board what had transpired at the meeting.  While Feuer states that he prepared his notes "[a]gainst the backdrop

19

of the investigation into [Parneros's] misconduct towards the female employee and his bullying

of senior executives," Feuer Decl. ¶ 19, he does not state that he attended the June 18, 2018,

meeting in his role as the leader of the investigation into Parneros's conduct with the Executive

Assistant.  Nor would it have made any sense to do so since the meeting was unrelated to the

Executive Assistant's allegations.  Indeed, Feuer never specifies why exactly he was at the

meeting.  He simply states that he prepared the notes "to provide the Company with legal advice."

Id.

> However, the notion that any notes taken by a general counsel of an entity must be

privileged simply based on his job title runs afoul of New York law circumscribing attorney-

client privilege.  The New York Court of Appeals has addressed this point specifically in Rossi v.

Blue Cross & Blue Shield of Greater New York, 73 N.Y.2d 588 (1989).

> [U]nlike the situation where a client individually engages a lawyer in a particular
> matter, staff attorneys may serve as company officers, with mixed business-legal
> responsibility; whether or not officers, their day-to-day involvement in their
> employers' affairs may blur the line between legal and nonlegal communications;
> and their advice may originate not in response to the client's consultation about a
> particular problem but with them, as part of an ongoing, permanent relationship
> with the organization.  In that the privilege obstructs the truth-finding process and
> its scope is limited to that which is necessary to achieve its purpose[,] Matter of
> Priest v. Hennessy, [51 N.Y.2d 62, 68 (1980)]; Matter of Jacqueline F., [47 N.Y.2d
> 215, 219 (1979)], the need to apply it cautiously and narrowly is heightened in the
> case of corporate staff counsel, lest the mere participation of an attorney be used to
> seal off disclosure[,] see Simon, The Attorney-Client Privilege as Applied to
> Corporations, 65 Yale L.J. 953, 970-973 (1956); 5 Weinstein-Korn-Miller, NY Civ
> Prac. ¶ 4503.06.

Id. at 592-93.

> In light of the need for a "cautious[]" and "narrow[]" application of attorney-client

privilege, Feuer's statement regarding his role is too conclusory to make a finding that the notes

documenting what occurred at the meeting were for the purpose of giving legal advice.  As to

20

Feuer's own notes, Feuer had no idea in advance that anything extraordinary would to occur at the meeting, thus suggesting there was a business purpose to his presence. Moreover, Feuer's declaration gives no description of his job duties as general counsel, what sort of business meetings he usually attends, and whether he uniformly gives legal advice as a result of such meetings. With respect to the notes he requested that others take, see Feuer Decl ¶ 20, we similarly cannot accept the assert that there were "legal reasons" to take the notes and that, as Feuer puts it, "there was no business need for the notes." Id. Plainly, a corporation would have a business reason to fully document improper conduct at a meeting by its CEO. Thus, the notes from the meeting with the Potential Acquirer are not protected by attorney-client privilege.

As for the work product privilege, the declarations submitted by Barnes & Noble are insufficient to show that Feuer created his notes, and directed others to create notes, "in anticipation of litigation," rather than in the ordinary course of business. In his declaration, Feuer states, in a conclusory manner, that he prepared notes documenting Parneros's behavior at the June 18, 2018, meeting "in anticipation of litigation" and that he "would not have prepared them had [he] not been concerned about the prospect of litigation." Feuer Decl. ¶ 19. He makes a similar assertion with respect to notes that he requested of others. Id. ¶ 20. But this merely articulates the legal standard. Feuer does state that he took these notes "[a]gainst the backdrop of the investigation into Plaintiff's misconduct toward the female employee and his bullying of senior executives" and that he "thought that there may be litigation by or against Plaintiff in the near future." Id. But the "mere possibility of litigation is insufficient to obtain work-product protection." Gucci Am., Inc., 271 F.R.D. at 74 (internal quotation marks and citation omitted).

In the end, Feuer's statements regarding the reason for the preparation of the notes are "simply too conclusory to make th[e] assessment" that they were prepared in anticipation of

litigation.  Am. Civil Liberties Union v. U.S. Dep't of Justice, 210 F. Supp. 3d 467, 483 (S.D.N.Y. 2016); see also In re Grand Jury Proceedings, 2001 WL 1167497, at *16 (S.D.N.Y. Oct. 3, 2001) ("Doe Corp.'s obscure references to unspecified threats of civil litigation (and particularized references to another type of litigation) do not satisfy Doe Corp.'s burden to demonstrate that, at the very least, it had a concrete anticipation of litigation.").

Barnes & Noble cites Greater N.Y. Taxi Ass'n v. City of N.Y., 2017 WL 4012051 (S.D.N.Y. Sept. 11, 2017), and Horn & Hardart Co. v. Pillsbury Co., 888 F.2d 8 (2d Cir. 1989), for the proposition that a court should protect an attorney's "mental processes" and "mental impressions."  See Def. Mem. at 16.  But this argument skips the threshold issue of whether the notes are work product to begin with.  If the documents at issue are not work product — that is, if they were not prepared in anticipation of litigation — then there is no warrant in Rule 26(b)(3)(B) or case law on work product to protect any portion of the documents as the "mental processes" or "mental impressions" of an attorney.

Accordingly, because the notes taken at the June 18, 2018, meeting, as well as any descriptions of the meeting that Feuer asked to be forwarded to him after the meeting, are protected by neither the attorney-client privilege nor the work product doctrine, Barnes & Noble is ordered to produce them.

C.  Press Release Drafts

1.  Documents Sent to Feuer or Outside Counsel

Barnes & Noble seeks to protect drafts of press releases that were sent to Feuer and/or outside counsel at Paul, Weiss for the purpose of obtaining legal advice.  Barnes & Noble has asserted that these documents are protected by the attorney-client privilege and the work product doctrine.  In his declaration, Feuer states that "draft press releases were sent to [him] by Ms.

Keating and Andy Milevoj (Vice President of Investor Relations) for [his] review and legal advice with respect to Plaintiff's departure from the Company," and that "[t]he draft press releases were also repeatedly sent to our outside counsel concerning the wording of the announcement for their review and legal advice."  Feuer Decl. ¶ 24.  Feuer also states in his declaration that "[t]he draft press releases were intended to be, and have been kept, confidential." Id. ¶ 26.

In his reply brief, Parneros all but abandons his argument that the documents are not subject to attorney-client privilege — offering no argument on the question other than to cite the case of Pearlstein v. BlackBerry Ltd., 2019 WL 1259382 (S.D.N.Y. Mar. 19, 2019), and to suggest that the court must conduct an in camera review of the communications to uphold the claim of privilege.  See Pl. Reply at 4 n.3; see also Pl. Mem. at 9 (offering no specific argument on attorney-client privilege).  Pearlstein, however, is irrelevant.  It found that emails sent to an external public relations consultant were not sent "for the predominant purpose of seeking or conveying legal advice."  Id. at *13.  Parneros does not even make that argument here.  The communications and drafts sent to Feuer and outside counsel are more akin to the documents that the Pearlstein court found to be privileged — in particular, several documents "that specifically request[ed] legal review" of language in the press release.  See id. at *14.  Here, Feuer has sworn that draft press releases were sent to him for his "review and legal advice" and were sent to "outside counsel concerning the wording of the announcement for their review and legal advice." Feuer Decl. ¶ 24.  Barnes & Noble has therefore made a sufficient showing that the communications between the corporate employees and Feuer and Paul, Weiss are protected by the attorney-client privilege.  Because of this ruling, we need not reach the question of whether these documents are protected by the work-product doctrine.

23

### 2. <u>Documents Where Only Work-Product Protection Has Been Asserted</u>

Barnes & Noble asserts that a series of emails and draft press releases sent among Barnes & Noble non-attorney executives are protected by the work product doctrine.  <u>See</u> Def. Mem. at 19; <u>see</u> <u>also</u> Excerpts of Barnes & Noble Privilege Log (annexed as Ex. 4 to Clark Decl.) ("Privilege Log").  While the relevant entries in Barnes & Noble's privilege log state that these documents were "drafted at the request of Brad Feuer" and were "prepared in anticipation of litigation," <u>see</u>, <u>e.g.</u>, Privilege Log at entries ## 144, 147-48, Feuer's sworn declaration does not state that he directed the creation of these documents in anticipation of litigation.  Rather, he states that "[i]n late June and early July, during a time when we were consulting with outside Counsel and the Board in order to dismiss Plaintiff from the Company, I reviewed multiple draft press releases concerning Plaintiff's departure from Barnes & Noble."  Feuer Decl. ¶ 24.  He states that "[t]hese draft press releases were sent to me for my review and legal advice with respect to Plaintiff's departure from the Company," and that "[t]he draft press releases were also repeatedly sent to our outside counsel concerning the wording of the announcement for their review and legal advice."  <u>Id.</u>  Thus, Feuer nowhere states that he directed Keating, Vice President of Investor Relations Andy Milevoj, or others to draft the press releases because he anticipated litigation.  While work product protection is available for non-attorneys even when they act without the direction of an attorney to prepare materials in anticipation of litigation, <u>see</u>, <u>e.g.</u>, <u>Wultz</u>, 304 F.R.D. at 394, there is no evidence in the record that any of the individuals who were circulating press releases did so because they anticipated litigation.[7]  Accordingly, Barnes &

---

[7]  We do not view Feuer's vague statement that the draft press releases were "reviewed and revised due to expected litigation," Feuer Decl. ¶ 25, to satisfy Barnes & Noble's burden on this point.

Noble is ordered to produce these documents.

D.   The Report Prepared by Paul, Weiss and Minutes of the July 27, 2018, Board Meeting

Parneros seeks production of a memorandum prepared by Paul, Weiss, and provided to Barnes & Noble's Board of Directors in preparation for its June 27, 2018, meeting; minutes of that meeting which have been redacted; and communications with counsel in connection with Parneros's termination.  Pl. Mem. at 4 & nn.4-5; see Def. Mem. at 20 n.11.  Parneros argues that none of the documents are protected by the attorney-client privilege or the work product doctrine, see Pl. Mem. at 9-10, and that even if the documents were privileged, Barnes & Noble has waived any privilege by issuing a press release regarding the advice it received from Paul, Weiss and putting its knowledge and state of mind "at issue," id. at 11-12.  In addition, Parneros argues that the deposition testimony of one of Barnes & Noble's Board Members that occurred while briefing on this motion was underway waives any privilege that attached to these documents.  See Pl. Reply Mem. at 5-7; Clark July 30, 2019, Letter; Clark Aug. 2, 2019, Letter.

1.   Whether the Documents Are Protected by the Attorney-Client Privilege

The communications with Paul, Weiss about Parneros's conduct, the drafts of the memorandum prepared by Paul, Weiss, the memorandum itself, and the discussion of the memorandum by the Board of Directors are protected from disclosure by the attorney-client privilege.  Feuer states in his declaration that beginning on May 24, 2018, he communicated regularly with Paul, Weiss to "provide[] information to enable them to render legal advice."  Feuer Decl. ¶ 27.  He confirms that Paul, Weiss "rendered legal advice concerning Plaintiff's employment at Barnes & Noble, his misconduct, and potential grounds for Plaintiff's termination."  Id.  In late June 2018, Feuer "received and reviewed drafts of a memorandum" prepared by Paul, Weiss for Barnes & Noble's Board of Directors.  Id.  Feuer states that the

memorandum "provided legal advice to the Board." Id.  An attorney from Paul, Weiss attended the June 27, 2018, Board meeting and rendered legal advice. Id. ¶ 28.  Finally, Feuer confirms that he prepared the minutes of the June 27, 2018, Board meeting after Parneros had been terminated and that the redacted portion of the minutes contain Paul, Weiss's advice to the Board and discussion of that advice. Id. ¶ 29.  These facts are sufficient to show that the materials are privileged under New York law.

Apart from its waiver arguments, Parneros essentially has no argument as to why these communications between counsel and Barnes & Noble would not be privileged.  The cases cited by Parneros to the contrary are distinguishable.  In OneBeacon Ins. Co. v. Forman Int'l, Ltd., 2006 WL 3771010 (S.D.N.Y. Dec. 15, 2006), the party claiming privilege offered no competent evidence that the work of the attorney-employee of an insurance company was anything other than the work that the insurer would have performed in the ordinary course of its business.  Id. at *5-6.  The sentences of Allied Irish Banks v. Bank of Am., N.A., 240 F.R.D. 96 (S.D.N.Y. 2007) and Strougo v. BEA Assocs., 199 F.R.D. 515 (S.D.N.Y. 2001), that Parneros quotes, see Pl. Mem. at 10, addressed the work-product doctrine and are thus irrelevant to the claim of attorney-client privilege.  Parneros cites Vidal v. Metro-N. Commuter Ry. Co., 2014 WL 413952 (D. Conn. Feb. 4, 2014), for the proposition that "'minutes of meetings attended by an attorney or directed by an attorney are not automatically privileged as a result of the attorney's presence.'"  Pl. Mem. at 10 (quoting Vidal, 2014 WL 413952, at *6).  Here, however, Barnes & Noble has not withheld the entirety of the meeting minutes simply because of its attorney's presence; rather, it has redacted only the portion reflecting counsel's legal advice to the company.  See Feuer Decl. ¶ 29.  Accordingly, we find that Barnes & Noble has met its burden in showing that the redacted portion of the notes reflect privileged attorney-client communications.

26

2.  <u>Waiver Based on Public Statement</u>

Parneros's argument that Barnes & Noble's press release regarding Parneros's firing

waived any privilege focuses on the statement in the press release that Parneros was terminated

for "violations of the Company's policies" and that "[t]his action was taken by the Company's

Board of Directors who were advised by the law firm Paul, Weiss, Rifkind, Wharton & Garrison

LLP." <u>See</u> Press Release.  Parneros argues that Barnes & Noble "selective[ly] disclose[d] . .

. counsel's advice" by issuing this statement, Pl. Reply Mem. at 11-12; <u>see</u> Pl. Mem. at 11-12,

resulting in a waiver of any privilege.  However, under New York law, "[d]isclosure of the mere

fact of a consultation [with an attorney] is no basis for a waiver as to the content of that

consultation."  <u>AMBAC Indem. Corp. v. Bankers Tr. Co.</u>, 151 Misc. 2d 334, 341 (Sup. Ct. 1991);

<u>accord</u> <u>Alcor Life Extension Found. v. Johnson</u>, 43 Misc. 3d 1225(A), 2014 WL 2050661, at *12

n.4 (Sup. Ct. 2014), <u>aff'd</u>, 136 A.D.3d 464 (1st Dep't 2016).  Barnes & Noble did not disclose the

content of counsel's advice in its July 3, 2018, press release.

Parneros cites <u>Electro Sci. Indus., Inc. v. Gen. Scanning, Inc.</u>, 175 F.R.D. 539 (N.D. Cal.

1997), <u>see</u> Pl. Mem. at 12, but in that case the defendant issued a "News Release" to its customers

that disclosed the otherwise "confidential opinion of counsel" that "clearly was substantive."  <u>See</u>

<u>id.</u> at 543.  In <u>E.I. Dupont de Nemours & Co. v. Kolon Indus., Inc.</u>, 269 F.R.D. 600 (E.D. Va.

2010), which Parneros also cites, <u>see</u> Pl. Mem. at 12, the court found that the party had "chose[n]

to broadcast the substance of [its] communications [with counsel] to the public," where it

published factual information that had been protected by the attorney-client privilege.  <u>See</u> <u>id.</u> at

607.  Because the July 3, 2018, press release does not disclose the substance of counsel's advice,

but rather only discloses the fact of counsel's consultation, there was no waiver based on the

inclusion of the statement in the press release.

3. "At Issue" Waiver

Parneros argues that Barnes & Noble has waived any privilege over these documents by placing the advice of counsel "at issue" in the litigation — specifically by asserting that it acted in "good faith" in issuing its public statements about Parneros's conduct and by asserting a "possible defense that it did not act in a 'grossly irresponsible manner.'" See Pl. Mem. at 10 (citation omitted).

a. The Doctrine of "At Issue" Waiver

Courts have found waiver of the attorney-client privilege "'when a client testifies concerning portions of the attorney-client communication, . . . when a client places the attorney-client relationship directly at issue, . . . and when a client asserts reliance on an attorney's advice as an element of a claim or defense . . . .'" In re Cty. of Erie, 546 F.3d 222, 228 (2d Cir. 2008) (quoting Sedco Int'l S.A. v. Cory, 683 F.2d 1201, 1206 (8th Cir. 1982)).  However, "that a privileged communication contains information relevant to issues the parties are litigating does not, without more, place the contents of the privileged communication itself 'at issue' in the lawsuit; if that were the case, a privilege would have little effect." Deutsche Bank Tr. Co. of Americas v. Tri-Links Inv. Tr., 43 A.D.3d 56, 64 (1st Dep't 2007).

The waiver doctrine, however, does not apply exclusively to situations where a party explicitly relies — or states that it intends to rely — on attorney-client communications.  Another aspect of the "at issue" waiver doctrine finds waiver even where there is no intention to rely on attorney-client communications.  Thus, in United States v. Bilzerian, 926 F.2d 1285 (2d Cir. 1991), the Second Circuit upheld a trial court's ruling that if a defendant testified about his good faith regarding the legality of certain actions, it would open the door to cross-examination into communications with his attorney on this subject.  Id. at 1291-93.  In affirming the district court

with respect to the privilege issue, the Second Circuit explained that "the attorney-client privilege cannot at once be used as a shield and a sword." Id. at 1292 (citing Clark v. United States, 289 U.S. 1, 15 (1933), and von Bulow, 828 F.2d at 103). "Thus, the privilege may implicitly be waived when defendant asserts a claim that in fairness requires examination of protected communications." Id. (citations omitted). Bilzerian reasoned that wavier was applicable because any testimony that the defendant "thought his actions were legal would have put his knowledge of the law and the basis for his understanding of what the law required in issue." Id. Thus, "[h]is conversations with counsel regarding the legality of his schemes would have been directly relevant in determining the extent of his knowledge and, as a result, his intent." Id.

In keeping with this principle, courts have recognized that an implied waiver "may be found even if the privilege holder does not attempt to make use of a privileged communication." In re Kidder Peabody Sec. Litig., 168 F.R.D. 459, 470 (S.D.N.Y. 1996). For example, in Cicel, the court held that waiver can "occur even if the asserting party does not make direct use of the privileged communication itself when that party avers material facts at issue related to the privileged communication, and where the validity of those facts can only be accurately determined through an examination of the undisclosed communication." 2019 WL 1574806, at *6 (emphasis added); accord Favors v. Cuomo, 285 F.R.D. 187, 199 (E.D.N.Y. 2012) ("[C]ourts within this Circuit, relying on Bilzerian, have reaffirmed the broader principle that forfeiture of the privilege may result where the proponent asserts a good faith belief in the lawfulness of its actions, even without expressly invoking counsel's advice."); Leviton Mfg. Co. v. Greenberg Traurig LLP, 2010 WL 4983183, at *3 (S.D.N.Y. Dec. 6, 2010) ("advice of counsel may be placed in issue where, for example, a party's state of mind, such as his good faith belief in the lawfulness of his conduct, is relied upon in support of a claim of defense"). While the instant

29

case arises under New York law, New York courts have explicitly articulated the same rule. See, e.g., Village Board of Village of Pleasantville v. Rattner, 130 A.D. 2d 654, 655 (2d Dep't 1987) (privilege is waived where defendant raises a defense of "good faith, the validity of which can only be tested by invasion of the attorney-client privilege").

   b. Analysis

Parneros argues that Barnes & Noble has implicitly waived the privilege essentially for two reasons: (1) its Answer states that "[t]he Board's July 3, 2018 announcement that Plaintiff had been terminated 'for violations of the Company's policies' and would not receive severance was clearly accurate and clearly made in good faith." Answer, at 2-3; and (2) Barnes & Noble intends to oppose any effort by Parneros to establish that Barnes & Noble "acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties" — a showing that a defamation plaintiff New York must prove by a preponderance of the evidence as stated in Chapadeau v. Utica Observer-Dispatch, 38 N.Y.2d 196, 199 (1975). Chapadeau held that the standard applies in a defamation suit challenging a publication whose content "is arguably within the sphere of legitimate public concern, [and] which is reasonably related to matters warranting public exposition," id. at 199.[8]

As to the first argument, the mere use of the term "good faith" in an Answer does not reflect reliance on a "good faith" defense in the absence of some assertion by the defendant that it intends to rely on such a defense. Here, Barnes & Noble has disclaimed any intention to assert a

---

[8]  While the initial briefing was not clear on whether Barnes & Noble intended to assert a "qualified privilege" defense, see Thomas H. v. Paul B., 18 N.Y.3d 580, 586 (2012), Barnes & Noble stated definitively at oral argument that it was not asserting such a defense. See Transcript of Proceedings held September 13, 2019, filed Sept. 19, 2019 (Docket # 124), at 60.

"good faith" defense and thus we do not view the statement in their Answer to be of significance.

As to the second argument, Barnes & Noble admits that it intends to counter any claim that by plaintiffs that it acted in a "grossly irresponsible manner" under Chapadeau when it announced that Parneros had violated company policies.  It states that it intends to do so by affirmatively offering evidence that Parneros in fact violated company policies through his harassing conduct, see Velazquez Sept. 20 Letter at 6.  In plaintiff's view, any effort to counter the burden placed on plaintiff by Chapadeau amounts to a "defense."  See Pl. Reply Mem. at 10 (referring to Barnes & Noble's "possible defense [under Chapadeau] that it did not act in a "grossly irresponsible manner").  It points to case law suggesting that the "grossly irresponsible manner" showing required by Chapadeau  may be met by offering proof of the subjective views of the speaker.  See, e.g., Boule v. Hutton, 138 F. Supp. 2d 491, 506 (S.D.N.Y. 2001) (in applying Chapadeau, courts consider whether the defendants "knew" that their statements were "false at the time the statements were made"); Fine v. ESPN, 11 F. Supp. 3d 209, 225 (N.D.N.Y 2014) (Chapadeau inquiry may consider the party's "subjective" state of mind).  Under Parneros's logic, fairness requires that he be able to find out what advice Barnes & Noble's attorneys gave it on the question of whether he violated company policies.

We conclude, however, that this argument takes the "at issue" waiver doctrine far beyond the narrow scope reflected in case law.  Barnes & Noble is not asserting an affirmative defense of any kind here, as is typically the case where the "at issue" waiver doctrines is applied in the absence of reliance by the opposing party on attorney-client communications.  See, e.g., Scott v. Chipotle Mexican Grill, Inc., 67 F. Supp. 3d 607, 615 (S.D.N.Y. 2014) (defendant intended to offer evidence of its "good faith" to avoid liquidated damages under the Fair Labor Standards Act).  Whether Barnes & Noble acted in a "grossly irresponsible  manner" must be proven by

Parneros and can be shown by him exclusively through objective proof.  See, e.g., Gaeta v. N.Y.
News, Inc., 62 N.Y.2d 340, 351 (1984) (Chapadeau standard "may be satisfied by wholly
objective proof"); accord Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 106 n.12 (2d Cir.
2000) (same); Treppel v. Biovail Corp., 233 F.R.D. 363, 376 (S.D.N.Y. 2006) ("Under
Chapadeau, the evaluation of a defendant's level of fault—whether its conduct in publishing
defamatory statements was grossly irresponsible—is an objective determination.") (citation
omitted).  Thus, while achieving "fairness" is the touchstone of the "at issue" waiver doctrine, see
generally John Doe Co. v. United States, 350 F.3d 299, 302 (2d Cir. 2003), fairness does not
require that Parneros have access to the attorney-client communications of Barnes & Noble both
because Barnes & Noble bears no burden and because there is ample objective evidence that
Parneros may use in his effort to meet the Chapadeau standard.  Under plaintiff's proposed rule,
any plaintiff in a defamation action subject to Chapadeau would automatically get any attorney-
client communications that the defendant had with its attorney on the subject matter of the alleged
defamatory statement.  We do not see why fairness requires such a result here when plaintiff has
access to all the factual proof he needs to show that Barnes & Noble acted irresponsibly.

        We note further that this case is a far cry from Bilzerian, in which the defendant had
affirmatively stated his intention that, notwithstanding any apparent objective proof to the
contrary, he planned to testify that he had a "good faith" belief in the lawfulness of his actions.
See Bilzerian, 926 F.2d at 1291.  Barnes & Noble will not be offering such testimony here.

        Accordingly, we do not find that there has been any "at issue" waiver here.

                4. Waiver by Deposition Testimony

        We next address the issue of whether the deposition testimony of a member of the board
of directors waived any privilege.  See Pl. Reply Mem. at 5-7; Velazquez July 30, 2019, Letter;

Clark July 30, 2019, Letter; Velazquez Aug. 2, 2019, Letter; Clark Aug. 2, 2019, Letter.

Parneros argues that deposition testimony given on June 5, 2019 — while briefing on this motion was underway — by Al Ferrara, a member of the Barnes & Noble board of directors, waived any privilege over the Paul, Weiss memorandum to the Board.  We note that Ferrara is an independent director, Valazquez July 30 Letter at 1, and the deposition in question was of him individual — that is, it was not a deposition of Barnes & Noble pursuant to Fed. R. Civ. P 30(b)(6).  Nonetheless, Ferrara's deposition was taken because of his role as director and he was represented by Barnes & Noble's attorney.

At the deposition Ferrara testified to factual information he had regarding Parneros's conduct, including a number of non-privileged conversations he had with Barnes & Noble staff such as Feuer.  See Deposition of Al Ferrara, annexed as Exhibit A Velazquez July 30 Letter ("Ferrara Dep.") at 251-56, 259-60, 298-303.[9]  The testimony that Parneros asserts resulted in a waiver relates to information Ferrara testified he received about Parneros's conduct.  See Clark July 30 Letter, at 3-4 (citing Ferrara Dep. at 276, 284-285, 302-04).  The testimony is confusing in that the witness is questioned about documents but it is not clear what particular documents are at issue.  More significantly, it is unclear what counsel's instructions were to the witness regarding the scope of his testimony.  Counsel's instruction that Ferrara was permitted to testify as to "facts" but not "legal advice,"  see Ferrara Dep. 276, 303, arguably could be understood that she was giving permission to testify "as to facts" specifically contained in attorney-client privileged memoranda that Ferrara did not have independent knowledge of.  But it also arguably indicated to Ferrara that he could testify about facts that he had learned outside the attorney-client

_____

[9]  Portions of this deposition also appear in Docket # 113-1.

relationship without indicating that it was permissible to reveal what was specifically contained in the written privileged memoranda.  <u>See</u> Ferrara Dep. 276, 303.

Notably, Ferrara's actual responses to these questions do little to reveal the contents of what was contained in the Paul, Weiss memorandum or any other privileged communication.  <u>See</u> Ferrara Dep. 276, 302-303.  It is certainly true, however, that for at least two questions, Parneros's counsel specifically asks about a "memo" and a "written submission to the board" and Ferrara reveals in response that the "investigation concluded that [the Executive Assistant's] statements were credible" and that "based upon the letter, you know, we concluded that the facts supported what she had claimed."  Ferrara Dep. 303-04.  Mostly, however, Ferrara could not recall what was contained in any written materials.  <u>See</u> <u>id.</u> 303-04, 284-85.

When it was Barnes & Noble's turn to question the witness, its counsel made an effort to "strike"  testimony.  <u>Id.</u> at 364.  After some back and forth, the witness ultimately testified that he could not remember if any of the facts he had given about Parneros's conduct came from the Paul, Weiss memorandum.  Ferrara Dep. at 370-71.

As the parties recognize, because the waiver question involves an allegation of disclosure of privileged material, its resolution is governed by Fed. R. Civ. P. 502, notwithstanding the fact that the substantive privilege is governed by state law.  <u>See</u>, <u>e.g.</u>, <u>Seyler v. T-Sys. N.A., Inc.</u>, 771 F. Supp. 2d 284, 287–88 (S.D.N.Y. 2011) ("Unlike the scope of the privilege, the waiver question is governed by Federal Rule of Evidence 502(a), which applies when a "disclosure is made in a Federal proceeding.").  As a threshold matter, Barnes & Noble argues that a member of the board of directors of a corporation does not have authority to waive a privilege belonging to a the corporation.  <u>See</u>, <u>e.g.</u>, Velazquez July 30 Letter at 6.  While the doctrine is not quite as broad as Barnes & Noble suggests, we conclude that its application here requires that we decline to find

34

any waiver.

The question of the power of a corporation's agent to waive a corporation's privilege was raised before the Second Circuit in In re Grand Jury Proceedings, 219 F.3d 175 (2d Cir. 2000). In that case, the chairman of a corporation, who was also its founder and the controlling shareholder, testified as to privileged communications. Id. at 185. While the district court found that the chairman had waived the corporation's privilege, the Second Circuit rejected this conclusion and remanded for the district court to "carefully weigh the circumstances surrounding [the CEO's] testimony in deciding whether, in fairness, that testimony effected waiver of [the corporation's] privilege." Id. at 186. The Second Circuit distinguished between situations where "the corporation as an entity makes the strategic decision to disclose some privileged information," id. at 184, and other situations. Among the factors the district court was to consider was that the corporation had many directors and shareholders beside the CEO, that the disclosure took place in the context of compelled grand jury testimony, that the witness was unaided by counsel, that the witness had disclosed to the grand jury "specific legal advice the corporation received[,]" and that the party seeking the testimony (the Government) would not be prejudiced by a finding of no waiver. Id. at 187,189. The court notes that the corporation "did not itself take any affirmative steps to inject privileged materials into the litigation or to otherwise explicitly raise the advice-of-counsel defense." Id. at 187. The court distinguished a number of cases where an implied waiver based on disclosure had been found as follows:

> In each case, the corporation waiving the privilege made a deliberate decision to disclose privileged materials in a forum where disclosure was voluntary and calculated to benefit the disclosing party. Clearly, when the corporation as an entity makes the strategic decision to disclose some privileged information, the courts may find implied waiver, as they do in cases involving individuals.

Id. at 184.

Many of the circumstances considered in In re Grand Jury Proceedings counsel against a finding of waiver in the instant case.   Here, there was plainly no "strategic decision," id., by Barnes & Noble to disclose privileged information during the director's deposition.   Rather, the witness was attempting to respond to questions posed by an adversary in a situation where the witness was legally obligated to participate in his or her examination by the opposing attorney. The director who testified is just one of may directors of the corporation.   Barnes & Noble did not take steps to inject the contents of the privileged material into the record; rather, one of its directors was responding to questions.   There was no effort to disclose specific legal advice received by Barnes & Noble.

We recognize that certain elements present here do not dovetail with the situation in In Re Grand Jury Subpoenas but rather favor Parneros — most obviously, that an attorney for the corporation was present at the deposition of the director and arguably might have done more to ensure that the director did not discuss any part of counsel's memoranda.   But we view the absence of evidence that Barnes & Noble acted purposefully in disclosing any privileged information as a critical difference in its favor.   Id. at 187-88.   We view this factor as critical to the fairness analysis because the waiver doctrine rests to a large degree on the notion that it is unfair for a corporation to deliberately use the privilege both "as a shield and a sword."   Bilzerian, 926 F.2d at 1292 (citations omitted).   That element, however, is completely absent here.   Barnes & Noble has disclaimed any effort to rely on information as contained in its attorneys' memoranda.   It will obviously be precluded from doing so at trial.   In the end, we cannot deduce from the muddled transcript that there was any deliberate effort by Barnes & Noble during the deposition to disclose portions of the privileged memoranda through the testimony of the director — particularly given that there are copious other sources of non-privileged information about

Parneros's conduct.  All of these sources are available to Parneros — a fact that also supports the notion that he cannot show that any prejudice resulted from the testimony given by the director.

As the Second Circuit stated in In re Grand Jury Proceedings, the issue of waiver in the case of the testimony of a corporation's agent is whether the corporation has acted deliberately in disclosing privileged information, not whether the witness acted deliberately.  See 219 F.3d at 188 (where disclosure of privileged information was an effort to provide exculpatory testimony, "the issue is not whether the reference to the attorney's advice was a deliberate attempt at exculpation, but rather whether it was a deliberate attempt on the part of the corporation to exculpate itself, as opposed to Witness's effort to exculpate himself personally") (emphasis in original).  Thus, we look to whether Barnes and Noble acted intentionally with respect to the waiver, not the individual director.  After weighing the considerations articulated in In re Grand Jury Subpoena, we conclude that the testimony by the director did not constitute such an effort and thus did not constitute a "disclosure" within the meaning of Fed. R. Evid. 502 by Barnes & Noble, which is the only party against whom the waiver is sought.  We thus do not believe it necessary to reach the remaining elements of Rule 502 because there was no "disclosure" by Barnes & Noble at all within the meaning of Rule 502(a) or (b).

IV. CONCLUSION

For the foregoing reasons, Parneros's application (Docket # 74) is granted in part and denied in part.

SO ORDERED.

Dated: October 4, 2019
       New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

37