UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  9/3/2020
```

DEMOS PARNEROS,

                            Plaintiff,

     -v-

BARNES & NOBLE, INC.,

                            Defendant.

No. 18-cv-7834 (MKV)

<u>OPINION AND ORDER
GRANTING IN PART
AND DENYING IN PART
SUMMARY JUDGMENT</u>

<u>MARY KAY VYSKOCIL</u>, District Judge:

        Plaintiff Demos Parneros was the Chief Executive Officer of Defendant Barnes & Noble,

Inc.  Days before distributing equity payments for the year that he was CEO, the board of

directors of Barnes & Noble fired Parneros, citing several incidents that the directors believed

violated company policies.  The company refused to give Parneros his upcoming equity payment

or pay him any severance and issued a press release stating that he was fired for "violations of

the Company's policies."  Parneros asserts claims for breach of contract, defamation, and breach

of the covenant of good faith and fair dealing.  He argues that the leadership of Barnes & Noble

manufactured reasons to fire him, that he never violated any company policies, and that the press

release about his firing implied that he had engaged in sexual misconduct.  Barnes & Noble

disputes these allegations.  It also asserts counterclaims against Parneros.  Before the Court is the

motion of Barnes & Noble for partial summary judgment on Parneros's claims for defamation

and breach of the covenant of good faith and fair dealing.  For the reasons set forth below, the

motion for partial summary judgment is GRANTED in part and DENIED in part.

I.      BACKGROUND[1]

Barnes & Noble first hired Parneros as its Chief Operations Officer in November 2016.

Def. 56.1 ¶ 1.  In April 2017, the company promoted Parneros to Chief Executive Officer and

made him a member of the board of directors.  *Id.* ¶ 2.  His employment agreement, as amended

for his role as CEO, granted Parneros an annual award of equity valued at $3.6 million, with the

first payment set to vest on July 13, 2018.  Pl. 56.1 ¶ 89; *see also* Def. 56.1 ¶ 5; Keane Decl., Ex.

N [ECF #148-14 ("Empl. Agreement")].  Section 3.9 of the employment agreement provided for

certain severance payments if Parneros were terminated without cause, but not if he were

terminated for cause.  *See* Def. 56.1 ¶ 6; Pl. 56.1 ¶ 6; Empl. Agreement at 3.  It further provided

that he could be terminated for cause for a variety of reasons, including any "material breach of

this Agreement or of any other contractual duty to, written policy of, or written agreement with

the Company."  Def. 56.1 ¶ 4; Pl. 56.1 ¶ 4.

On July 2, 2018, the founder and executive chairman of the company, Leonard Riggio,

accompanied by counsel from the law firm Paul, Weiss, Rifkind, Wharton & Garrison LLP,

informed Parneros that he was being terminated for cause.  Pl. 56.1 ¶ 191.  Riggio told Parneros

that his firing was based on allegations that he had sexually harassed an executive assistant and

bullied the Chief Financial Officer of the company, Allen Lindstrom.  *See id.* Parneros later

---

[1] The facts are taken from the parties' Local Civil Rule 56.1 statements [ECF #149 ("Def. 56.1"), 160 ("Pl. 56.1")], the affidavits and declarations submitted in connection with this motion, and the exhibits attached thereto [ECF #148, 157].  Unless otherwise noted, where one party's 56.1 statement is cited, the other party does not dispute the fact asserted, has offered no admissible evidence to refute that fact, or merely disagrees with the inferences to be drawn from that fact.

learned that the board cited his behavior at a meeting with a potential acquirer as a third reason for his firing.  *See id.*

A.  The Accusation of Sexual Harassment

Barnes & Noble offers evidence that, on May 17, 2018, Parneros made a comment to an executive assistant about her height and moved behind her to stand back-to-back to compare heights, such that their shoulders were touching, while they were alone in his office.  Def. 56.1 ¶ 9; Keane Decl., Ex. A [148-1 ("EA Dep.") 198:20–200:22].  It offers testimony that, as he moved away, he pinched her neck.  EA Dep. 198:20–200:22.  Parneros maintains that they compared heights by standing side by side without touching as he was walking out of his office.  Pl. 56.1 ¶ 9; Clark Decl., Ex. 1, Parneros Dep. 13:16–14:23.

Parneros admits that, after the executive assistant returned from a weekend trip to Quebec City, Parneros showed her pictures from the website of a hotel in Quebec where he once stayed with his wife.  Pl. 56.1 ¶ 10.  There is no dispute that Parneros described the hotel as "charming" and "romantic" and said it puts you "in the right mood."  *Id.* ¶ 11–12.  Barnes & Noble offers evidence that Parneros also stood up and pulled the executive assistant towards him so that their cheeks touched, she pulled away, and he sat down and told her that "she look[ed] like the kind of girl who if he wined and dined would put out after that."  EA Dep.  216:14–218:16, 224:5–12.  Parneros says he never touched her.  Parneros Dep. 14:23.  There is no dispute that the executive assistant's notes about the interaction say "cheek on cheek," "I would have taken you here," and "I bet you're the kind of girl if I wined and dined would put out after that."  Def. 56.1 ¶¶ 13, 14.

However, Parneros denies that he made the statements or engaged in the conduct reflected in the notes and asserts that the notes are inadmissible.  Pl. 56.1 ¶¶ 13, 14.

Barnes & Noble offers evidence that, on May 23, 2018, the executive assistant spoke to Lindstrom, the CFO, about these interactions with Parneros.  Def. 56.1 ¶ 15.  It offers evidence that, the next day, Lindstrom brought the matter to General Counsel Bradley Feuer, who conducted an investigation.  *Id.* ¶ 16–17.  Specifically, Feuer met with the executive assistant. *Id*. ¶ 18.  Feuer then spoke with Mary Ellen Keating, the SVP of Corporate Communications, and asked her to help him with the investigation.  *Id.* ¶ 19.  Feuer and Keating brought the allegations to Riggio, and Keating and Riggio later met with the executive assistant.  *Id*. ¶¶ 19– 21.  Parneros contests that Barnes & Noble has provided evidence of an internal investigation and argues that a jury would be entitled to disregard the testimony of Lindstrom, Feuer, Keating, and Riggio because they are interested witnesses.  Pl. 56.1 ¶¶ 15–21.

It is undisputed that in late May or early June 2018, Riggio met with Parneros to tell him about the allegations that the executive assistant had made against him.  *Id.* ¶ 22.  Specifically, Parneros admits that Riggio told him that the executive assistant said Parneros stood back-to-back with her to compare heights, showed her pictures of a hotel that he said was romantic and "puts you in the right mood," touched her face, and said she seemed like the kind of person who would "put out" if he wined and dined her.  *Id*. ¶¶ 23–25.  Riggio also raised the possibility that the board would need to get involved.  Indeed, Parneros took notes during the meeting that included the phrases "put out," "romantic place," "puts you in the right mood," "face touching?," "back to back," and "Board will need to be involved."  *Id.* ¶ 26.  Parneros also admits that Riggio told him he felt that the executive assistant was credible.  *Id.* 28.  Parneros adds, however, that he denied touching the executive assistant and saying she would "put out."  *Id*. ¶ 26.  He offers

evidence that Riggio told Parneros that, even if what the executive assistant said were true, it was not a "big deal" and "definitely not a 'Me-Too thing.'"  *Id*. ¶ 26.  Parneros also offers evidence that he and Keating met with the executive assistant in order for Parneros to apologize.  *Id.* ¶ 103.  He cites Keating's testimony that she told Parneros that the executive assistant accepted his apology and that the matter was "over with."  *Id.* ¶ 104; Clark Decl. Ex. 7, Keating Dep. 229:17.  According to Parneros, after he apologized to the executive assistant, Riggio considered the matter "closed."  Pl. 56.1 ¶ 105.

It is undisputed that Barnes & Noble has a policy against sexual harassment that prohibits "unwelcome conduct, such as unwelcome or unsolicited sexual advances," including "touching" and "pinching," "conversations regarding sexual activities," and "other verbal, visual, or physical conduct of a sexual nature[.]"  Def. 56.1 ¶¶ 53, 54; Pl. 56.1 ¶¶ 53, 54.  Parneros maintains that he did not violate the policy.  Pl. 56.1 ¶ ¶ 53, 54.

B.  <u>The Accusation of Bullying</u>

It is undisputed that, on May 28, 2018, Lindstrom sent a self-evaluation to Parneros, the head of Human Resources, and Feuer complaining that had Parneros bullied him.  Def. 56.1 ¶¶ 35, 36; Pl. 56.1 ¶¶ 35, 36.  There is no dispute that the CFO wrote: "I am frequently berated by [Parneros] in front of others at meetings, and in one instance my schedules were actually thrown on the floor.  [He] has turned his back on me at meetings, and openly complains about finance in front of the team . . . . I feel bullied and find this behavior both unprofessional and unproductive. *Id*. ¶ 35. Parneros offers testimony that Lindstrom was incompetent and that Riggio, and other members of the board, agreed.  Pl. 56.1 ¶ 32, 34.  Parneros admits that, at a meeting in April 2018, he tossed papers on the ground and left the meeting.  *Id.* ¶ 33.  He denies that he berated or turned his back on Lindstrom.  *Id.* ¶ 35.  Parneros also offers evidence that, as early as July 2017,

Lindstrom reported to the head of HR and Feuer that his interactions with Parneros were causing Lindstrom "chest pains," but both the head of HR and Feuer simply told Lindstrom to "figure out a way to work" with Parneros.  *Id.* ¶ 34.  According to Parneros, he discussed Lindstrom's May 28, 2018 self-evaluation with Riggio, and Riggio said that the underperforming CFO was "trying to 'cover his ass.'"  *Id.* ¶ 37.

It is undisputed that Barnes & Noble has a "Core Values policy" that includes "Empathy" and "Teamwork."  Def. 56.1 ¶ 55; Pl. 56.1 ¶ 55.  Parneros maintains that he followed the Core Values Policy, while Riggio and others flouted it.  Pl. 56.1 ¶ 55.  He adds that the Employee Handbook containing the Core Values states that it "does not create an express or implied contract, bargain, or agreement."  *Id.*  The company's "Code of Business Conduct and Ethics," also "found in its Employee Handbook, includes an Equal Employment and Working Conditions provision," Def. 56.1 ¶ 56, which states: "You have a fundamental responsibility to show respect and consideration to your teammates" and the company "does not tolerate illegal discrimination or harassment of any kind."  Keane Decl., Ex. P [148-16 at 11].  Parneros maintains that he did not violate this provision.  Pl. 56.1 ¶ 56.

C.  The Potential Acquisition

The parties agree that, in May 2018, the board directed Parneros to pursue a deal with a potential acquiror.  *See* Def. 56.1 ¶¶ 39–41; Pl. 56.1 ¶¶ 39–41.  The parties agree that, leading up to a meeting on June 18, 2018, the potential acquiror stressed that the company needed to provide an explanation for a recent decline in sales and whether the sales issues were fixable. *See* Def. 56.1 ¶ 42; Pl. 56.1 ¶ 42.  Barnes & Noble offers evidence that, instead of reassuring the potential acquiror, Parneros was openly negative about the company.  Specifically, it cites the testimony of executives from both Barnes & Noble and the potential acquiror who attended the

meeting, Feuer's contemporaneous notes, and emails that attendees wrote a few days after the meeting, which state that Parneros said "it's an ugly mess," *id.* ¶ 45, and used "negative tones throughout," *id.* ¶ 47.  Parneros maintains that he was honest about the documented problems with the business and enthusiastic about initiatives to fix those problems.  Pl. 56.1 ¶ 45.  He also argues that the notes and emails are inadmissible.  *Id.* ¶¶ 45–49.  There is no dispute that, on June 19, 2018, the CEO of the potential acquiror informed Riggio that it was withdrawing from the deal based on the company's "unexpected and unexplained" decline in sales.  Def. 56.1 ¶ 50; Pl. 56.1 ¶ 50; Keane Decl., Ex. Y.

### D.  The Board Votes To Terminate Parneros

It is undisputed that, on June 27, 2018, the board of directors met to discuss Parneros's conduct.  Def. 56.1 ¶ 58; Pl. 56.1 ¶ 58.  It is also undisputed that, in advance of the meeting, the board received an excerpt of Lindstrom's self-evaluation and an email describing Parneros's conduct at the June 18, 2018 meeting with the potential acquiror.  Def. 56.1 ¶ 59; Pl. 56.1 ¶ 59.  Barnes & Noble offers testimony that Riggio, Feuer, Keating, and Lindstrom also spoke with certain members of the board about the executive assistant's allegations of sexual harassment in advance of the board meeting.  Def. 56.1 ¶¶ 60, 61.  It is undisputed that the minutes of the June 27, 2018 board meeting reflect that Riggio spoke to the board about "the key facts relating to" (1) "a complaint made by a female employee" alleging that Parneros "sexually harassed her"; (2) "a complaint that Mr. Parneros had bullied a member of the executive management team"; and (3) allegations that Parneros "worked to undermined the deal" with the potential acquiror. Def. 56.1 ¶ 65; Pl. 56.1 ¶ 65.  It is also undisputed that the minutes reflect that Riggio stated that, in the light of these issues, the board should terminate Parneros.  Def. 56.1 ¶ 66; Pl. 56.1 ¶ 66.  It is undisputed that, after a discussion, the board voted unanimously to terminate Parneros for

"sexual harassment, bullying behavior, and Parneros's conduct with respect to the [deal with the potential acquiror]."  Def. 56.1 ¶¶ 67–68; Pl. 56.1 ¶¶ 67–68.  It is undisputed that several directors testified that they understood Parneros's conduct to violate company policies and breach fiduciary duties.  Def. 56.1 ¶¶ 70–74; Pl. 56.1 ¶ 70–74; Keane Decl. Ex. G, Ferrara Dep. 322:7–324:6; Ex. E, Van Der Zon Dep. 303:22–304:17; Ex. F, Guenther Dep. 274:11–275:13; Riggio Dep. 294:23–295:22.  Parneros, however, denies the truth of the allegations, denies that "Riggio genuinely believed them," and denies that the board had a reasonable basis for believing that he violated company policies.  Pl. 56.1 ¶¶ 65–68, 70–74.

It is undisputed that, on July 3, 2018, Barnes & Noble issued a press release about firing Parneros that stated:

> The Board of Directors of Barnes & Noble, Inc. today announced the termination of its Chief Executive Officer, Demos Parneros, for violations of the Company's policies.  This action was taken by the Company's Board of Directors who were advised by the law firm Paul, Weiss, Rifkind, Wharton & Garrison LLP.  Mr. Parneros' termination is not due to any disagreement with the Company regarding its financial reporting, policies or practices or any potential fraud relating thereto.  Mr. Parneros will not receive any severance payment and he is no longer a member of the Company's Board of Directors.

Def. 56.1 ¶ 77; Pl. 56.1 ¶ 77; Keane Decl., Ex. EE [ECF #148-31].  An earlier draft contained a reference to sexual harassment, which was removed.  Def. 56.1 ¶ 79; Pl. 56.1 ¶ 79.

Parneros maintains that the press release was widely interpreted to mean that he was fired for sexual harassment.  Pl. 56.1 ¶ 87.  He cites the testimony of one member of the board of directors who agreed that the press release could be interpreted that way, even though he did not think that was the only interpretation.  *Id*. ¶ 79.  Parneros offers his own testimony that family, friends, and co-workers told him that they understood the press release to say that he was fired for sexual harassment.  *Id*. ¶ 194.  Parneros also cites two articles and a few online comments that implied or speculated that he might have been fired for sexual harassment.  *Id.* ¶ 195.

Specifically, he cites one article in the *Washington Post* that mentioned Parneros's firing

alongside the firing of a CEO who had an affair with a contractor, *see* Keane Decl., Ex. HH

[ECF #148-34 at 9–10], and one story in the *New York Times* that included Parneros's name

among a list of more than 200 "#Me Too" firings, *see* Audrey Carson et al., *#MeToo Brought*

*Down 201 Powerful Men. Nearly Half of Their Replacements Are Women*, N.Y. TIMES (Oct. 23,

2018), https://www.nytimes.com/interactive/2018/10/23/us/metoo-replacements.html.  Parneros

submits that one comment to an article posted by CNBC said, "Reading between the lines, my

money's on sexual harassment."  Another commenter added, "Yeah, my money's on sexual

harassment or even sexual assault."  A comment on a website for booklovers said, "But

seriously, if advice from lawyers was involved, and it wasn't something involving finance or

fraud, it could have been some impending scandal with the potential to give B&N a huge black

eye if it came out while Parneros was still in the driver's seat.  And if this is the sort of thing that

could take Parneros from zero to fired in less than a week, it must be pretty darned serious.

Sexual harassment, perhaps?"  Pl. 56.1 ¶ 195.

　　　　Parneros initiated this action by filing a complaint, which he later amended [ECF #16

("FAC")].  The First Amended Complaint asserts three causes of action.  First, Parneros asserts a

claim for breach of contract, alleging that Barnes & Noble did not have cause to fire him.  FAC

¶¶ 84–87.  Second, he asserts a claim for defamation.  *Id.* ¶¶ 88–92.  Third, he asserts a claim for

breach of the covenant of good faith and fair dealing.  *Id.* ¶¶ 93–98.  Parneros seeks damages,

including the equity and severance payments he would have received under his contract had he

not been fired.  In its answer, Barnes & Noble denies Parneros's allegations and asserts

counterclaims against him [ECF #23 ("Ans.")].  Specifically, it asserts a claim for breach of the

fiduciary duties of loyalty and good faith and a faithless servant claim, both based on allegations

that Parneros "sabotage[d]" the potential acquisition of the company.  Ans. ¶ 156.  It seeks a declaratory judgment that Barnes & Noble had cause to fire Parneros, damages associated with the failed potential acquisition of the company, and attorneys' fees and costs associated with this action.

Before the Court is the fully-submitted motion of Barnes & Noble for partial summary judgment on Parneros's claims for defamation and breach of the covenant of good faith and fair dealing [ECF #146, 147 ("Def. Mem."), 148, 149, 150, 151, 156, 157, 158, 159, 160, 161, 163, 164 ("Pl. Mem."), 165, 166 ("Def. Reply")].

## II.     LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A court can conclude that there is no genuine dispute as to any material fact in three circumstances.  *See Johnson v. Nat'l Football League Players Ass'n*, No. 17-cv-5131 (RJS), 2019 WL 3531957, at *2 (S.D.N.Y. Aug. 2, 2019).  First, the parties agree on all facts (that is, there are no disputed facts).  Second, the parties disagree on some or all facts, but no reasonable fact-finder could accept the non-moving party's version of the facts (that is, there are no *genuinely* disputed facts).  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).  Third, the parties disagree on some or all facts, but even on the non-moving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, a court may not weigh evidence or make credibility assessments.  *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996).  It must draw

all reasonable inferences in favor of the party opposing summary judgment.  *Id.*  However, the

non-moving party must provide "hard evidence," *D'Amico v. City of New York*, 132 F.3d 145,

149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder &*

*Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (quoting *R.B. Ventures, Ltd. v. Shane*,

112 F.3d 54, 59 (2d Cir. 1997)).  "Conclusory allegations, conjecture, and speculation" do not

support reasonable inferences.  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

Moreover, a mere "scintilla of evidence in support of the [non-moving party's] position" is not

enough to create a genuine dispute.  *Anderson*, 477 U.S. at 252.

III.   ANALYSIS

A.  Barnes & Noble Is Entitled to Judgment as a
    Matter of Law on Parneros's Defamation Claim.

      Parneros brings a defamation claim based on the press release about his termination.  The

parties agree that New York law governs the claim.  New York requires a libel plaintiff to prove

five elements: (1) a written defamatory statement of fact about the plaintiff; (2) publication to a

third party; (3) defendant's fault; (4) falsity of the defamatory statement; and (5) defamation *per*

*se* or injury to plaintiff.  *See Meloff v. New York Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001);

*Gargiulo v. Forster & Garbus Esqs.*, 651 F. Supp. 2d 188, 192 (S.D.N.Y. 2009) (citing *Dillon v.*

*City of New York*, 261 A.D.2d 34, 38 (1st. Dept. 1999)).  Barnes & Noble is entitled to judgment

as matter of law on Parneros's defamation claim because there is no genuine dispute that the

press release is substantially true.

      Publishing a statement about a "discharge from employment . . . [may] be defamatory if

'the publication contains an insinuation that the discharge was for some misconduct."  *Davis v.*

*Ross*, 754 F.2d 80, 84 (2d Cir. 1985) (quoting *Nichols v. Item Publishers*, 309 N.Y. 596, 601

(1956)).  Under New York law, however, "it is 'fundamental that truth is an absolute, unqualified

defense to a civil defamation action,' and 'substantial truth' suffices to defeat a charge of libel."
*Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 301 (2d Cir. 1986); *see also Chau v. Lewis*,
771 F.3d 118, 129–30 (2d Cir. 2014); *Carter v. Visconti*, 233 A.D.2d 473, 474, 650 N.Y.S.2d 32,
33 (2d Dep't. 1996) (the absolute defense applies as long as the publication is "substantially
true"). New York courts hold that "[a] statement is substantially true if the statement would not
'have a different effect on the mind of the reader from that which the pleaded truth would have
produced.'" *Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 366 (S.D.N.Y.1998) (quoting
*Fleckenstein v. Friedman*, 266 N.Y. 19, 193 N.E. 537, 538 (1934)).

There is no dispute about the truth of most of the statements in the press release. There is
no dispute that Parneros was terminated. Def. 56.1 ¶ 75; Pl. 56.1 ¶ 75. There is no dispute that
the "action was taken by the Company's Board of Directors." Def. 56.1 ¶ 80; Pl. 56.1 ¶ 80.
There is no dispute that the board was "advised by the law firm Paul, Weiss." Def. 56.1 ¶ 82; Pl.
56.1 ¶ 82. There is no dispute that Parneros's termination had nothing to do with financial
reporting or fraud. Def. 56.1 ¶ 83; Pl. 56.1 ¶ 83. There is no dispute that he did not receive any
severance payment. Def. 56.1 ¶ 84; Pl. 56.1 ¶ 84. And there is no dispute that Parneros was no
longer a member of the company's board of directors after he was terminated. Def. 56.1 ¶ 85; Pl.
56.1 ¶ 85.

The parties disagree only about whether there is a genuine dispute that Parneros was
terminated "for violations of the Company's policies." Barnes & Noble contends that Parneros
"admits that he was terminated 'for violations of the Company's policies.'" Def. Mem. at 10.
Parneros responds that he admits only that is what he was "told" about why he was being
terminated. Pl. Opp. at 9; Pl. 56.1 ¶ 81. He asserts that he "was not fired 'for violations of the
Company's policies,' because he never violated any policies." Pl. Opp. at 8.

There is no *genuine* dispute about the truth of the statement that Parneros was terminated "for violations of the Company's policies."  That statement is substantially true because it would make no difference in the mind of the reader if the press release had stated that the board of directors voted to terminate Parneros for violations of company policies, which is literally true and not in dispute.  *See Jewell*, 23 F. Supp. 2d at 366.  It is undisputed that the board "unanimously decided to terminate Parneros for . . . sexual harassment, bullying behavior, and Parneros's conduct with respect to the [failed deal with the potential acquiror]."  Def. 56.1 ¶ 68; Pl. 56.1 ¶ 68.  Parneros admits that "those are the grounds the Board stated."  Pl. 56.1 ¶ 68.  He also admits that multiple members of the board testified that they believed his conduct violated company policies.  *Id*. ¶¶ 70, 71, 72, 73, 74; *see* Keane Decl. Ferrara Dep. 322:7–324:6; Van Der Zon Dep. 303:22–304:17; Guenther Dep. 274:11–275:13; Riggio Dep. 294:23–295:22.

Parneros argues that the Court cannot read the press release "as simply repeating what the Board stated as why it fired [him]."  Pl. Opp. 9.  The Court disagrees.  The press release expressly professes to describe an announcement by the board about Parneros's firing ("The Board of Directors of Barnes & Noble, Inc. today announced the termination of its Chief Executive Officer, Demos Parneros, for violations of the Company's policies.") [ECF #148-31]. Perhaps the board's decision was unfair, and perhaps Parneros did not engage in the conduct of which he was accused, or perhaps that conduct did not violate any company policies.  If so, the appropriate legal challenges are Parneros's claims for breach of contract and breach of the covenant of good faith and fair dealing.  If the Court were to accept Parneros's theory of defamation, every public company that fired a director for cause would be exposed to a libel lawsuit if the director disagreed with its decision to fire him.  *See* SEC Form 8-K, Item 5.02(a) (requiring that if a director is removed for cause, a public company must disclose "a brief

description of the circumstances representing the disagreement that [it] believes caused . . . the director's . . . removal"). Parneros's quarrel is with his firing, not the substantially truthful statement about the board's action.

Parneros also advances a theory of defamation by implication. Under that doctrine, the plaintiff need not show that "a direct statement is, in and of itself, false; rather [liability] is premised on 'false suggestions, impressions and implications arising from otherwise truthful statements. . . . [D]efamation by implication can include statements whose falsity is based not on what was said, but rather 'by omitting or strategically juxtaposing key facts.'" *Macineirghe v. Cty. of Suffolk*, No. 13-cv-1512, 2015 WL 4459456, at *13 (E.D.N.Y. July 21, 2015); *see also Herbert v. Lando*, 781 F.2d 298, 307 (2d Cir. 1986); *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 464 (S.D.N.Y. 2012). Courts require an "especially rigorous showing that (1) the language may be reasonably read to impart the false innuendo, and (2) the author intends or endorses the inference." *Biro*, 883 F. Supp. 2d at 466; *see also Kavanagh v. Zwilling*, 997 F. Supp. 2d 241, 249 (S.D.N.Y.), *aff'd*, 578 F. App'x 24 (2d Cir. 2014).

Parneros stresses that the press release about his firing was published "in the context of the Me-Too movement." Pl. Opp. at 11. He argues that because the company included statements about the use of outside counsel, denying Parneros severance, and removing him from the board, the clear implication was that Parneros "was fired for serious misconduct including sexual harassment." Pl. Opp. at 12; *accord id.* at 15–16. He adds that "multiple third parties saw the Press Release as charging Parneros with sexual harassment." *Id*. at 13. Barnes & Noble responds that the press release does not implicitly accuse Parneros of sexual harassment, because it says nothing about sexual harassment and could refer to violations of any number of company policies. Barnes & Noble further argues that the press release does not imply anything false

because Parneros was indeed fired for violating company policies, including its policy on sexual harassment.

The Court agrees with Barnes & Noble.  Even if the press release could be read to imply that he was fired for sexual harassment, Parneros cannot show that it contained a "false innuendo."  *Biro*, 883 F. Supp. 2d at 466.  As explained above, the uncontested evidence shows that among the reasons the board voted to fire Parneros was sexual harassment.  Accordingly, the press release does not contain a false statement or inuendo.  Therefore, the motion of Barnes & Noble for summary judgment on Parneros's defamation claim is granted.

### B. There Are Triable Issues with Respect to Parneros's Claim for Breach of the Covenant of Good Faith and Fair Dealing.

Under New York law, a covenant of good faith and fair dealing is implied in all contracts. *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc*., 769 F.3d 807, 817 (2d Cir. 2014); *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002).  The covenant demands "that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007) (quoting *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389, 663 N.E.2d 289, 291 (1995)).  A claim for breach of the covenant lies "only where one party's conduct, though not breaching the terms of the contract in a technical sense, nonetheless deprived the other party of the benefit of its bargain."  *Pearce v. Manhattan Ensemble Theater, Inc.*, 528 F. Supp. 2d 175, 180–81 (S.D.N.Y. 2007).

"Where the contract contemplates the exercise of discretion," the covenant of good faith and fair dealing "includes a promise not to act arbitrarily or irrationally in exercising that discretion."  *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011) (quoting *Dalton*, 87 N.Y.2d at 389).  The covenant does not "undermine a party's general right to act on its own interests in a

way that may incidentally lessen the other party's expected benefit." *Sec. Plans, Inc*, 769 F.3d at 817 (quoting *M/A–COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990)).  Rather, "a defendant violates the covenant of good faith and fair dealing only when he acts with some improper motive." *Wagner v. JP Morgan Chase Bank*, No. 06-cv-3126 (RJS), 2011 WL 856262, at *4 (S.D.N.Y. Mar. 9, 2011) (internal quotation marks and citation omitted); *Longhi v. Lombard Risk Sys., Inc.*, No. 18-cv-8077 (VSB), 2019 WL 4805735, at *9 (S.D.N.Y. Sept. 30, 2019) ("The tort requires an element of bad faith.").  However, a plaintiff need not provide direct evidence of motive to deprive him of the fruits of his contract.  Instead, the defendant's bad faith can be inferred from evidence that its actions were arbitrary and defied reasonable expectations. *See Fishoff*, 634 F.3d at 653.

The "covenant is violated when a party promises commissions or profits and then does not act in good faith to permit such commissions or profits to be earned, thereby depriving the other party of the benefit of the bargain." *Wagner*, 2011 WL 856262, at *3 (quoting *Keene Corp. v. Bogan*, 1990 WL 1864, at *14 (S.D.N.Y. Jan. 11, 1990)).  Whether a party has breached the covenant depends on "not only the express language of the parties' contract, but also any course of performance or course of dealing that may exist between the parties." *Tractebel Energy Mktg., Inc.*, 487 F.3d at 98 (quoting 23 Williston on Contracts § 63:22 (4th ed.)).  "Thus, whether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is ordinarily a question of fact to be determined by the jury or other finder of fact." *Id.*  (quoting Williston § 63:22).

Parneros claims that Barnes & Noble violated the implied covenant of good faith and fair dealing by firing him mere days before the equity payment for the prior year, when he served as CEO, was set to vest.  Barnes & Noble argues that it is entitled to judgment as a matter of law

16

because Parneros negotiated an employment agreement that gave it discretion to terminate him at any time and did "not provide for the grant of any *new* equity awards" after his termination, with or without cause.  Def. Mem. at 22 (emphasis added).  The company's arguments are unpersuasive.  It suggests that a high-level executive can never succeed on a claim for breach of the covenant, even if a company intentionally times his termination to avoid triggering payment obligations, citing *Woodard v. Reliance Worldwide Corp.*, 18-cv-9058 (RA), 2019 WL 3288152 (S.D.N.Y. July 22, 2019).  Barnes & Noble misunderstands *Woodward*.  In that case, the parties specifically negotiated a contract that provided a bonus if, and only if, the plaintiff were terminated within seven days of an acquisition, and the court explained that it could not rewrite that specifically negotiated provision.  *Id*. at *3.  But Parneros's employment agreement did not specifically tie his equity to the *timing* of his termination.  Rather, Barnes & Noble exercised its discretion to fire Parneros at any time, and the Second Circuit has made clear that the covenant of good faith and fair dealing "includes a promise not to act arbitrarily or irrationally in exercising [such] discretion."  *Fishoff*, 634 F.3d at 653.  Thus, Parneros has a claim that the decision to fire him right before he would receive the equity he earned over the previous year, "though not breaching the terms of the contract in a technical sense, nonetheless deprived [him] of the benefit of its bargain."  *Pearce*, 528 F. Supp. 2d at 180–81.

Parneros raises a triable question as to whether the timing of his firing was arbitrary. Barnes & Noble argues that the timing of his firing was based on the timing of his alleged misconduct, Def. Mem. at 25, but Parneros offers evidence that the leadership of Barnes & Noble knew about and dismissed the allegations against him before it cited those allegations as reasons to fire him.  Specifically, Parneros offers evidence that Riggio assured him that, even if everything the executive assistant said were true, her complaint was "not a 'big deal.'"  Pl. 56.1 ¶

26.  He cites Keating's testimony that, after Parneros apologized, Keating told him the problem

was "over with."  *Id.* ¶ 104; Keating Dep. 229:17.  Riggio likewise considered the matter

"closed."  Pl. 56.1 ¶ 105.  Parneros also offers evidence that Lindstrom's complaints of bullying

were nothing new.  Lindstrom testified that, a year before Parneros was fired, Lindstrom reported

that Parneros's treatment was causing him "chest pains," and the head of HR and Feuer, the

general counsel, responded only that Lindstrom needed to "figure out a way to work with"

Parneros.  Pl. 56.1 ¶ 32; Lindstrom Dep. 237:1–14.  According to Parneros, when he spoke to

Riggio about Lindstrom's self-evaluation, in which Lindstrom stated that he felt bullied, Riggio

responded that the underperforming CFO was just "trying to 'cover his ass.'"  Pl. 56.1 ¶ 37;

Parneros Decl. ¶ 16.  With respect to the timing of the June 18, 2018 meeting that Parneros

allegedly mishandled with the potential acquirer, Riggio testified that he had no intention of

recommending that the board fire Parneros as of that afternoon.  Riggio Dep. 255:21–24.  Of

course, Barnes & Noble might be able to convince the trier of fact that the timing of Parneros's

firing was based on the timing of his conduct, or was not arbitrary because it was based on some

other "business justification."  *Sec. Plans, Inc*, 769 F.3d at 820.  Perhaps learning of the loss of

the potential acquisition was the last straw.  However, it would be up to the trier of fact to decide

whether to believe that, or to accept Parneros's argument that the deal was dead in the water

anyway, and the leadership decided to push him out instead of paying him.  Resolving these

competing views will require weighing Parneros's testimony against that of Riggio and other

members of the board, and such "[c]redibility determinations are inappropriate at the summary

judgment stage."  *Id*.

IV.    <u>CONCLUSION</u>

For the reasons set forth above, the motion for partial summary judgment is GRANTED with respect to Parneros's defamation claim.  The motion is DENIED with respect to the claim for breach of the covenant of good faith and fair dealing.  The parties shall appear for a final pretrial conference on Thursday, October 8, 2020 at 10:30 AM.  By October 1, 2020, the parties shall submit a proposed Joint Pretrial Order and other required pretrial filings in accordance with the Court's Individual Rules of Practice in Civil Cases.

**SO ORDERED.**

**Date:   September 3, 2020**
       **New York, NY**

**MARY KAY VYSKOCIL**
**United States District Judge**